1  D. Dennis La (#237927)
     dla@afrct.com
2  Michael Rapkine (#222811)
     mrapkine@afrct.com
3  ANGLIN, FLEWELLING, RASMUSSEN,
   CAMPBELL & TRYTTEN LLP
4  301 N. Lake Avenue, Suite 1100
   Pasadena, California  91101-4158
5  Telephone: (626) 535-1900
   Facsimile:  (626) 577-7764
6
   Attorneys for Defendants
7  BLUEGREEN VACATIONS UNLIMITED,
   INC., THE CLUB AT BIG BEAR VILLAGE,
8  THE CLUB AT BIG BEAR VILLAGE MASTER
   ASSOCIATION, THE CLUB AT BIG BEAR
9  VILLAGE FRACTIONAL OWNERS
   ASSOCIATION, BLUEGREEN RESORTS
10 MANAGEMENT, INC., BLUEGREEN
   VACATIONS CORPORATION, AND BFC
11 FINANCIAL CORPORATION

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14

15 RAYMOND SCOTT and CARLA SCOTT,      CASE NO.:

16          Plaintiffs,

17     v.                              **NOTICE OF REMOVAL BY
                                       DEFENDANTS PURSUANT TO
18 BLUEGREEN VACATIONS UNLIMITED,      28 U.S.C. §§ 1441(b) & 1331 [FEDERAL
   INC; THE CLUB AT BIG BEAR VILLAGE;  QUESTION] AND, ALTERNATIVELY,
19 THE CLUB AT BIG BEAR VILLAGE        § 1332 [DIVERSITY JURISDICTION]**
   MASTER ASSOCIATION; THE CLUB AT
20 BIG BEAR VILLAGE FRACTIONAL
   OWNERS ASSOCIATION; BLUEGREEN
21 RESORTS MANAGEMENT, INC;
   VACATION TRUST, INC; BLUEGREEN
22 VACATIONS CORPORATION;
   BLUEGREEN RESORTS; BLUEGREEN
23 VACATION CLUB; BBX CAPITAL
   CORPORATION; BFC FINANCIAL
24 CORPORATION; and SHAWN B. PEARSON
   and DOES 1 through 10,
25
          Defendants.
26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1    TO PLAINTIFFS, THE CLERK OF THE ABOVE-ENTITLED COURT, AND THE

2    HONORABLE UNITED STATES DISTRICT JUDGE, AS ASSIGNED:

3    PLEASE TAKE NOTICE that defendants Bluegreen Vacations Unlimited, Inc., The

4    Club At Big Bear Village, The Club At Big Bear Village Master Association, The Club At Big

5    Bear Village Fractional Owners Association, Bluegreen Resorts Management, Inc., Bluegreen

6    Vacations Corporation, and BFC Financial Corporation (collectively "Defendants") hereby

7    provide this Notice of Removal pursuant to 28 U.S.C. §§ 1441(b) & 1331, based on federal

8    question jurisdiction and/or alternatively, based on diversity of citizenship pursuant to 28 U.S.C.

9    § 1332.  The action is hereby removed to this Court from the State Court, as more particularly set

10   forth below.

11              **1.    THE STATE COURT ACTION.**

12   On October 4, 2019, plaintiffs Raymond Scott and Carla Scott ("Plaintiffs"), commenced

13   an action in the Superior Court of the State of California for the County of Kern, Case No. BCV-

14   19-102842 (the "State Court Action").

15   Defendants have not appeared in the State Court Action.  A copy of the Complaint filed

16   in the State Court Action is attached hereto as **Exhibit A**.  Attached collectively hereto as

17   **Exhibit B** are all other documents filed in the State Court Action which are in Defendants'

18   possession.

19   This is the second lawsuit filed by Plaintiffs in connection with the subject matter of the

20   State Court Action.  Plaintiffs previously filed a Complaint on March 15, 2018 in Kern County

21   Superior Court which was removed to this District Court on May 9, 2018, Case No. 1:18-CV-

22   00649-AWI-JLT, the Hon. Anthony W. Ishii presiding (the "First Action").  Copies of the

23   Complaint in the First Action and the Motion to Dismiss filed by defendant Bluegreen Vacations

24   Unlimited, Inc. on May 16, 2018 are attached hereto as **Exhibit C**.  Attached as **Exhibit D** is a

25   copy of the Request for Judicial Notice filed in support of the Motion to Dismiss attaching the

26   alleged "unregistered securities" contracts in this matter.  Attached as **Exhibit E** is a copy of the

27   Court's November 21, 2018 Order granting the Motion to Dismiss in the First Action.  Attached

28   as **Exhibit F** is a copy of Plaintiffs' voluntary dismissal filed on December 18, 2018.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1              **2.    FEDERAL QUESTION JURISDICTION.**

2         Cases filed in state court may be removed to federal court where the district court has

3    original subject matter jurisdiction over the case.  28 U.S.C. § 1441(a).  "The existence of federal

4    question jurisdiction is ordinarily determined from the face of the complaint."  *Sparta Surgical*

5    *Corp. v. National Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1211 (9th Cir. 1998).  Under the

6    well-pleaded complaint rule, a defendant may remove a case to federal court if "the plaintiff's

7    complaint establishes that the case 'arises under' federal law."  *Franchise Tax Bd. v.*

8    *Construction Laborers Vacation Trust*, 463 U.S. 1, 10 (1983) (emphasis omitted); *see also,*

9    *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (stating that federal jurisdiction is

10   appropriate when it is presented on the face of plaintiff's well-pleaded complaint); *Duncan v.*

11   *Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996) (same).

12        This Court has jurisdiction of the instant action pursuant to the Securities Litigation

13   Uniform Standards Act of 1988 ("SLUSA") and 15 U.S. Code §§ 77p(b)-(c) and 77v because

14   Plaintiffs allege claims both under the federal Securities Exchange Act of 1933 and the

15   California Corporations Code.  "[A] case that includes federal claims is deemed to arise under

16   federal law for purposes of the general removal statute, 28 U.S.C. § 1441, even though it also

17   contains related claims that are based on state law…The same is true with respect to § 77v. A

18   case that contains one or more [1933] Act claim is deemed to arise under the Act for purposes of

19   § 77v even if it also includes state law claims that make the case removable under § 77p(c).

20   SLUSA's amendment to § 77v [] was needed to eliminate any doubt about the removability of

21   cases that include both state law claims and otherwise nonremovable claims based on the [1933]

22   Act [alone]."  *Rajasekaran v. CytRx Corp.,* 2014 U.S. Dist. LEXIS, 124550, *8, n. 12 (C.D. Cal.

23   Aug. 21. 2014).

24        Here, the Complaint seeks, among other relief, "[i]njunctive relief prohibiting Defendants

25   from continuing to market and sell unregistered securities in violation of Sections 5(a), 5(c),

26   12(a)(1), and 15(a) of the Securities Act [sic] Section 25160, 25164, and 25165 of the California

27   Corporations Code" (Comp., Prayer for Relief ¶ 2) implicating damages not only on behalf of

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  themselves but other potential unnamed parties (*see* Comp. ¶ 75).[1]  Because Plaintiffs seek such

2  relief through their state law causes of action, *e.g.,* violations of California Corporations Code §§

3  25160, 25164, and 25165, in addition to federal claims under the Securities Exchange Act of

4  1933, the action is removable.  *Madden v. Cowen & Co.*, 576 F.3d 957, 965 (9th Cir. 2009) (case

5  removable where it is "based on the statutory or common law of any state") (internal quotations

6  omitted); *Rajasekaran, supra,* at *8 ("the amendment to the jurisdictional provision makes clear

7  when a plaintiff asserts claims under the 1933 Act alongside precluded state law claims, the

8  entire action is removable notwithstanding the general bar to removal of 1933 Act claims."); *see*

9  *Cf. Harper v. Smart Techs., Inc.,* 2012 U.S. Dist. LEXIS 191130, * 6 (N.D. Cal. Sept. 28, 2012)

10  ("In contrast, where, as here, the action only alleges claims under the 1933 Act, as opposed to

11  state law, the 1933 Act's removal bar controls and precludes removal of the action."); *Young v.*

12  *Pacific Biosciences of California, Inc.*, 2012 U.S. Dist. LEXIS 33695, at **1-2 (N.D. Cal. Mar.

13  13, 2012) (remanding action on the ground that "cases alleging claims only under the 1933 Act

14  cannot be removed from state court").

15      Federal law applies accordingly and renders the State Court Action removable under the

16  foregoing authorities.  *In re Tyco Int'l, Ltd.*, 322 F. Supp. 2d 116, 120 n. 7 (D.N.H. 2004).

17  **3.   DIVERSITY OF CITIZENSHIP JURISDICTION.**

18      Alternatively, this Court has jurisdiction of this case under 28 U.S.C. § 1332 because the

19  citizenship of the relevant parties is entirely diverse and the amount in controversy exceeds

20  $75,000.

21  **i.   Plaintiffs' Citizenship.**

22      Plaintiffs are California citizens, based on domicile, as they plead residency in

23  Bakersfield, California (Comp., ¶ 11).

24      Upon information and belief, plaintiffs in this action reside in California with the

25  intention to remain indefinitely.  "A person's domicile is her permanent home, where she resides

26

27  [1] It appears the Complaint in the State Court Action filed by Plaintiffs is copied from a class action complaint filed in *Joseph M. Dropp et al. v. Diamond Resorts International, Inc. et al.*

28  filed in the United States District Court, District of Nevada, on February 9, 2018.  (**Exhibit G** hereto.)

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  with the intention to remain or to which she intends to return." See e.g., *Kanter v. Warner-*

2  *Lambert Co.*, 265 F.3d 853, 857 (9th Cir. Cal. 2001); *Heinz v. Havelock*, 757 F. Supp. 1076,

3  1079 (C.D. Cal. 1991) (residence and property ownership is a factor in domicile for diversity

4  jurisdiction); *State Farm Mut. Auto Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994)

5  ("Residence alone is not the equivalent of citizenship, **but the place of residence is prima facie**

6  **the domicile**."). (emphasis added).

7      **ii.**   **Bluegreen Vacations Unlimited, Inc.'s Citizenship.**

8      Defendant Bluegreen Vacations Unlimited, Inc. ( "BVU") is a Florida citizen, based on

9  its state of incorporation and principal place of business. As set forth in the Declaration of D.

10  Dennis La filed concurrently herewith, BVU is incorporated under Florida law with its principal

11  place of business located in Boca Raton, Florida. Accordingly, BVU is a citizen of Florida for

12  diversity purposes pursuant to 28 U.S.C. § 1332(c)(1).

13      **iii.**   **The Remaining Defendants' Citizenship Should Be Ignored For Diversity**

14          **Jurisdiction.**

15      With respect to the remaining defendants – specifically The Club At Big Bear Village,

16  The Club At Big Bear Village Master Association, The Club At Big Bear Village Fractional

17  Owners Association, Bluegreen Resorts Management, Inc., Bluegreen Vacations Corporation,

18  and BFC Financial Corporation (collectively "Fraudulently Joined Defendants") – their

19  citizenship should be ignored as they are fraudulently joined in this action.

20      "[F]raudulently joined defendants will not defeat removal on diversity grounds."

21  *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998); *Morris v. Princess Cruises,*

22  *Inc.*, 236 F.3d 1061, 1067-68 (9th Cir. 2001) ("one exception to the requirement of complete

23  diversity is where a non-diverse defendant has been 'fraudulently joined.'"). Joinder of a non-

24  diverse defendant is fraudulent if "the plaintiff fails to state a cause of action against the [non-

25  diverse] defendant, and the failure is obvious according to the settled rules of the state."

26  *Hamilton Materials, Inc., v. Dow Chem. Co.*, 494 F.3d 1203, 1206 (9th Cir. 2007) (quoting

27  *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987). Fraudulent joinder is

28  also conclusive where it is demonstrated that "there is no possibility that the plaintiff will be able

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1   to establish a cause of action in state court against the alleged sham defendant." *Good v.*

2   *Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 807 (N.D. Cal. 1998).  Similarly, removing a

3   defendant may submit facts showing that the resident defendant has "'no real connection with the

4   controversy.'"  *Ritchey*, 139 F.3d at 1318 (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S.

5   92, 97-99 (1921)).

6       When testing the applicability of federal diversity jurisdiction, the Court is not limited to

7   the four corners of the pleadings.  *West America Corp. v. Vaughan-Bassett Furniture Co., Inc.*,

8   765 F.2d 932, 936 (9th Cir. 1985); *Charlin v. Allstate Ins., Co.*, 19 F. Supp. 2d 1137, 1140 (C.D.

9   Cal. 1998) (to ascertain whether a joinder is fraudulent, this Court may "look beyond the

10   pleadings").

11       In the instant matter, Plaintiffs cannot state a viable claim against any of the Fraudulently

12   Joined Defendants in connection with their claims under the Securities Exchange Act of 1933

13   ("1933 Act") and/or the California Corporations Code.  The Complaint alleges that "securities

14   sold in the United States [shall] be registered with the United States Securities and Exchange

15   Commission ("SEC")" and that the "SEC regulations mandate that any issuer of a security file a

16   prospectus which in turn must provide extensive, detailed information regarding, inter alia, risk

17   factors, ratio of earnings to fixed charges, use of proceeds, determination of offering price, plan

18   of distribution, and any potential conflicts of interest of the named experts and counsel."  (Comp.

19   ¶¶ 1, 90.)  Section 2(a)(4) of the 1933 Act defines the term "issuer" as: "every person who issues

20   or proposes to issue any security…"

21       Here, however, there is only one purported "issuer" of the securities alleged in the

22   Complaint: BVU.  As the Court is aware from dismissal of the First Action, the subject contracts

23   at issue in the instant case are between BVU and Plaintiffs only.  (*See* **Exhibit D** hereto.)  Thus

24   any prayer for relief "[g]ranting Plaintiffs the right to rescind their purchases of

25   points/memberships as set forth herein" (Prayer ¶ 3) can be granted by BVU only – and not any

26   of the named Fraudulently Joined Defendants: The Club At Big Bear Village, The Club At Big

27   Bear Village Master Association, The Club At Big Bear Village Fractional Owners Association,

28   Bluegreen Resorts Management, Inc., Bluegreen Vacations Corporation, and BFC Financial

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  Corporation.  Likewise, any "compensatory damages" (Prayer ¶ 4) is attributable to damages
2  arising from the alleged unregistered securities transactions, which again is between Plaintiffs
3  and BVU only.  (**Exhibit D**.)  The pleadings are silent as to what role any of the other defendants
4  played in allegedly "issuing" the purported "unregistered" securities.  They should be
5  disregarded for diversity purposes.

6      It should also be noted that none of the Fraudulently Joined Defendants were named in
7  the First Action.  Rather, after BVU's motion to dismiss was granted, Plaintiffs voluntarily
8  dismissed the First Action (**Exhibit F**) only to file the instant case joining California citizens to
9  thwart diversity – even though none of the Fraudulently Joined Defendants had any role in
10 "issuing" the claimed securities in the Complaint.  (*See* Comp. ¶¶ 12-13; **Exhibit D** hereto).
11 These defendants clearly have "no real connection with the controversy" and were named in
12 anticipation that this second lawsuit would be removed to this District Court and related to the
13 First Action.  *Ritchey, supra,* at 1318.  Plaintiffs' attempt to "forum shop" should not be
14 condoned based on allegations against these sham defendants.  *Good, supra,* at 807.

15     **iv.     Amount In Controversy.**

16     Diversity jurisdiction exists only "where the matter in controversy exceed the sum or
17 value of $75,000, exclusive of interest and costs…"  28 U.S.C. § 1332(a); *Arbaugh v. Y&H*
18 *Corp.,* 546 U.S. 500, 514 (2006).

19     Here, Plaintiffs' request for damages including rescission exceeds the $75,000 threshold.
20 The Complaint alleges that on June 5, 2015, Plaintiffs were damaged in the amount of $27,850
21 for purchase of the alleged unregistered securities.  (Comp. ¶ 12.)  Thereafter on August 22,
22 2015, Plaintiffs were allegedly damaged in the amount of $30,850 (Comp. ¶ 13) for their next
23 purchase.  The Complaint further alleges that since such time, Plaintiffs paid $3,600 per year in
24 "property management fees" (Comp. ¶ 52) on the contracts.  These amounts, coupled with
25 Plaintiffs request for costs and expenses including expert fees (Prayer ¶ 5), well exceeds the
26 $75,000 amount in controversy threshold.  What's more, Plaintiffs expressly sought $463,900 as
27 damages in the Complaint of the First Action.  (**Exhibit C**, First Action Complaint ¶¶19-24, 31,
28 52; Prayer 1).  Generally, "[t]he amount in controversy is determined from the allegations or

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1   prayer of the complaint." *Schwarzer, Tashima & Wagstaffe, Fed. Civ. Proc. Before Trial* (2009),

2   ¶ 2:450 (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938), which

3   held that an inability to recover an amount adequate to give the court jurisdiction does not oust

4   the court of jurisdiction); *Reyes v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 113821, at

5   *12-*13 (N.D. Cal. June 29, 2010) ("[i]n actions seeking declaratory or injunctive relief, it is

6   well established that the amount in controversy is measured by the value of the object of the

7   litigation.").

8      Consequently, the damages amounts that plaintiffs seek exceed the $75,000.00 minimum.

9   ### 4.   **TIMELINESS.**

10     This Notice is timely, pursuant to 28 U.S.C. § 1446(b), because Defendants received

11  notice of this action on November 27, 2019 via personal service.  Defendants have not appeared

12  in the State Court Action. *Destfino v. Reiswig, et al.*, 630 F.3d 952, 956 (9th Cir. Cal. 2011) ("we

13  hold that each defendant is entitled to thirty days to exercise his removal rights after being

14  served.").  The other named defendants have not been served.

15  ### 5.   **INTRADISTRICT ASSIGNMENT.**

16     This case is being removed to the Eastern District, Fresno Division of this Court because

17  the existing State Court Action is pending in Kern County.

18  ### 6.   **OTHER PERTINENT INFORMATION.**

19     Pursuant to 28 U.S.C. § 1446(a), Defendants' file this Notice in the District Court of the

20  United States for the district and division within which the State Court Action is pending.

21  Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice and its attachments will promptly be

22  served on plaintiffs in the State Court Action, and notice thereof will be filed with the clerk of

23  the Kern County Superior Court.

24     Moreover, **this case should be related to the lawsuit recently filed and dismissed by**

25  **Plaintiffs that this Court (Hon. Anthony W. Ishii) presided over and granted 12(b)(6) relief**

26  **in, Case No. 1:18-CV-00649-AWI-JLT.**  Defendants respectfully request that this case be

27  assigned to the Hon. Ishii in light of his previous handling of Plaintiffs' claims in connection

28  with the State Court Action.

1    WHEREFORE, Defendants hereby removes Kern Superior Court Case No. BCV-19-

2    102842 to the United States District Court for the Eastern District of California, Fresno Division.

3

4                                           Respectfully submitted,

5    Dated:  December 27, 2019             ANGLIN, FLEWELLING, RASMUSSEN,
                                            CAMPBELL & TRYTTEN LLP
6

7                                           By:   /s/ D. Dennis La
                                                  D. Dennis La
8                                           Attorneys for Defendants
                                            BLUEGREEN VACATIONS UNLIMITED, INC.,
9                                           THE CLUB AT BIG BEAR VILLAGE, THE
                                            CLUB AT BIG BEAR VILLAGE MASTER
10                                          ASSOCIATION, THE CLUB AT BIG BEAR
                                            VILLAGE FRACTIONAL OWNERS
11                                          ASSOCIATION, BLUEGREEN RESORTS
                                            MANAGEMENT, INC., BLUEGREEN
12                                          VACATIONS CORPORATION, AND BFC
                                            FINANCIAL CORPORATION
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

EXHIBIT A

ELECTRONICALLY FILED
10/4/2019 9:59 AM
Kern County Superior Court
By Layton Johnson, Deputy

1   Stephen M. Dake, SBN 89289
    DAKE, BRAUN & MONJE, LLP
2   1626 - 19th Street, Suite 23
    Bakersfield, CA  93301
3   Telephone:  (661) 322-0991
    Facsimile:  (661) 322-0650
4   sdake@dbmllp.com

5   Attorneys for RAYMOND P. SCOTT and CARLA SCOTT

6

7                    CALIFORNIA SUPERIOR COURT

8              COUNTY OF KERN – METROPOLITAN DIVISION

9   RAYMOND P. SCOTT and CARLA SCOTT,        Case No. ~~BCV-19-~~
10                                                      **BCV-19-102842**
                    Plaintiffs,
11                                           **COMPLAINT**
    v.
12
    BLUEGREEN VACATIONS UNLIMITED,
13  INC.; THE CLUB AT BIG BEAR VILLAGE;
    THE CLUB AT BIG BEAR VILLAGE
14  MASTER ASSOCIATION; THE CLUB AT
    BIG BEAR VILLAGE FRACTIONAL
15  OWNERS ASSOCIATION; BLUEGREEN
    RESORTS MANAGEMENT, INC.;
16  VACATION TRUST, INC.; BLUEGREEN
    VACATIONS CORPORATION; BLUEGREEN
17  RESORTS; BLUEGREEN VACATION CLUB;
    BBX CAPITAL CORPORATION; BFC
18  FINANCIAL CORPORATION;  and SHAWN
    B. PEARSON and DOES 1 through 10,
19
20                  Defendants.

21

22

23

24       **COMES NOW** Plaintiffs RAYMOND P. SCOTT and CARLA SCOTT (the "Plaintiffs"),

25  by and through their undersigned attorneys, bring this action against Defendants BLUEGREEN

26  VACATIONS UNLIMITED, INC.; THE CLUB AT BIG BEAR VILLAGE; THE CLUB AT BIG

27  BEAR VILLAGE MASTER ASSOCIATION; THE CLUB AT BIG BEAR VILLAGE

28  FRACTIONAL OWNERS ASSOCIATION; BLUEGREEN RESORTS MANAGEMENT, INC.;

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

1

COMPLAINT

1   VACATION TRUST, INC.; BLUEGREEN VACATIONS CORPORATION; BLUEGREEN

2   RESORTS; BLUEGREEN VACATION CLUB; BBX CAPITAL CORPORATION; and BFC

3   FINANCIAL CORPORATION (collectively "Bluegreen" or "BVC"), and SHAWN B. PEARSON

4   (the "Individual Defendant," and together with Bluegreen the "Defendants"), based on personal

5   knowledge with respect to themselves and, on information and belief derived from, among other

6   things, investigation of counsel and review of public documents as to all other matters, and

7   complain and allege as follows:

8

9   ## NATURE OF THE CASE

10

11   1.      This action arises out of Defendants' sale of unregistered securities in violation of

12   Section 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act of 1933 ("the Securities Act"), which,

13   pursuant to 15 U.S.C. Sections 77e(a), 77e(c), 77l(a)(1) & 77o(a). Sections 5(a), 5(c), and 12(a)(1)

14   require that any securities sold in the United States be registered with the United States Securities

15   and Exchange Commission ("SEC"). As well as Sections 24200, 25400(b), 25400(c), 25400(d),

16   25400(e), 25401, 25402, 25403(a), 25403(b), 25403(c), 25404(a) and 25404(b) of the California

17   Corporations Code, governing the rules for the sale of Securities in the state of California.

18

19   2.      Bluegreen is in the business of selling "points," which are marketed to prospective

20   purchasers as an investment which will appreciate in value. These "points" are aggregated in

21   exchange pools. Every purchaser of points simultaneously becomes a member of one or more

22   Vacation Associations or Clubs, which enables the owner of the points to potentially reserve rooms

23   in one of the Bluegreen resort or hotel properties. Bluegreen sells points to new purchasers, as well

24   as existing owners, in person, at sales centers throughout the United States.

25

26   3.      The practice utilized by the Bluegreen sales operation is as follows: Prospective

27   purchasers, including new purchasers as well as existing owners to whom Bluegreen seeks to sell

28   additional points, are typically provided with some kind of conditional benefit or incentive, such as

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

2

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 11

a gift certificate, free vacations, free tickets to shows or a reduced room rate at a condominium or hotel. In order to realize these conditional benefits, the prospective purchaser is required to attend what is described as a 60 to 90 minute sales presentation. No contract or other official document describing the terms of the point investment is provided to the prospective purchasers during this presentation and, in fact, not until the time of closing.

4. Prospective purchasers are organized by Bluegreen depending upon their characteristics and the perceived likelihood that they will agree to purchase points. Bluegreen then assigns these prospective purchasers to work with Bluegreen salespeople who are also called vacation counselors and quality assurance specialists. The sales presentations actually exceed 90 minutes and often last five to six hours in length or longer. Moreover, Bluegreen tells prospective purchasers that they will forfeit their benefits if they leave the sales presentation before the respective sales people agree that the presentation is over. Prospective purchasers are not permitted to take any contract, information sheets, Purchase and Security Agreements ("PSAs" or "Agreements"), Credit Sales Contracts, notes or other written materials with them off premises prior to closing, nor are prospective purchasers given time to consult with their own advisors, attorneys or any other person during the sales presentation.

5. Bluegreen salespeople's common practice is to pitch the points to prospective purchasers as more than just a way to vacation. Rather, Bluegreen pitches its points as an investment that will appreciate in value due to the continuing improvements made by Bluegreen in the quality and number of its resort and hotel properties, the general appreciation of real estate in the future and the managerial skill that Bluegreen provides in operating the properties it holds. Bluegreen salespeople tell their unwitting targets, over the course of hours-long, high pressure sales pitches that, by purchasing points "now," purchasers will receive a discounted purchase price that is only available on the day of the sales presentation; they are investing in their future; their

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

3
COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 12

points will increase in value; they can bequeath the points to their heirs as an inheritance; and they can sell their points-at a profit- at any time. Thus, these "points" are actually investment contracts, and therefore securities, under the United States securities laws.

6.     Once the prospective purchasers succumb to the sales pitches and agree to purchase points, they are individually shepherded to a sales center "quality assurance specialist" (or otherwise labeled individual), whose job is to obtain the purchaser's signature on a lengthy, densely-worded sales contract (the PSA) and to instruct the purchaser to initial numerous items on a lengthy information sheet (often the initials are generated electronically by the sales people for the purchasers' "convenience"). In reality, purchasers are not given sufficient time to read the documents, nor are they permitted to take the documents with them off premises before the closing, nor may purchasers discuss the terms and conditions of the PSAs, or any other contracts or documents given to them by Bluegreen with any other person prior to signing and initialing these documents. Moreover, by the time that the typical purchaser goes through the closing process, he or she is too exhausted to read or understand the provisions of these documents and is not capable, by training, to understand the substance or legal ramifications of executing them. The closing documents actually contradict parts of what the prospective purchasers are told and shown during the sales presentations.

7.     Many of Bluegreen's point purchasers are induced to buy tens of thousands of points, representing many weeks of potential vacations that the typical purchaser could never possibly utilize. These points can cost tens of thousands of dollars, and the purchases are often financed by Bluegreen at credit card interest rates. In addition, the points are accompanied by an obligation to pay yearly "maintenance" fees for the use of various resorts found in the particular property or collection the purchaser bought into. Maintenance fees have risen at a rate far higher and faster than ordinary inflation despite the economies of scale that Bluegreen has in place to

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

4

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 13

1    manage its properties. As such, a common complaint by purchasers is that maintenance fees have

2    become unaffordable over time. As a result, existing point investors or members are often induced

3    to purchase additional points in order to reach "preferred" thresholds. Bluegreen tells these point

4    purchasers or members that if they buy more points, they will receive various preferential

5    treatments.

6

7         8.      Unfortunately for Plaintiffs, Defendants' sales pitches regarding the investment

8    value of the points are false. Bluegreen points do not increase in value, there is no viable secondary

9    market for them, and Bluegreen severely restricts the resale of points. Rather than receiving a

10   return on their investment, Plaintiffs are on the hook for massive annual maintenance fees that keep

11   going up and up every year, to an amount not disclosed to purchaser at the time of purchase. This is

12   in addition to the exorbitant cost of the points themselves as well as any interest payments thereon.

13   Moreover, these Bluegreen contracts or PSAs last in perpetuity. There is no way for the Bluegreen

14   members to sell their membership. In fact, Bluegreen memberships are liabilities not assets.

15

16        9.      The Securities Act of 1933 requires all sellers of securities to register those

17   securities with the Securities Exchange Commission ("SEC") to prevent precisely the types of

18   abuses perpetrated by Defendants in connection with the sale of their "points."

19

20        10.     Defendants are selling purchasers investment contracts, and hence securities, even if

21   they are not explicitly described as such and even though the written contracts contradict in part the

22   promises of the sales pitches. Defendants have not followed the registration requirements under the

23   securities laws and SEC regulations, and thus, they have violated and are in continuing violation of

24   the Securities Act of 1933.

25                                         **THE PARTIES**

26        11.     Plaintiffs RAYMOND P. SCOTT and CARLA DEANN SCOTT are a married

27   couple who, at all times relevant hereto, were and are residents of Bakersfield, California.

28

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

5

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 14

12.     On June 5, 2015 the Scotts purchases 20,000 annual points in The Club at Big Bear Village for a price of $27,850 following a sales pitch they received in the sales office of Bluegreen in Las Vegas, Nevada.

13.     On August 22, 2015, the Scotts purchased an additional 25,000 annual points in The Club at Big Bear Village for a price of $30,850.50, following a sales pitch they received in the sales office of Bluegreen in Las Vegas, Nevada.

14.     During the course of each sales presentation, the Bluegreen salespeople represented to the Scotts that their points were tied to real property, that the points would increase in value over time as a result of efforts bestowed by Bluegreen, that the points could be sold for a profit and that the Scotts could bequeath the points to their heirs.

15.     The Scotts purchased these points in reliable upon the Bluegreen salespeople's representations.

16.     Defendant WOODBRIDGE HOLDINGS, LLC is a Florida Limited Liability Corporation and has a principal place of business located at 2100 West Cypress Creek Road, Fort Lauderdale, Florida 33309. Bluegreen Vacations Corporation and all of its subsidiaries are owned and controlled by Woodbridge Holdings, LLC.

17.     Defendant BBX CAPITAL CORPORATION is a Florida Corporation and has a principal place of business located at 401 East Las Olas Boulevard Suite 800, Fort Lauderdale, Florida 33301. BBX Capital has an approximate 90% ownership interest in Bluegreen Vacations Corporation.

18.     Defendant BLUEGREEN VACATIONS CORPORATION is a Florida Corporation and has a principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431. Bluegreen Vacations Corporation is the sole owner of Bluegreen Vacations Unlimited, Inc.

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

6
COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 15

19.    Defendant BLUEGREEN VACATIONS UNLIMITED, INC.("BVCI"). is a Florida Corporation and has a principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431.

20.    Defendant THE CLUB AT BIG BEAR VILLAGE is a California Corporation with a principal place of business located at 40671 Village Drive, Big Bear, California.

21.    Defendant THE CLUB AT BIG BEAR VILLAGE FRACTIONAL OWNERS ASSOCIATION is a California Corporation with a principal place of business located at 40671 Village Drive, Big Bear, California.

22.    Defendant THE CLUB AT BIG BEAR MASTER ASSOCIATION is a California Corporation with a principal place of business located at 40671 Village Drive, Big Bear, California.

23.    Defendant BLUEGREEN RESORTS MANAGEMENT, INC. is a Delaware Corporation and has a principal place of business located at 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431.

24.    Defendant VACATION TRUST, INC. is a Florida Corporation with a principal place of business located at 4950 Communication Avenue, Suite 900, Boca Raton, Florida 33431.

25.    Defendant RESORT TITLE AGENCY, INC. is a Florida Corporation with a principal place of business located at 4960 Conference Way North Suite 100, Boca Raton, Florida 33431.

26.    Defendant BLUEGREEN RESORTS is a Florida Corporation with a principal place of business located at 4960 Conference Way North Suite 100, Boca Raton, Florida 33431.

27.    Defendant BLUEGREEN VACATION CLUB is a Florida Corporation with a principal place of business located at 4960 Conference Way North Suite 100, Boca Raton, Florida 33431.

7
COMPLAINT
EXHIBIT A TO NOTICE OF REMOVAL PAGE 16
DAKE, BRAUN & MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

28.     Defendant SHAWN B. PEARSON is the President and CEO of Bluegreen Vacations Unlimited, Inc.

## JURISDICTION AND VENUE

29.     Defendants violated specific statutory law enacted within the State of California.

30.     This Court has original jurisdiction over all causes of action asserted in this Complaint. Plaintiffs entered into this agreement with Defendants regarding property within the State of California.  Venue is proper in Kern County because all Defendants regularly conduct business in and have engaged and continue to engage in the wrongful conduct alleged herein and thus are subject to personal jurisdiction.

## FACTUAL ALLEGATIONS

31.     Bluegreen purports to be in the vacation business, but in reality it is in the investment business.  Specifically, the business of selling unregistered, illiquid securities in the form of exchange pools of "points", using high pressure sales techniques. Bluegreen sells its "points" as an "investment," when, in reality, all the "points" provide (other than an opportunity to try to book rooms at resorts and hotels, which can be done without purchasing points) is a source of debt for Bluegreen's investor-members, who must pay onerous maintenance fees or borrow money from a Bluegreen affiliate in order to own and continue to own these points. At high-pressure, mandatory sales presentations, Bluegreen salespeople convince investor-members that Bluegreen's points (i) appreciate in value; (ii) can be readily sold; (iii) are a hedge against inflation; and (iv) constitute an appreciating asset that Bluegreen members can pass along to their children. These representations are false.

## I.    BLUEGREEN'S BUSINESS MODEL

32.     Bluegreen's investment scheme is premised upon a convoluted system of "vacation ownership interests" ("VOI"). Bluegreen is commonly thought of as a "timeshare" company, but it

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

8

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 17

1    does not sell traditional timeshare interests, and indeed, does not refer to itself as such.

2        33.    In a traditional timeshare model, the timeshare owner purchases the right to use the

3    particular timeshare property in question for a certain number of weeks per year. The timeshare

4    owner may choose to utilize an exchange program that allows them to swap their weeks at a

5    particular resort with another timeshare owner's weeks at another resort, but his or her ownership

6    interest is in a particular resort, and for a particular period of time. Indeed, California law protects

7    timeshare owners in this respect by prohibiting timeshare companies from selling more than 364

8    use-days in any particular property in any particular year.

9        34.    Although investor-members purchasing points for property in California are

10   provided a form stating that the Bluegreen salesperson is a licensed real estate agent who has a

11   fiduciary duty to disclose all facts material to the transaction, Bluegreen points are in no way tied

12   to the value of any real estate, and Bluegreen investor-members are not purchasing an interest in

13   real estate, as described in further detail below.

14       35.    Bluegreen's points provide nothing more than an opportunity to attempt to reserve

15   rooms at various properties during various times of the year. Bluegreen has developed a matrix that

16   sets forth how many points are required to reserve a room at each of its properties, a calculation

17   that factors in the location, size of the room, time of the year, and how far in advance reservations

18   are made. However, because the points are not tied to a right to use a particular property for a

19   particular period of time, as a traditional timeshare does, investor-members are not "guaranteed"

20   access to any particular resort or property at any particular time, no matter how many points they

21   own. Instead, Bluegreen doles out rooms to both members and nonmembers on a first come, first

22   serve basis. As such, there is no guarantee that members will ever be able to vacation where or

23   when they want to.

/ / /

DAKE, BRAUN & MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

9
COMPLAINT

## II. THE CONVOLUTED RELATIONSHIP BETWEEN ORGANIZATIONS

36.     Investor-members who purchase points from Bluegreen Vacations Unlimited, Inc. are actually purchasing membership in a particular group.

37.     According to the Purchase and Security Agreement (the "PSA") that an investor-members must sign in order to purchase points in The Club at Big Bear VIllage, the investor purchases a membership in one of several "Homeowners' Associations." An investor-member signs a "Credit Sales Contract" to buy into the Fractional Owners Association for the Club. The PSA further provides that "the basis for the Membership is certain real property interests in various resorts, hotels and other vacation properties and that title to those interests is held in a trust for the benefit of the Association." In other words, the investor has no direct ownership interest in any real property, as he or she would in a traditional timeshare arrangement. Instead, the real property is owned by or held by the trust, for the benefit of an Association in which the investor is a member solely by virtue of his or her ownership of points.

38.     Each Association is administered through a board of directors elected by members - but crucially, Bluegreen owns a "significant number of points" in each collection, which points are weighted, thereby enabling Bluegreen to control the votes electing the board of directors for each Association. Indeed, this is evidenced by the fact that the board of every single Association has hired Bluegreen to provide management services for the Association.   Services for which Bluegreen receives substantial fees.

39.     In addition, each investor-member who purchases points in an individual Club is simultaneously enrolled in an entity known as "Bluegreen Vacation Club Multi-site Time-Share Plan" which is a trade name used by Bluegreen.

40.     All investor-members who purchase or invest in a California Members Association are enrolled automatically in Bluegreen Vacation Club.

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 19

41.     Bluegreen Vacation Club is a wholly owned subsidiary of Bluegreen Vacations Unlimited, Inc.

42.     Vacation Trust, Inc. operates the exchange pool of points.

43.     Although "points" in The Club at Big Bear Village Fractional Owners Association are defined as a member's "Qualifying Interest," a "Qualifying Interest" may itself be based on the points purchased to become a member of an Association.

44.     In other words, there are two points systems at play-the points that Plaintiffs were assigned when they purchased a membership, and the points they were assigned in The Owners Association.

45.     Of course, the nuances were never explained to the Plaintiffs, during the high pressure sales pitch Bluegreen utilizes to induce them to purchase points.

46.     The relationships among these entities are not explained to points purchasers, nor provided to them in written form during the sales presentation or closing.

## III.     THE POINTS HAVE NO INTRINSIC VALUE

47.     Bluegreen Vacation Club Multi-State Time-Share Plan is described as an exchange pool of points. Bluegreen describes this system in sale pitches as permitting investor-members to utilize their points to reserve rooms at resorts all over the world, and therefore not being limited to resorts or hotels within the United States.  However, because there is no cap on how many investor-members can join the Multi-State Time Share Plan, or the Association, Bluegreen reserves the right to, and does, add additional points to the Multi-State Time Share Plan from time to time. As a result, it is impossible for any investor-member to quantify the vacation stays available to the investor-member by virtue of his or her point ownership or to otherwise determine the value of his or her investment, especially since these values can change, and do change, based upon how many points the Bluegreen sales operation is able to sell.

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

11
COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 20

48.     In fact, rooms at Bluegreen resorts are doled out on a first come, first served basis, meaning that many investor-members cannot vacation when and where they want despite Bluegreen's sales pitch that a points-based model offers members greater flexibility than a traditional timeshare model. Thus, many investor-members end up using their points to book vacations at less desirable locations, or at off-peak times.

49.     Thus, it is impossible to determine what the "face value" of a "point" in the exchange pool is worth, and even if it were possible to make this determination, the value of a "point" is diluted any time additional points are sold - a common occurrence, because virtually every investor-member is purchasing "new" points.

50.     Further, there is no secondary market for the "points," and Bluegreen's universal practice is to refuse to buy back points, except by foreclosure, so it is impossible to determine a "market value" of any investor's interest.

IV.     THE ONEROUS, ONGOING COST OF BLUEGREEN POINTS AND IT
        RELATION TO BLUEGREEN'S BUSINESS MODEL

51.     While it is difficult, if not impossible, to ascertain the value of Bluegreen points, it is possible to calculate their cost. Investment in Bluegreen "point" exchange pools comes at a high price in the form of Club dues and fees, including a yearly Club Fee, the amount of which is a function of the Member's membership class (or a base fee), plus an amount based on the number of points owned, to cover the costs of Club management; (b) a Property and Services Fee, in an amount to be determined by the Club, to cover the costs relating to the represented services provided by the Club; (c ) closing costs at the time of sale; and (d) "Other Charges," to cover "any expenses associated with the operation of the Club which are not covered" in the various other fees.

/ / /

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA  93310
Phone: (661) 322-0991
Fax: (661) 322-0650

12

COMPLAINT

52.    The Club Fee represents a significant source of income for Bluegreen. Bluegreen also collect a "property management fee" of $3,600 per year of the costs of operating any resort. Bluegreen's revenue from property management contracts increases to the extent that (a) operation costs at managed resorts rise, and consequently, management fees increase proportionately under the cost-plus fee arrangements; (b) Bluegreen adds services under their management contracts; or (c) Bluegreen acquires or enters into contracts to manage additional resorts. In other words, the more investor-members are charged fees for the cost of operating an Association, the more revenue Bluegreen generates. Moreover, the Bluegreen property management contracts renew automatically each year.

53.    In addition to the income generated from fees, Bluegreen generates significant revenue from financing the sale of its points. Many of Bluegreen's investors, including Plaintiffs, are unable to purchase their points -which can range from costing a few thousand dollars to tens, or even hundreds, of thousands of dollars - in cash up front. Thus, Bluegreen offers financing, from Bluegreen's financing affiliate, to the investors by loaning them money to purchase the points. Those loans are secured by the points themselves as provided under article 9 of the Uniform Commercial Code.

54.    Bluegreen relies on its ability to use its outstanding loans to member-investors as collateral in order to borrow enough money to facilitate selling more points - and therefore issuing more loans - to new member-investors.

55.    Like most other components of the Bluegreen investment scheme, what is presented as a wise investment is actually a tremendous expense. Unlike an interest rate for a home mortgage, for example, Bluegreen financing is set at credit card interest rates, which can be as high as 22% per annum. Various other protections which exist as part of the underwriting process for homebuyers likewise do not apply to sales of ephemeral "points," such as affordability measures

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

13

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 22

1    like debt to income ratios.

2    56.    While mortgage interest payments are often tax deductible, interest payments on

3    "points" are not. Despite this, and despite the fact that Plaintiffs do not actually hold any fee simple

4    ownership interest in any real property, Bluegreen sent IRS Form 1098 to Plaintiffs for all calendar

5    years through 2015. Form 1098 is the IRS form provided by a lender to a mortgagor setting forth

6    the amount of mortgage interest (which is generally deductible) paid in a particular year.

7
## V.    THE HIGH-PRESSURE SALES PROCESS
8

9    57.    The one-on-one, high pressure sales experience is a cornerstone of Bluegreen's

10   business model. Bluegreen has sales center around the world with a full in-house sales and

11   marketing team at many of these locations, including their property at 366 E. Tropicana Avenue in

12   Las Vegas, Nevada. A substantial portion of Bluegreen's sale of exchange pool "points" in the U.S.

13   take place at the sales office in Las Vegas, though these "points" are sold at various locations

14   throughout the United States.

15
16   58.    The Bluegreen sales technique, however, is not unique to any particular office. The

17   same high pressure sales pitch is utilized by virtually all Bluegreen salespeople at offices

18   throughout the country. Indeed, Bluegreen touted the uniformity of its sales practice in its most

19   recent 10-k filing with the SEC.

20   59.    In order to generate sales, Bluegreen relies on high-pressure, in-person sales pitches,

21   which take place following presentations at resorts targeted to prospective investors as well as

22   current investors and their guests, and through "mini-vacations" packages. In these packages, a

23   sales target is offered a free "experience" - for example, a cruise, a dinner at a high-end restaurant,

24   tickets to a Cirque de Soleil performance in Las Vegas, tickets to a popular sporting event, or even

25   an entire trip to Las Vegas for a period of several days - "free," *if* they attend and sit through the

26   entirety of a sales presentation that is said to last 90 minutes but often lasts as long as five or six

27
28

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

14

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 23

hours or more. If the target fails to attend the sales presentation, or leaves before the presentation has been completed, the individual is told that he or she is responsible for paying the cost of the entire "free" experience.

**A.**     **Bluegreen Salespeople State the Points Will Increase in Value**

60.     First, the Bluegreen salesperson reiterates that points in the exchange pool will increase in value, because the value of the underlying real estate properties increases, due largely to Bluegreen's efforts to maintain, upkeep and improve the properties, as well as the general appreciation of real estate. In effect, the Bluegreen salesperson represents that because Bluegreen is always working to improve the quality of the resorts, and because real property values in general are increasing, the value of the target's investment will increase as well.

61.     Further, the prospective investors are told that the points they are purchasing are being sold to them at a discount from their regular price, so that they will immediately have "equity" because they own interests that are worth more than the purchase price.

62.     Indeed, during sales presentations, Bluegreen salespersons routinely provide potential investor-members with a two-page document titles "Pricing History and Location Growth," or similar document, which purports to set forth how the Bluegreen points have increased and will increase in value over time.

63.     However, as set forth above, the points have no intrinsic value. They are not tied to any ownership interest in any piece of real estate, because the real estate interest is held in trust for the Association. Moreover, the offer to sell points at a discount as being time sensitive is false. Prospective purchasers are not receiving any preferential treatment or receiving any special, discounted price on the day of the sales presentation. The price point offer will be available to the purchaser on the following day and the following week.

/ / /

DAKE, BRAUN & MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

15

COMPLAINT

64.     Because the number of points in the pool can be increased as much as Bluegreen would like, and because Bluegreen can arbitrarily change the "value" of a point at any time, it is virtually impossible to determine what the value of any member's points is, and thus impossible to determine whether the points' value has increased over time. Moreover, the points have no market value because they generally cannot be sold due to the restrictions that Bluegreen has placed on them. In effect, Bluegreen points are illiquid and worthless to the purchaser because Bluegreen effectively has a monopoly on the sale of points.

65.     Bluegreen salespeople also tell existing investor-members that they will "save money" on maintenance fees for their existing points by purchasing more points. Sales people represent that, by purchasing additional points, an investor will enter a different "tier" of membership and will thereby be able to apply points as payment of paying maintenance fees (or pay fewer maintenance fees). Such representations are false, because the fees are calculated based on how many points a member owns -the more points, the more fees.

**B.      Bluegreen Salespeople State that there is a Market for Points, and Bluegreen will Help Investor-Members Find Buyers for Their Points**

66.     Of course, an investment's appreciation in value requires the existence of a market for the investment. Bluegreen salespeople mislead potential investor-members into believing that there is a robust market for the sale of points in the exchange pool, and they will be able to easily sell their points after they have increased in value (which they purportedly already have because they were purchased at a "discount"), thereby capturing a significant return on their investment. Bluegreen salespeople further represent that they, and Bluegreen, will assist the investor-buyer in locating a buyer to purchase the Bluegreen member's points.

67.     In reality, however, this statement is belied by Bluegreen's Legal Documents (which potential investor-members are not provided any meaningful opportunity to study and

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

16

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 25

review before agreeing to purchase their points). Points in The Club at Big Bear Village are non-transferable.

68.     While an investor-member's membership could, theoretically, be sold - conditioned on Bluegreen's consent, which it is entitled to withhold in its discretion and which it virtually never grants - there is no viable market for these membership interests. First, no fully-informed rational buyer would purchase points on the resale market, if a viable market even existed. The buyer must be willing to assume the onerous fees described herein. A reasonable, fully-informed potential buyer would prefer to simply reserve rooms at the resort in question without purchasing any points or interest in the Association. By way of example, Bluegreen directly markets and rents rooms to the general public at its various resorts. Non-Bluegreen members may book rooms by the night without having to expend enormous upfront sums on points or being charged maintenance fees. Second, Bluegreen restricts the prospective resale of points that are not purchased directly from Bluegreen. Further, the Bluegreen salesperson's representation that they will help an investor/member sell their points directly contradicts the contract delivered to Plaintiffs on CD after signing.

69.     Indeed, so many Bluegreen investor-members (as well as purchasers of interests of various timeshare companies) are desperate to release themselves from their continuing obligation to make high-interest financing payments and exorbitant maintenance fees that an entire industry has arisen to help them do so. Called "timeshare exit companies," these organizations will - for a fee that typically ranges in the many thousands of dollars to the tens of thousands of dollars - attempt to find a buyer for points or time share interests (or otherwise help the purchaser try to get out of his or her contract). People generally utilize these timeshare exit companies services only as a last resort, after all prior efforts to rid themselves of their investment have failed. Simply put, once the brief period to rescind the membership has expired, there is no way for an investor-

DAKE, BRAUN & MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661)322-0991
Fax: (661)322-0650

member to get out of his or her contract. Investor-members are trapped in perpetuity because there is no viable secondary market for the resale of points and memberships. Moreover, Bluegreen even prohibits the use of points to rent rooms except to friends and relatives. Accordingly, the timeshare exit companies typically try to negotiate a release from the timeshare membership. Success rates are extremely low because Bluegreen has no interest in letting investor members out of their contracts. In the overwhelming majority of cases, the timeshare exit companies advise investor-members to simply stop making payments on their maintenance fees or loan. When that happens, Bluegreen terminates the membership, recaptures the points and then resells them to new purchasers. The net result is that the purchasers lose their entire investment. Furthermore, Bluegreen reports the purchasers to the credit agencies thereby damaging the purchasers' credit scores.

70.     Although Bluegreen salespeople regularly represent the member investors that there exists a viable secondary market for points, Bluegreen not only refuses to help its member-investors sell their points, it targets and attacks timeshare exit companies and law firms who attempt to help investor-members (sometimes by suing them) in an attempt to effectively destroy any possible secondary market. Bluegreen has experienced a substantial increase in the number of purchasers who are defaulting on their loans and maintenance fees.

71.     Bluegreen has a significant interest in ensuring that no viable secondary market exists for its points (despite its representations to the contrary during its sale pitches). Pursuant to the Purchase and Security Agreement, Bluegreen can, and does, "recover" (*i.e.*, repossess) member-investors' points if the member-investor defaults on any payment due to Bluegreen, including any payments due under a loan financed by Bluegreen, maintenance fees, or any other obligation that the member-investor owes to Bluegreen. Thus, if a member-investor is unable to continue making payments to Bluegreen and defaults under the terms of the Purchase and Security

18
COMPLAINT
DAKE, BRAUN & MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650
EXHIBIT A TO NOTICE OF REMOVAL
PAGE 27

Agreement or credit sales contract, Bluegreen can repossess their points and resell them to another member-investor or new purchaser, meaning that Bluegreen has little to lose-and much to gain-if a member-investor defaults. In fact, the Bluegreen 10-k states that when Bluegreen member-investors default of their payments, those interests "are added to existing inventory and resold at full retail value" and such "recovered" points "may be sold by Bluegreen in the form of points to new customers or existing members." If, however, that same member-investor could utilize a secondary market to sell their points, they would, presumably, do so - thereby costing Bluegreen the opportunity to profit off of the resale. Thus, Bluegreen has a significant pecuniary interest in ensuring that no viable secondary market for its points is ever established.

### C. Bluegreen Salespeople Represent That Investor-Members Can Bequeath Their Points to Heirs to Convince Their Potential Sales Targets That the Points are a Sound Investment

72.     In the course of their sales pitch to potential investor-members, Bluegreen salespeople emphasize the fact that they can leave the points to their children, grandchildren, or other heirs in a will. This tactic is designed to encourage the potential investor-members to view the points as a long-term investment; something they can enjoy and then pass down to their children; and something that will increase in value, act as a hedge against inflation and can one day be sold for a significant profit.

73.     Unfortunately, while the contract does provide that it will "ordinarily" and at its discretion approve the transfer of points to an immediate family member following an investor-member's death, points in Bluegreen pools are not an inheritance any rational person would want. As set forth above, the points are not tied to an interest in real property, they have no intrinsic value, and, indeed, they largely serve to saddle their owners with massive annual fees and loan payments. In leaving their points to their heirs, investor-members are not providing for their future,

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0091
Fax: (661) 322-0650

19

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 28

but rather, they are burdening them with debt.

**D.    Bluegreen Sales Pitch Specifics**

74.     The Bluegreen sales pitch is designed to exhaust and overwhelm a potential investor-member until they eventually "give in" and purchase points. The Bluegreen sales person take the individual or couple into a small room, office or other area, where they are not permitted to leave to review any written material that they are provided with-they must first agree to purchase their points on the spot. They cannot consult with an attorney, financial advisor or any other person not in the sales pitch location.

75.     Many of Bluegreen's targets are especially susceptible, specifically senior citizens, many of whom are living on a fixed income, where it would make no fiscal sense for these targets (or anyone else) to purchase points, often through financing at credit card interest rates, hundreds of thousands of dollars of "points" just to potentially be able to go on a vacation a few times per year. Instead, Plaintiffs and the Class purchased points because Bluegreen sold them as an investment.

76.     Bluegreen salespeople are highly incentivized to sell points to investors by any means necessary, and are principally compensated based on their performance, meaning that their income is directly correlated to how many points they are able to sell.

**VI.    THE TERMS OF THE BLUEGREEN PURCHASE AND SECURITY AGREEMENTS**

**A.    The Member-Investor's Right to Rescind the Agreements is Illusory**

77.     Some of the Bluegreen Purchase and Security Agreements, and credit sales contracts through which Bluegreen sells points contain a rescission provision, as mandated by specific state laws, which provides the purchaser between 5 to 10 days after signing the contract to rescind its terms.

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

20
COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 29

78.     However, this right to rescind is illusory. As set forth above, investor-members sign the Bluegreen contracts following multi-hour long high pressure sales presentations during which they are provided no meaningful opportunity to review the terms of the Purchase Agreement prior to signing. Furthermore, the vast majority of investor-members are on vacation when they attend a sales presentation and sign the Purchase and Security Agreement, meaning they generally do not review the terms of the contract until they have returned home, which in many cases means they are not even made aware of their right to rescind until the deadline by which to do so would have already passed.

79.     The Agreement is constructed using highly technical language and densely worded, using small print with few headings and barely any organization. It is largely impossible for a layperson to fully comprehend its provisions. The purchasers are required to review, sign and initial numerous other documents that would take many hours to read and understand. The closing is designed to rush the purchasers through the process in such a way that they are not afforded a fair opportunity to understand what they are buying or what obligations they are accepting.

80.     Finally, because the Purchase and Security Agreements as well as other documents provided to investor-members after they sign the Agreements do not clearly describe the points as a security, nor do the contracts provide accurate and complete information regarding the investor-members rights under the law or any of the information required to be set forth in a prospectus for the offering of a security, which in and of itself renders the Agreement void and unenforceable, it is impossible for an investor-member to understand what, precisely, he or she has purchased without the assistance of an attorney or financial advisor. Because investor-members are prohibited from having an attorney, financial advisor or anyone outside of the signing room review the sales materials prior to signing them, and because most investor-members sign their Agreements while on vacation and therefor unable to provide the document to their attorney or financial advisor for

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

21

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 30

1  several days, any rights to rescind in the 5 to 10 days provided by law is purely illusory.

2  **VII.    The Plaintiffs Are Induced to Invest to Their Great Detriment**

3  81.    Plaintiffs Raymond and Carla Scott first purchased Bluegreen Vacation Points on

4  June 5, 2015 and purchased additional points on August 22, 2015. Plaintiffs had acquired

5  approximately 45,000 Bluegreen Vacation points by August 22, 2015. During the course of the

6

7  sales presentations, Bluegreen salespeople represented to the Scotts that:

8  • Their Bluegreen Vacation points could be passed down to their heirs and

9    sold by their heirs at a profit.

10  • Their Bluegreen Vacation points could be used to purchase Airfare.

11  • Their Bluegreen Vacation points were real property and could be used for

12    real property tax deductions.

13

14  • Their purchase of Bluegreen Vacation points was a limited offer being sold

15    at a reduced rate.

16  • Their Bluegreen Vacation points would increase in value.

17  • Their Bluegreen Vacation points could be sold for a profit.

18  • Their Bluegreen Vacation points could be used to book RCI Resorts hotel

19    rooms.

20  82.    Plaintiffs relied upon these representations as the basis for their purchase of points.

21  Contrary to the salespeople's representations, none of these representations regarding their

22  Bluegreen Vacation points were true.

23

24  **STATUTE OF REPOSE ALLEGATIONS**

25  83.    Section 13 of the Securities Act of 1933 provides that all claims under the Securities

26  Act must be brought within one year of the discovery of the violation and within three years after

27  the security was offered to the public.

28

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

22

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 31

84.    As described herein, the typical investor would not be able to discover facts sufficient to form the basis of an investigation into the question of whether that the sale of "points" was actually the sale of an unregistered security. Moreover, investors in such points are not put on inquiry notice of the fact that the purchase of points constitutes the purchase of securities under applicable law. For the reasons alleged herein, Bluegreen's sales practices and ongoing business practices are designed to prevent such inquiry notice. Reasonable inquiry into this matter is possible only after a thorough investigation and analysis by attorneys or financial professionals with highly specialized knowledge of the provisions of the Securities Act who make sustained efforts to obtain access to a substantial body of information concerning Bluegreen's sales practices involving numerous investors and salespersons over a period of time. Plaintiffs are not aware they had purchased an unregistered security under the Act.

85.    Thus, the full three-year statute of repose, and not the one-year-from-discovery statute of limitations, should apply to the claims set forth herein.

## CLAIMS FOR RELIEF

### COUNT I

**(Unregistered Offer and Sale of Securities in Violation of Section 5(a), 5(c), and 12(a)(1) of the Securities Act and Section 25160, 25164, and 25165 of the California Corporations Code-Against All Defendants)**

86.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

87.    Section 5(a) of the Securities Act of 1933 prohibits the use of "any means or instruments of interstate commerce or of the mails" in the sale of a security "unless a registration is in effect" as to that security. *See* 15 U.S.C. § 77e(a).

88.    Section 5(c) of the Securities Act of 1933 provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

23

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 32

communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security." *See* 15 U.S.C. § 77e(c).

89.    Section 12(a)(1) of the Securities Act of 1933 provides that "Any person who offers or sells a security in violation of section 5...shall be liable...to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, or for damages if he no longer owns the security." *See* 15 U.S.C. § 77*l*(a)(1).

90.    Registration of a security with the SEC is not a perfunctory or rote process. To the contrary, SEC regulations mandate  that any issuer of a security file a prospectus which in turn must provide extensive, detailed information regarding, *inter alia*, risk factors, ratio of earnings to fixed charges, use of proceeds, determination of offering price, plan of distribution, and any potential conflicts of interest of the named experts and counsel. *See, e.g.*, 17 C.F.R. 229.500 *et seq.* 17 C.F.R. 239.11, S.E.C. Form S-1. This prospectus must be reviewed by the SEC to determine full compliance with all applicable regulations. Any comments to the preliminary prospectus must be addressed to the SEC's satisfaction before the issuer may offer the applicable security for sale.

91.    Defendants made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

92.    Defendants sold "points" in various "membership associations" exchange pools which are in turn affiliated with points in the Vacation Trust. These points are affiliated with the ability to reserve rooms at various hotels and resorts for various lengths of time. The "points" system is modelled after a traditional timeshare system, but is different in several key respects.

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

24

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 33

93.     Defendants, through their sales people, represented to Plaintiffs that these "points" reflected an ownership interest in real property and were an investment. Defendants further represented that the value of the points would increase over time and Plaintiffs would be able to sell their points at profit. Defendants represented that the value increase would be due, at least in part, to the efforts of Defendants insofar as they manage and market the various hotels, resorts, and other properties.

94.     The "points" were marketed as securities.

95.     Defendants utilized the mails, and interstate commerce and communication, including interstate telephone calls and internet communication, to market and sell these securities.

96.     No registration statements have been filed with the SEC or have been in effect with respect to the offering of the "points."

97.     By reason of the foregoing, the Defendants have violated Sections 5(a), 5(c) and 12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), & 77l(a)(1).

98.     As a direct and proximate result of the Defendant's sale of unregistered securities, Plaintiffs have suffered damages in connection with the respective purchases of "points" in the Bluegreen Vacation Club.

## COUNT II

**(Control Person Liability Pursuant to Section 15(1) of the Securities Act and Section 25402 and 25403 of California Corporations Code- Against the Individual Defendants)**

99.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

100.    Sections 15(a) of the Securities Act provides that "[e]very person who, by or through stock ownership, agency, or otherwise...controls any person liable under section 11 or 12 [of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable..." *See* 15 U.S.C. §

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661)322-0650

25

COMPLAINT

EXHIBIT A TO NOTICE OF REMOVAL
PAGE 34

77o(a).

101.    As the Chief Executive Officer, Defendant Shawn B. Pearson is the head of Bluegreen, and thus considered a "control person" of Bluegreen.

102.    As the President and Chief Financial Officer of Bluegreen, Defendant Anthony M. Puleo is a "control person" of Bluegreen.

103.    The Individual Defendants were both officers and controlling persons of Defendants charged with the legal responsibility of overseeing its operations. both controlling persons had the power to influence and exercised the same to cause Defendants to engage in the unlawful acts and conduct complained of herein.

104.    As the owner of Bluegreen, BBX Capital Corporation was a control person of Defendants charged with the legal responsibility of overseeing its operations. Both controlling persons had the power to influence and exercised the same to cause Defendants to engage in the unlawful acts and conduct complaints of herein.

105.    By reason of such conduct, the Individual Defendants and Collective Defendants are liable pursuant to Section 15(a) of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Bluegreen "points."

## COUNT III

### (False and Misleading Appearance of Trading and Market to Induce the Purchase of Securities in Violation of California Corporations Code Section 25400- Against All Defendants)

106.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

107.    Section 25400(a) makes it clear that it is unlawful for any person to make statements "For the purpose of creating a false or misleading appearance of active trading in any security or a

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA. 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

26

COMPLAINT

1    false or misleading appearance with respect to the market for any security…"

2        108.   Defendants created the false appearance of an active secondary trading and sales

3    market for the points purchased by Plaintiffs.

4        109.   Plaintiffs reliance on these statements induced purchase of Defendant's unregistered

5    securities to their detriment.

6        110.   By reason of such conduct, Defendants are liable pursuant to California

7    Corporations Code Section 25500.

8
9                              **PRAYER FOR RELIEF**

10   **WHEREFORE**, Plaintiffs pray for relief and judgement, as follows:

11       1.   Determining that the unlawful conduct alleged above is in violation of Sections 5(a),

12   5(c), 12(a)(1), and 15(a) of the Securities Act and Section 25160, 25164, and 25165 of the

13   California Corporations Code;

14       2.   Injunctive relief prohibiting Defendants from continuing to market and sell

15   unregistered securities in violation of Sections 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act

16   Section 25160, 25164, and 25165 of the California Corporations Code;

17       3.   Granting Plaintiffs the right to rescind their purchases of points/memberships as set

18   forth herein.

19       4.   Awarding compensatory damages in favor of Plaintiffs against all Defendants,

20   jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an

21   amount to be proven at trial, including interest thereon;

22       5.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

23   including counsel fees and expert fees;

24   / / /

25   / / /

26
27
28

DAKE, BRAUN &
MONJE, LLP
626 - 19ᵗʰ Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

                                27
                          COMPLAINT

1        6.      Such other relief as deemed appropriate by the Court.

2   DATED:    October 1, 2019.         DAKE, BRAUN & MONJE, LLP

3

4                              By _____

5                              Stephen M. Dake, Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAKE, BRAUN &
MONJE, LLP
626 - 19th Street, Suite 23
Bakersfield, CA 93310
Phone: (661) 322-0991
Fax: (661) 322-0650

28
COMPLAINT

EXHIBIT B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SEE ATTACHMENT

**YOU ARE BEING SUED BY PLAINTIFF:**

*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
RAYMOND P. SCOTT and CARLA SCOTT

| FOR COURT USE ONLY |
|---|
| *(SOLO PARA USO DE LA CORTE)* |
| **ELECTRONICALLY FILED** |
| **10/4/2019** |
| **Kern County Superior Court** |
| **By Layton Johnson, Deputy** |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site *(www.lawhelpcalifornia.org)*, the California Courts Online Self-Help Center *(www.courtinfo.ca.gov/selfhelp)*, or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | CASE NUMBER: *(Número del Caso):* |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* | BCV-19- **BCV-19-102842** |

KERN COUNTY SUPERIOR COURT
1415 Truxtun Avenue
Bakersfield, CA  93301

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Stephen M. Dake 89289 DAKE, BRAUN & MONJE, LLP
1626 - 19th Street, Suite 23                          661-322-0991
Bakersfield, CA  93301

| DATE: **10/4/2019** | TAMARAH HARBER-PICKENS | Clerk, by | *(signature)* | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:
   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]



**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SCOTT, RAY
EXHIBIT B TO NOTICE OF REMOVAL
PAGE 38

BLUEGREEN VACATIONS UNLIMITED, INC.; THE CLUB AT BIG BEAR VILLAGE; THE CLUB AT BIG BEAR VILLAGE MASTER ASSOCIATION; THE CLUB AT BIG BEAR VILLAGE FRACTIONAL OWNERS ASSOCIATION; BLUEGREEN RESORTS MANAGEMENT, INC.; VACATION TRUST, INC.; BLUEGREEN VACATIONS CORPORATION; BLUEGREEN RESORTS; BLUEGREEN VACATION CLUB; BBX CAPITAL CORPORATION; BFC FINANCIAL CORPORATION;  and SHAWN B. PEARSON and DOES 1 through 10

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Stephen M. Dake 89289<br>DAKE, BRAUN & MONJE, LLP<br>1801 - 18th Street<br>Bakersfield, CA 93301<br>TELEPHONE NO: 661-322-0991   FAX NO: 661-322-0650<br>ATTORNEY FOR *(Name):* RAYMOND SCOTT and CARLA SCOTT | **ELECTRONICALLY FILED**<br><br>**10/4/2019 9:59 AM**<br><br>**Kern County Superior Court**<br><br>**By Layton Johnson, Deputy** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN
STREET ADDRESS: 1415 Truxtun Avenue
MAILING ADDRESS:
CITY AND ZIP CODE: Bakersfield, CA 93301
BRANCH NAME: METROPOLITAN DIVISION - UNLIMITED

CASE NAME: SCOTT V. BLUEGREEN

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: ~~BCV-19-~~ **BCV-19-102842** |
|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [X] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37) | (Cal. Rules of Court, rules 3.400-3.403)<br>[ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | **Real Property**<br>[ ] Eminent domain/Inverse<br>condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26) | [ ] Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20) |
| **Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35) | **Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11) | **Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition *(not specified above)* (43) |
| **Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | |

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
  b. [ ] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts
     issues that will be time-consuming to resolve         in other counties, states, or countries, or in a federal court
  c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [ ] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 1, 2019

Stephen M. Dake
(TYPE OR PRINT NAME)     ▶     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | CEB Essential Forms<br>ceb.com™ | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

SCOTT, RAY
EXHIBIT B TO NOTICE OF REMOVAL
PAGE 40



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF KERN**
BAKERSFIELD COURT
1415 TRUXTUN AVENUE
BAKERSFIELD CA 93301

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF KERN

OCTOBER 04, 2019
BY *Layton Johnson* DEPUTY

**PLAINTIFF/PETITIONER:**
  **RAYMOND P. SCOTT**
  **CARLA  SCOTT**
**DEFENDANT/RESPONDENT:**
  **BLUEGREEN VACATIONS UNLIMITED, INC.**
  **THE CLUB AT BIG BEAR VILLAGE**
  **THE CLUB AT BIG BEAR VILLAGE MASTER ASSOCIATION**

**NOTICE OF ASSIGNMENT TO JUDGE FOR ALL PURPOSES AND NOTICE OF ORDER TO SHOW CAUSE RE CRC RULE 3.110 AND NOTICE OF CASE MANAGEMENT CONFERENCE**

CASE NUMBER:

BCV-19-102842

By order of the presiding judge, the above entitled case is assigned to the Honorable Stephen D. Schuett for all purposes. It will be managed on the direct calendar program in Bakersfield Department 10 until its conclusion. Peremptory challenges, if any, must be made within the times set out in CCP §170.6.  Please include the initials **SDS** after the case number on all future pleadings filed in this case.

**TO PLAINTIFF AND PLAINTIFF'S COUNSEL:**
You are ordered to appear on **January 17, 2020** in **Bakersfield Department 10** at **8:30 AM** in the above entitled court to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service on the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110.  All appearances are mandatory, unless the court receives the required proof(s) of service five (5) court days prior to the hearing date, and then no appearance is necessary.

**TO EACH PARTY AND THEIR RESPECTIVE ATTORNEY(S) OF RECORD:**
This case is set for Case Management Conference, by the Honorable Stephen D. Schuett on **April 01, 2020** at **8:15 A.M.** in **Bakersfield Department 10** of the above entitled court. Case management statements are to be filed at least fifteen (15) days prior to the conference in accordance with California Rules of Court, Rules 3.720 – 3.730.  All parties shall comply with California Rules of Court, Rules 3.720 – 3.730.

### NOTICE TO PLAINTIFF'S COUNSEL
**IMPORTANT:** You are required to serve this Notice of Assignment and Notice of Order to Show Cause Date and Notice of Case Management Conference Date with the Summons, Complaint [Local Rule 3.7(a)], Alternative Dispute Resolution (ADR) Information Packet, and ADR Stipulation and Order Form ( California Rules of Court, Rule 3.221).

### NOTICE TO CROSS COMPLAINANT'S COUNSEL
**IMPORTANT:** If you are bringing a cross complaint against new parties, you are, likewise, required to serve this Notice of Assignment pursuant to California Rules of Court, Rule 3.110 and Notice of Order to Show Cause date and Notice of Case Management Conference date on the new cross defendants.

Date: October 04, 2019

TAMARAH HARBER-PICKENS
CLERK OF THE SUPERIOR COURT

By:  _____*Layton Johnson*_____
Layton Johnson, Deputy Clerk

Notice of Assignment/Notice of Order to Show Cause Re CRC 3.110/Notice of Case Management Conference

Page **1** of **4**

EXHIBIT B TO NOTICE OF REMOVAL
PAGE 41

RAYMOND SCOTT ET AL VS BLUEGREEN VACATIONS UNLIMITED, INC. ET AL
BCV-19-102842

The Clerk of the Superior Court's office has received a civil complaint from you for filing. Pursuant to the Trial Court Delay Reduction Act, your case has been assigned to the Honorable Stephen D. Schuett as monitoring judge.

Judge Stephen D. Schuett has instituted a direct calendaring system for all cases assigned to him/her as the monitoring judge.

All law and motion, case management and trial setting conferences, ex parte matters and trials will be scheduled before him/her in Bakersfield Department 10. This will involve all cases in which the clerk has assigned the initials SDS to the complaint at the time of filing. Counsel is expected to make the initials of the monitoring judge a part of the case number on all pleadings and papers.

Judge Stephen D. Schuett expects that all law and motion hearings to be heard by him/her be set within five (5) days of the earliest date that they may be heard, given mail notice of hearing. **Law and motion matters must be reserved by going to the website address http://kerncourtlink.com for the Kern Courtlink Online Reservation System. The website is available at any time. You may calendar motions as scheduled below. Ex-parte matters require pre-clearance.**

At the time of filing the complaint, plaintiff's counsel will be given a Notice of Case Management Conference which sets a conference approximately one hundred eighty (180) days after filing of the complaint. This notice must be served with the summons and complaint on all defendants. Defendants must serve the notice on all cross-defendants named. The notice must also be served on interveners and lien claimants.

Telephonic appearances for case management conferences and law and motion hearings are available through Court Call. The toll free telephone number for Court Call is (888) 88-COURT. Proper procedures must be complied with under California Rules of Court, Rule 3.670. Arrangements to make appearances through Court Call must be made at least five (5) court days prior to the hearing date.

Another judge will hear settlement conferences in cases assigned to Judge Stephen D. Schuett. However, those cases that do not settle will be set for trial before him/her.

To confirm any hearing on calendar, for general questions regarding cases assigned to Judge Stephen D. Schuett or to pre-clear an ex-parte hearing, contact the Direct Calendaring Clerk at (661) 868-5404. To check on tentative rulings from Judge Clark, go to the court's website address "http/www.kern.courts.ca.gov/", after 4:00 pm, and click on tentative rulings. Judge Lampe does **not** offer tentative rulings.

EXHIBIT B TO NOTICE OF REMOVAL
PAGE 42

RAYMOND SCOTT ET AL VS BLUEGREEN VACATIONS UNLIMITED, INC. ET AL
BCV-19-102842

### SUPERIOR COURT OF CALIFORNIA
### COUNTY OF KERN
### SPECIAL RULES RELATING TO CASE MANAGEMENT CONFERENCES

At least fifteen (15) days prior to the case management conference, each party shall prepare, file and serve on each other party a case management conference statement providing the Court with the following information:

1. The "at-issue" status of the case including any new parties that may be contemplated;
2. A brief statement of the type of case and the general facts or contentions;
3. A description of the discovery done to date and that contemplated to be done;
4. Estimated time for trial and whether a jury is demanded;
5. Whether or not the case is entitled to priority in trial setting and if so, the legal authority thereof;
6. An evaluation of the case for alternative dispute resolution, including arbitration (judicial or binding), mediation or private judge handling;
7. If a person injury action, a description of the injuries sustained by each plaintiff and the elements of claimed damage;
8. A statement of any settlement negotiations undertaken thus far;
9. The name of the attorney primary responsible for the case on behalf of the party filing the statement.

More than one party may join in the filing of a single statement.

The case management conference shall be attended by the attorney primarily responsible for the case on behalf of each party or a member of his or her firm or counsel formally associated in the case. The attorney attending shall be thoroughly familiar with the case, and be able to engage in meaningful discussions with court and counsel, and to enter into agreements on behalf of his or her client on the following subjects:

1. The "at-issue" status of the case including the dismissal of the unnamed doe defendants or cross-defendants by agreement of all parties;
2. Discovery conducted and remaining to be done;
3. Amenability of the case to alternative dispute resolution including, but no limited to, arbitration (judicial or binding), mediation, and private judge handling.
4. Delineation of issues including stipulation of facts not in substantial controversy;
5. Settlement prospects;
6. Setting the matter for trial, pre-trial conferences, settlement conference or further case management conference;
7. Any other matters relevant to the processing of the case to a final resolution.

Any violation of these rules shall result in the imposition of substantial sanctions which may include monetary, issue, termination, or other appropriate sanctions.

RAYMOND SCOTT ET AL VS BLUEGREEN VACATIONS UNLIMITED, INC. ET AL
BCV-19-102842

**CERTIFICATE OF POSTING**

The undersigned, of said Kern County, certify:  That I am a Deputy Clerk of the Superior Court of the State of California, in and for the County of Kern, that I am a citizen of the United States, over 18 years of age, I reside in or am employed in the County of Kern, and not a party to the within action, that I served the ***Notice of Assignment/Notice of Order to Show Cause Re CRC 3.110/Notice of Case Management Conference*** attached hereto on all interested parties and any respective counsel of record in the within action by posting true copies thereof,  to the Superior Court of California, County of Kern, Non-Criminal Case Information Portal (https://odyprodportal.kern.courts.ca.gov/portalprod).


Date of Posting:          October 04, 2019

Place of Posting:          Bakersfield, CA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                    **TAMARAH HARBER-PICKENS**
                                    CLERK OF THE SUPERIOR COURT
Date:  October 04, 2019

                         By:          *Layton Johnson*
                                    Layton Johnson, Deputy Clerk

Certificate of Posting - Notice of Assignment/Notice of Order to Show Cause Re CRC 3.110/Notice of Case Management Conference

Page **4** of **4**

EXHIBIT B TO NOTICE OF REMOVAL
PAGE 44

EXHIBIT C

PLD-C-001

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State B*
Stephen M. Dake
DAKE, BRAUN & MONJE, LLP
1801 - 18th Street
Bakersfield, CA  93301
TELEPHONE NO: 661-322-0991
E-MAIL ADDRESS *(Optional)*:   sdake@dbml1
ATTORNEY FOR *(Name)*: RAYMOND SCOTT

address:    89289

*(Optional)*: 661-322-0650
m
CARLA SCOTT
KERN

FOR COURT USE ONLY

FILED
SUPERIOR COURT OF CA, COUNTY OF KERN

MAR 1 5 2018

TERRY McNALLY, CLERK
BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA, COU
STREET ADDRESS: 1415 Truxtun A
MAILING ADDRESS:
CITY AND ZIP CODE: Bakersfield, C
BRANCH NAME: METROPOLITAN D
PLAINTIFF: RAYMOND SCOTT an

DEFENDANT: BLUEGREEN VACATI

☒ DOES 1 TO 20

☒ COMPLAINT          ☐ AMENI

☐ CROSS-COMPLAINT    ☐ AMENI

1301
ON - UNLIMITED
RLA SCOTT
CORPORATION

CONTRA

MPLAINT *(Number)*:

OSS-COMPLAINT *(Number)*:

NOTICE OF ASSIGNMENT AND
CASE MANAGEMENT CONFERENCE
DAVID R. LAMPE
Assigned to _____ for all purposes
Hearing Date:   SEP 1 1 2018
Time:   8:30 am
Department:   11
See CRC Rule 3.720 Et. Seq.

CASE NUMBER:
BCV-18-100614 DRL

Jurisdiction (check all that apply):
☐ ACTION IS A LIMITED CIVIL CASE
    Amount demanded  ☐ does not ex
                     ☐ exceeds $1
☒ ACTION IS AN UNLIMITED CIVIL CAS
☐ ACTION IS RECLASSIFIED by this am
    ☐ from limited to unlimited
    ☐ from unlimited to limited

10,000
ut does not exceed $25,000)
eds $25,000)
complaint or cross-complaint

1.  Plaintiff* *(name or names)*: RAYMONI        TT and CARLA SCOTT

    alleges causes of action against defendan      e. or names):  BLUEGREEN VACATIONS CORPORATION

2.  This pleading, including attachments and           consists of the following number of pages:
3.  a.  Each plaintiff named above is a comp          ult
        ☐ except plaintiff *(name)*:
           (1) ☐ a corporation qualified to        iness in California
           (2) ☐ an unincorporated entity          se) ;
           (3) ☐ other *(specify)*:

    b.  ☐ Plaintiff *(name)* :
        a.  ☐ has complied with the fictitio          ess name laws and is doing business under the fictitious name *(specify)* :

        b.  ☐ has complied with all licensin         ements as a licensed*(specify)* :
    c.  ☐ Information about additional plai        o are not competent adults is shown in Attachment 3c.
4.  a.  Each defendant named above is a na         rson.
        ☒ except defendant *(name)* :                   ☒ except defendant *(name)* :
           BLUEGREEN VACATIONS CC                         DOES 1-5
           (1) ☐ a business organization            TION      (1) ☒ a business organization, form unknown
           (2) ☒ a corporation               nknown         (2) ☐ a corporation
           (3) ☐ an unincorporated entit                    (3) ☐ an unincorporated entity *(describe)* :
                                             ibe) :
           (4) ☐ a public entity *(describe*                (4) ☐ a public entity *(describe)* :

           (5) ☐ other *(specify)* :                        (5) ☐ other *(specify)* :

Form Approved for Optional Use
Judicial Council of California
PLD-C-001 [Rev. January 1, 2007]
CEB Essential
ceb.com Forms

*if this form is use

COMPLAINT - Contract

complaint, plaintiff meant cross-complaint and defendant means cross-defendant.

Code of Civil Procedure, § 425.12

SCOTT, RAY

Page 1 of 2

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 45

PLD-C-001

| SHORT TITLE: SCOTT V. BLUEGREEN | NUMBER: BCV-18- |
|---|---|

4.  *(Continued)*
    b.  The true names of defendants sued as Does are unknown to plaintiff.
        (1)  ☒ Doe defendants *(specify Doe numbers)*:  <u>1-10</u>  were the agents or employees of the named defendants and acted within the scope of that agency or employment.
        (2)  ☒ Doe defendants *(specify Doe numbers)*:  <u>11-20</u>  are persons whose capacities are unknown to plaintiff.
    c.  ☐ Information about additional defendants who are not natural persons is contained in Attachment 4c.
    d.  ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names)*:

5.  ☐ Plaintiff is required to comply with a claims statute, and
    a.  ☐ has complied with applicable claims statutes, or
    b.  ☐ is excused from complying because *(specify)*:

6.  ☐ This action is subject to ☐ Civil Code section 1812.10 ☐ Civil Code section 2984.4.

7.  This court is the proper court because
    a.  ☒ a defendant entered into the contract here.
    b.  ☐ a defendant lived here when the contract was entered into.
    c.  ☐ a defendant lives here now.
    d.  ☒ the contract was to be performed here.
    e.  ☐ a defendant is a corporation or unincorporated association and its principal place of business is here.
    f.  ☐ real property that is the subject of this action is located here.
    g.  ☐ other *(specify)*:

8.  The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached)*:
    ☒ Breach of Contract
    ☐ Common Counts
    ☐ Other *(specify)*:

9.  ☒ Other allegations:  Fraud and misrepresentation in the inducement to enter into each of the Contracts referenced in this Complaint.

10. Plaintiff prays for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
    a.  ☒ damages of: $  100,000.00
    b.  ☒ interest on the damages
        (1)  ☒ according to proof
        (2)  ☒ at the rate of *(specify)*:  10  percent per year from *(date)*:
    c.  ☒ attorney's fees
        (1)  ☐ of: $
        (2)  ☒ according to proof.
    d.  ☐ other *(specify)*:

11. ☐ The paragraphs of this pleading alleged on information and belief are as follows *(specify paragraph numbers)*:

Date: March <u>14</u>, 2018

Stephen M. Dake
_____
(TYPE OR PRINT NAME)

▶

_____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

*(If you wish to verify this pleading, affix a verification.)*

SCOTT, RAY

PLD-C-001 [Rev. January 1, 2007]

**CEB** Essential [JI] Forms™
ceb.com

**COMPLAINT - Contract**

Page 2 of 2

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 46

PLD-C-001(3)

| SHORT TITLE: | C... ...MBER: |
|---|---|
| SCOTT V. BLUEGREEN | BCV-18- |

FIRST _____     **CAUSE OF ACTION-Fraud**
   (number)

ATTACHMENT TO [X] Complaint   [ ] Cross-Complaint

*(Use a separate cause of action form for each cause of action.)*

FR-1. Plaintiff *(name):* RAYMOND SCOTT and CARLA SCOTT

   alleges that defendant *(name):* BLUEGREEN VACATIONS CORPORATION and DOES
                       1-20, inclusive
   on or about *(date):* 6/5/15 and 8/22/15     defrauded plaintiff as follows:

FR-2. [X] **Intentional or Negligent Misrepresentation**
   a. Defendant made representations of material fact [X] as stated in Attachment FR-2.a [ ] as follows:

   b. These representations were in fact false. The truth was [X] as stated in Attachment FR-2.b [ ] as follows:

   c. When defendant made the representations,
      [ ] defendant knew they were false, or
      [X] defendant had no reasonable ground for believing the representations were true.
   d. Defendant made the representations with the intent to defraud and induce plaintiff to act as described in item
      FR-5. At the time plaintiff acted, plaintiff did not know the representations were false and believed they were
      true. Plaintiff acted in justifiable reliance upon the truth of the representations.

FR-3. [ ] **Concealment**
   a. Defendant concealed or suppressed material facts [ ] as stated in Attachment FR-3.a [ ] as follows:

   b. Defendant concealed or suppressed material facts
      [ ] defendant was bound to disclose.
      [ ] by telling plaintiff other facts to mislead plaintiff and prevent plaintiff from discovering the concealed or
         suppressed facts.
   c. Defendant concealed or suppressed these facts with the intent to defraud and induce plaintiff to act as de-
      scribed in item FR-5. At the time plaintiff acted, plaintiff was unaware of the concealed or suppressed facts
      and would not have taken the action if plaintiff had known the facts.

                                                        Page _____

Form Approved for Optional Use
Judicial Council of California
PLD-C-001(3) [Rev. January 1, 2007)

CEB | Essential
ceb.com | Forms

**CAUSE OF ACTION-Fraud**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

SCOTT, RAY

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 47

PLD-C-001(3)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| SCOTT V. BLUEGREEN | BCV-18- |

FIRST _____          **CAUSE OF ACTION-Fraud**
____(number)____

FR-4. [X] **Promise Without Intent to Perform**
   a. Defendant made a promise about a material matter without any intention of performing it   [X]  as stated
      in Attachment FR-4.a  [ ]  as follows:

   b. Defendant's promise without any intention of performance was made with the intent to defraud and in-
      duce plaintiff to rely upon it and to act as described in Item FR-5. At the time plaintiff acted, plaintiff was
      unaware of defendant's intention not to perform the promise.  Plaintiff acted in justifiable reliance upon
      the promise.

FR-5.  In justifiable reliance upon defendant's conduct, plaintiff was induced to act   [X]    as stated in Attachment FR-5
        [ ]  as follows:

FR-6   Because of plaintiff's reliance upon defendant's conduct, plaintiff has been damaged   [X]   as stated in
       Attachment FR-6  [ ]  as follows:

FR-7.  Other:

                                                                                Page _____

CEB Essential
ceb.com Forms                         **CAUSE OF ACTION-Fraud**                  Page 2 of 2

                                              SCOTT, RAY

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 48

## ATTACHMENT FR-2.a.

On or about June 5, 2015, Plaintiffs met with representatives of Defendant BLUEGREEN VACATIONS CORPORATION in Bakersfield, California to discuss acquiring an interest in a specific timeshare property owned by Defendants. Plaintiffs did, in fact, subsequently enter into Contract No. 906775. The entire basis for Plaintiffs entering into this Contract was based upon the benefits of having a timeshare vacation property and vacation points that could be used for purposes of staying at a number of vacations sites purportedly owned or controlled by Defendants throughout the United States as well as being able to use these points on various cruise lines. This same sales presentation was again used on or about August 22, 2015, when Plaintiffs, as a result of these fraudulent misrepresentations, entered into a second Contract (Contract No. 925678) which promised additional preferential treatment in the form of vacation points to be used at various vacation sites and cruise lines.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 49

## ATTACHMENT FR-2.b.

Plaintiffs have made substantial efforts to use the vacation points and to book reservations at various facilities owned by BLUEGREEN VACATIONS CORPORATION. As a result of these efforts, Plaintiffs learned that Defendants will not honor the representations made by the agents of Defendant BLUEGREEN VACATIONS CORPORATION and that these representations were, in fact, false and made for the purpose of inducing Plaintiffs to enter into each of the Contracts.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 50

## ATTACHMENT FR-4.a.

Plaintiffs have made substantial efforts to use the vacation points and to book reservations at various facilities owned by BLUEGREEN VACATIONS CORPORATION. As a result of these efforts, Plaintiffs learned that Defendants will not honor the representations made by the agents of Defendant BLUEGREEN VACATIONS CORPORATION and that these representations were, in fact, false and made for the purpose of inducing Plaintiffs to enter into each of the Contracts.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 51

## ATTACHMENT FR-5

Entering into Contract No. 906775 on June 5, 2015 and entering into Contract No. 925678 on August 22, 2015.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 52

## ATTACHMENT FR-6

Plaintiffs have sustained monetary damages of approximately $50,000 consisting of principal and interest payments made on the two Contracts as well as maintenance fees paid to Defendants from and after June 15, 2015. Plaintiffs have also sustained emotional distress damages resulting from the absolute failure of Defendants to perform in accordance with the terms of the Contracts entered into with Defendants as well as perform in accordance with the oral representations made to Plaintiffs at the time the Contracts were entered into which Plaintiffs believe equal or exceed $50,000.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 53

PLD-C-001(1)

| SHORT TITLE: | C. ...MBER: |
|---|---|
| SCOTT V. BLUEGREEN | BCV-18- |

SECOND _____ (number)    **CAUSE OF ACTION-Breach of Contract**

ATTACHMENT TO ☒ Complaint    ☐ Cross-Complaint

*(Use a separate cause of action form for each cause of action.)*

BC-1. Plaintiff *(name)*: RAYMOND SCOTT and CARLA SCOTT

    alleges that on or about *(date)*: June 5, 2015 and August 22, 2015

    a ☒ written ☐ oral ☐ other *(specify)*:

    agreement was made between *(name parties to agreement)*:

      ☐ A copy of the agreement is attached as Exhibit A, or

      ☒ The essential terms of the agreement ☒ are stated in Attachment BC-1 ☐ are as follows *(specify)*:

BC-2. On or about *(dates)*: September 4, 2015 and at various times thereafter

    defendant breached the agreement by ☒ the acts specified in Attachment BC-2 ☐ the following acts

    *(specify)*:

BC-3. Plaintiff has performed all obligations to defendant except those obligations plaintiff was prevented or excused from performing.

BC-4. Plaintiff suffered damages legally (proximately) caused by defendant's breach of the agreement

    ☒ as stated in Attachment BC-4 ☐ as follows *(specify)*:

BC-5. ☒ Plaintiff is entitled to attorney fees by an agreement or a statute

      ☐ of $

      ☒ according to proof.

BC-6. ☐ Other:

Page _____

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-C-001(1) [Rev. January 1, 2007]

CEB Essential Forms
ceb.com

**CAUSE OF ACTION-Breach of Contract**

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

SCOTT, RAY

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 54

## ATTACHMENT BC-1

The Contract entered on June 5, 2015 (Contract No. 906775) provides, in summary, that Plaintiffs will be able to use vacation properties owned by Defendant BLUEGREEN VACATIONS CORPORATION at any number of locations throughout the United States and various destinations in other countries. The Contract entered into on August 22, 2015 (Contract No. 925678) was intended to elevate Plaintiffs' membership status and entitle Plaintiffs to additional benefits offered to Defendants' preferred customers.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 55

## ATTACHMENT BC-2

The failure to accommodate travel plans or to otherwise provide any of the benefits designated in the initial Contract or the upgraded Contract.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 56

## ATTACHMENT BC-4

Plaintiffs have sustained monetary damages of approximately $50,000 consisting of principal and interest payments made on the two Contracts as well as maintenance fees paid to Defendants from and after June 15, 2015. Plaintiffs have also sustained emotional distress damages resulting from the absolute failure of Defendants to perform in accordance with the terms of the Contracts entered into with Defendants as well as perform in accordance with the oral representations made to Plaintiffs at the time the Contracts were entered into which Plaintiffs believe equal or exceed $50,000.

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 57

1  Robert A. Bailey (#214688)
   rbailey@afrct.com
2  D. Dennis La (#237927)
   dla@afrct.com
3  ANGLIN, FLEWELLING, RASMUSSEN,
   CAMPBELL & TRYTTEN LLP
4  301 N. Lake Ave., Suite 1100
   Pasadena, California 91101-4158
5  Telephone: (626) 535-1900
   Facsimile: (626) 577-7764
6
   Attorneys for Defendant
7  BLUEGREEN VACATIONS UNLIMITED,
   INC. erroneously sued herein as "BLUEGREEN
8  VACATIONS CORPORATION"
   ("Bluegreen")
9

10              UNITED STATES DISTRICT COURT

11              EASTERN DISTRICT OF CALIFORNIA

12  RAYMOND SCOTT AND CARLA SCOTT,     CASE NO.: 1:18-CV-00649-AWI-JLT

13            Plaintiffs,               [Assigned to the Hon. Anthony W. Ishii]

14        v.                            **DEFENDANT BLUEGREEN VACATIONS**
15                                      **UNLIMITED, INC.'S NOTICE OF**
    BLUEGREEN VACATIONS               **MOTION TO DISMISS PLAINTIFFS'**
16  CORPORATION and DOES 1 TO 20,      **COMPLAINT**

17            Defendants.
                                       Date:   June 18, 2018
18                                     Time:   1:30 p.m.
                                       Ctrm:   2
19

20

21

22

23

24

25

26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

                                1

TO PLAINTIFFS AND THE HONORABLE COURT:

PLEASE TAKE NOTICE that on June 18, 2018 at 1:30 p.m. in Courtroom 2 of the above-entitled Court located at Robert E. Coyle United States Courthouse, 2500 Tulare Street, Fresno, California 93721, the Honorable Anthony W. Ishii, presiding, defendant Bluegreen Vacations Unlimited, Inc. erroneously sued herein as Bluegreen Vacations Corporation ("Bluegreen"), will move to dismiss each claim for relief in the complaint filed by plaintiffs Raymond Scott and Carla Scott pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Grounds for the motion are:

**First Claim for Relief: Breach of Contract.**

The complaint fails to state a claim for relief because it lacks a factual or legal basis for the claim.

**Second Claim for Relief: Fraud and Misrepresentation.**

The complaint fails to state a claim because: (i) the pleadings lack the specificity required under Rule 9(b); and (ii) it lacks a factual or legal basis for the claim.

The motion is based on this notice, the memorandum of points and authorities, the complaint, and on Bluegreen's argument at the hearing on the motion.

Respectfully submitted,

Dated: May 16, 2018

ANGLIN, FLEWELLING, RASMUSSEN, CAMPBELL & TRYTTEN LLP

By:  _/s/ D. Dennis La_
        D. Dennis La
        dla@afrct.com
Attorneys for Defendant
BLUEGREEN VACATIONS UNLIMITED, INC.
erroneously sued herein as "BLUEGREEN
VACATIONS CORPORATION"
("Bluegreen")

NOTICE OF MOTION TO DISMISS
EXHIBIT C TO NOTICE OF REMOVAL
PAGE 59

1

**CERTIFICATE OF SERVICE**

2

    I, the undersigned, declare that I am over the age of 18 and am not a party to this action.

3

I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 301 N. Lake Ave., Suite 1100, Pasadena, California

4

91101.

5

    On the date below, I served a copy of the foregoing document entitled:

6

**DEFENDANT BLUEGREEN VACATIONS UNLIMITED, INC.'S NOTICE OF MOTION**

7

**TO DISMISS PLAINTIFFS' COMPLAINT**

8

on the interested parties in said case as follows:

9

**Served Electronically Via the Court's CM/ECF System**

10

Stephen M. Dake, Esq.

11

DAKE, BRAUN, & MONJE, LLP
1801 18th Street

12

Bakersfield, CA  93301
Tel: (661) 322-0991

13

14

    I declare under penalty of perjury under the laws of the United States of America that the

15

foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  This declaration is executed in Pasadena,

16

California on May 16, 2018.

17

    Rachelle H. Guillory                  */s/ Rachelle H. Guillory*

18

    (Type or Print Name)                    (Signature of Declarant)

19

20

21

22

23

24

25

26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1

MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 60

1   Robert A. Bailey (#214688)
      rbailey@afrct.com
2   D. Dennis La (#237927)
      dla@afrct.com
3   ANGLIN, FLEWELLING, RASMUSSEN,
      CAMPBELL & TRYTTEN LLP
4   301 N. Lake Ave., Suite 1100
    Pasadena, California 91101-4158
5   Telephone: (626) 535-1900
    Facsimile: (626) 577-7764
6
    Attorneys for Defendant
7   BLUEGREEN VACATIONS UNLIMITED,
    INC. erroneously sued herein as "BLUEGREEN
8   VACATIONS CORPORATION"
    ("Bluegreen")
9

10                    UNITED STATES DISTRICT COURT

11                    EASTERN DISTRICT OF CALIFORNIA

12

13   RAYMOND SCOTT AND CARLA SCOTT,       CASE NO.: 1:18-CV-00649-AWI-JLT

14            Plaintiffs,                 [Assigned to the Hon. Anthony W. Ishii]

15         v.                             **DEFENDANT BLUEGREEN VACATIONS
                                          UNLIMITED, INC.'S MEMORANDUM
16   BLUEGREEN VACATIONS                  OF POINTS AND AUTHORITIES IN
     CORPORATION and DOES 1 TO 20,        SUPPORT OF MOTION TO DISMISS
17                                        PLAINTIFFS' COMPLAINT**
              Defendants.
18                                        Date:    June 18, 2018
                                          Time:    1:30 p.m.
19                                        Ctrm:    2

20

21

22

23

24

25

26

27

28

*(Vertical left margin text:)* ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

**TABLE OF CONTENTS**

Page No.

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

1.   INTRODUCTION ................................................................................................................1

2.   SUMMARY OF PLEADINGS............................................................................................1

3.   LEGAL STANDARD..........................................................................................................3

4.   PLAINTIFFS' CLAIMS ARE CONTRADICTED BY THE INTEGRATED WRITTEN AGREEMENTS ................................................................................................3

5.   PLAINTIFFS' BREACH OF CONTRACT CLAIM IS DEFICIENT IN ANY EVENT ..................................................................................................................................5

6.   PLAINTIFFS' FRAUD CLAIM FALLS SHORT OF RULE 9(B) ...................................7

    A.   Plaintiffs Impermissibly Seek To Convert A Contract Claim Into A Tort.............................................................................................................................7

    B.   The Fraud Claim Fails Pursuant To Rule 9(b)........................................................8

7.   CONCLUSION...................................................................................................................12

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abramson v. Marriott Ownership Resorts, Inc.,*
  2016 U.S. Dist. Lexis 2311 (C.D. Cal. Jan. 4, 2016)..........................9

*Abrego v. The Dow Chem. Co.,*
  443 F.3d 676 (9th Cir. 2006) ..........................5

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..........................3, 12

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..........................3, 12

*Branch v. Tunnell,*
  14 F.3d 449 (9th Cir. 1994) ..........................4

*Coastal Abstract Serv. v. First Am. Title Ins. Co,*
  173 F.3d 725 (9th Cir. 1999) ..........................10

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.,*
  100 F. Supp. 2d 1086 (C.D. Cal. 1999) ..........................8, 11

*Grid Sys. Corp. v. Texas Instruments, Inc.,*
  1992 U.S. Dist. LEXIS 14582 (N.D. Cal. Sept. 9, 1992) ..........................9

*Kabbash v. Jewelry Channel, Inc.,*
  2015 U.S. Dist. Lexis 150675 (C.D. Cal. Nov. 2, 2015) ..........................9

*Knievel v. ESPN,*
  393 F.3d 1068 (9th Cir. 2005) ..........................5

*Marder v. Lopez,*
  450 F.3d 445 (9th Cir. 2006) ..........................4

*Newcal Industries, Inc. v. Ikon Office Solution,*
  513 F.3d 1038 (9th Cir. 2008) ..........................9

*Parrino v. FHP, Inc.*
  146 F.3d 699 (9th Cir. 1998) ..........................4, 5

*Reyes v. Wells Fargo Bank, N.A.,*
  2011 U.S. Dist. LEXIS 2235 (N.D. Cal. Jan. 3, 2011) ..........................6

*Southland Sod Farms v. Stover Seed Co.,*
  108 F.3d 1134 (9th Cir. 1997) ..........................9

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ii

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001) ...........................................................................12

*Starr v. Baca,*
   652 F.3d 1202 (9th Cir. 2011) ..........................................................................3

*Sutcliffe v. Wells Fargo Bank, N.A.,*
   283 F.R.D. 533 (2012) ......................................................................................6

*Warren v. Fox Family Worldwide, Inc.,*
   328 F.3d 1136 (9th Cir. 2003) ........................................................................12

**STATE CASES**

*Aas v. Superior Court,*
   24 Cal.4th 627 (2000) ......................................................................................7

*Alphonzo E. Bell Corp. v. Bell View Oil Syndicate,*
   46 Cal.App.2d 684 (1941) ...............................................................................5

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,*
   7 Cal. 4th 503 (1994) ......................................................................................7

*Archuleta v. Grand Lodge etc. of Machinists,*
   262 Cal.App.2d 202 (1968) ...........................................................................10

*Cadlo v. Owens-Illinois, Inc.,*
   125 Cal. App. 4th 513 (2004) ........................................................................11

*Careau & Co. v. Security Pacific Business Credit, Inc.,*
   222 Cal.App.3d 1371 (1990) ...........................................................................6

*Chavez v. Times-Mirror Co.,*
   185 Cal. 20 (1921) ............................................................................................5

*Church of Merciful Savious v. Volunteers of America,*
   184 C.A.2d 851 (1960) ...................................................................................10

*Engalla v. Permanente Medical Group, Inc.,*
   15 Cal. 4th 951 (1997) ...................................................................................11

*Erlich v. Menezes,*
   21 Cal.4th 543 (1999) ..................................................................................7, 8

*Henry v. Continental Bldg. & Loan Assn.,*
   156 C. 667 (1909) ...........................................................................................10

*Kwan v. Mercedes-Benz of North America, Inc.,*
   23 Cal. App. 4th 174 (1994) ............................................................................7

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

iii

*Lazar v. Superior Court,*
    12 Cal.4th 631 (1996) ................................................................8, 10

*Mirkin v. Wasserman,*
    5 Cal. 4th 1082 (1993) ................................................................11

*Neu-Visions Sports, Inc., v. Soren/McAdam/Bartells,*
    86 Cal.App.4th 303 (2000) ................................................................10

*Performance Plastering v. Richmond American Homes of California, Inc.,*
    153 Cal. App. 4th 659 (2007) ................................................................6

*Regus v. Schartkoff,*
    156 Cal. App. 2d 382 (1957) ................................................................9

*Rheingans v. Smith,*
    161 C. 362 (1911) ................................................................9, 10

*San Francisco Design Center Assoc. v. Portman Cos.,*
    41 Cal. App. 4th 29 (1995) ................................................................10

*Sawyer v. Bank of America,*
    83 Cal. App. 3d 135 (1978) ................................................................7

*Tenzer v. Superscope,*
    39 Cal. 3d 18 (1985) ................................................................9

*Wilhelm v. Pray, Price, Williams & Russell,*
    186 Cal. App. 3d 1324 (1986) ................................................................8, 11

**STATE STATUTES**

Cal. Civ. Code, § 1572 ................................................................9

**RULES**

Fed. R. Civ. P. 9(b) ................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ................................................................5, 9

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   **MEMORANDUM OF POINTS AND AUTHORITIES**

2   **1.   INTRODUCTION**

3   This action arises from two timeshare estate purchases made by plaintiffs Raymond P.

4   Scott and Carla D. Scott (collectively, "Plaintiffs") from defendant Bluegreen Vacations

5   Unlimited, Inc. ("Bluegreen") in June and August 2015.

6   Although Plaintiffs agreed to express contractual terms that are disputed in this case, they

7   bring suit alleging they were victims of fraud and were induced to enter into both transactions.

8   For the reasons briefed below, the complaint should be dismissed without leave to

9   amend.  Among other defects, Plaintiffs' claims are contradicted by the parties' agreements

10   and/or otherwise deficient as a matter of law.  The motion should be granted accordingly.

11   **2.   SUMMARY OF PLEADINGS**

12   Plaintiffs reside in Bakersfield, California.  Defendant Bluegreen Vacations Unlimited,

13   Inc. is a Florida corporation with its principal place of business in Florida.  (*See* Documents 1

14   and 3.)

15   On or around June 5, 2015 and August 22, 2015, Plaintiffs purchased timeshare estate

16   interests from Bluegreen (collectively, "Transactions").  (Comp. FR-2.a.)  Each of the

17   Transactions was memorialized by a written contract between the parties.  True and correct

18   copies of the contracts are attached to the accompanying Request for Judicial Notice ("RJN") as

19   Exhibits A and B, respectively (collectively, "Purchase Contracts").

20   Each Purchase Contract contains disclaimers and acknowledgments that it was a fully

21   integrated contract:

22   NO PURCHASER SHOULD RELY UPON REPRESENTATIONS

23   OTHER THAN THOSE INCLUDED IN THIS AGREEMENT

24   AND IN THE DOCUMENTS REFERRED TO HEREIN.

25   (RJN, Exhs. A and B, at p. 3.)  Each agreement also sets forth:

26   24.   NO ORAL OR WRITTEN REPRESENTATIONS,

27   WARRANTIES.  The parties hereto agree that this Agreement,

28

1   MEMORANDUM OF POINTS AND

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 66

1   along with the documents referred to herein, are the only agreements

2   and disclosures between them.  Purchaser should not rely upon any

3   representations, oral or written, which are not herein set forth.  This

4   Agreement will become effective and binding upon the parties hereto

5   when signed by Purchaser in the space provided herein and received

6   and accepted by Developer/Seller.  Except as otherwise provided by

7   law, Developer/Seller makes no warranties, express or implied,

8   whatsoever, regarding the Property, Units, Common Elements or

9   Common Furnishings including but not limited to warranties of

10  merchantability or fitness for a particular purpose...

11  (RJN, Exhs. A and B, at ¶ 24.)

12       Despite the foregoing terms, Plaintiffs now allege that Bluegreen made certain

13  unspecified misrepresentations and induced them to enter into the Purchase Contracts:

14  • "The entire basis for Plaintiffs entering into this Contract [on or about June 5,

15     2015] was based upon the benefits of having a timeshare vacation property and

16     vacation points that could be used for purposes of staying at a number of

17     vacations sites purportedly owned or controlled by Defendants throughout the

18     United States as well as being able to use these points on various cruise

19     lines."  (Comp. FR-2.a.);

20  • "This same sales presentation was again used on or about August 22, 2015, when

21     Plaintiffs, as a result of these fraudulent misrepresentations, entered into a second

22     Contract (Contract No. 925678) which promised additional preferential treatment

23     in the form of vacation points to be used at various vacation sites and cruise

24     lines."  (Comp. FR-2.a.); and

25  • Plaintiffs have suffered damages "resulting from the absolute failure of

26     Defendants to perform in accordance with the terms of the Contracts entered into

27     with Defendants as well as perform in accordance with the oral representations

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

2                                    MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 67

1     made to Plaintiffs at the time the Contracts were entered into which Plaintiffs

2     believe equal or exceed $50,000." (Comp. BC-4.)

3     As briefed below, neither of Plaintiffs' claims for relief is actionable.

4     **3.   LEGAL STANDARD**

5     Although the complaint need not contain detailed allegations, its "[f]actual allegations

6   must be enough to raise a right to relief above the speculative level . . . on the assumption that all

7   the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v.*

8   *Twombly*, 550 U.S. 544, 556-557 (2007). In short, it must allege "enough facts to state a claim to

9   relief that is plausible on its face." *Id.*, at 570. The "plausibility" requirement governs

10  complaints in all federal civil actions. *Ashcroft v. Iqbal*, 556 U.S. 662, 883-884 (2009).

11    In determining the "plausibility" of a complaint, the court must first identify which

12  statements in the complaint are factual allegations and which are legal conclusions. Courts are

13  not bound to accept as true allegations that are legal conclusions, even if cast in the form of

14  factual allegations. *Ashcroft, supra*, at 884. Second, the court, drawing "on its judicial

15  experience and common sense," must decide in the specific context of the case whether the

16  factual allegations, if assumed true, allege a plausible claim. *Id.* The plausibility standard is not

17  the equivalent to a "probability requirement," but requires more than a mere possibility that the

18  defendant has acted unlawfully. *Id.*

19    Moreover, the factual allegations in the complaint must be sufficient to nudge plaintiff's

20  "claims across the line from conceivable to plausible . . ." *Bell Atlantic Corp., supra*, at 570.

21  Under the standards adopted by the Supreme Court, in order to be entitled to the presumption of

22  truth, the complaint "must contain allegations of underlying facts to give fair notice and to enable

23  the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

24  2011).

25    **4.   PLAINTIFFS' CLAIMS ARE CONTRADICTED BY THE INTEGRATED**

26          **WRITTEN AGREEMENTS**

27    As a threshold matter, Plaintiffs' allegations of "promise[s of] additional preferential

28

<div align="left">ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP</div>

3     MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 68

1   treatment" and/or "oral representations made to Plaintiffs at the time of the Contracts" (Comp.

2   FR-2.1. and BC-4) are barred by the integrated Purchase Contracts.  (RJN, Exhs. A-B.)

3          California law is clear that courts will not close their eyes to situations where a complaint

4   contains allegations of fact inconsistent with attached documents or contrary to facts which are

5   judicially noticed.  A court properly considers a document on which the complaint "necessarily

6   relies" if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's

7   claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion.

8   *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Parrino v. FHP, Inc.* 146 F.3d 699, 706 (9th

9   Cir. 1998) (plaintiff may not deliberately omit references to documents upon which his claim is

10  based to survive a 12(b)(6) motion); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994)

11  (documents that are not attached to the complaint may be incorporated by reference if the

12  plaintiff has referred to the document in the complaint or if the document forms the basis of the

13  plaintiff's claims).

14          Here, the Purchase Contracts encompass the parties' relationship.  These agreements

15  define the legal rights and obligations of Plaintiffs and Bluegreen, and are directly at odds with

16  the complaint.  For example, any alleged representation that Plaintiffs would receive

17  "preferential treatment" (Comp. FR-2.a.), oral or otherwise (Comp. BC-4), is absent from the

18  Purchase Contracts.  To the contrary, both agreements state: "each Owner beneficiary shall have

19  rights to reserve use of the Accommodations and Facilities on a first-come-first-serve basis,

20  subject to the home resort priority reservation right held by Purchaser and certain other Owner

21  Beneficiaries."  (RJN, Exhs. A and B, at ¶ 5.)

22          Plaintiffs also agreed to be bound by "RESERVATION GUIDELINES…Such

23  reservation guidelines and rules and regulations may establish the nightly minimum basis for use

24  of Accommodations and Facilities, weekend and holiday use of Accommodations and Facilities,

25  split-week reservations regarding Accommodations, and bonus time use of Accommodations and

26  Facilities."  (RJN, Exhs. A and B, at ¶ 20.)  There are other clauses in the Purchase Contracts that

27  set forth Plaintiffs' rights in connection to "VACATION POINTS," "ESTABLISHMENT OF

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

4          MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 69

1   VACATION POINT VALUE," "SAVING AND BORROWING OF VACATION POINTS,"

2   and "NON-TRANSFERABILITY OF VACATION POINTS." (RJN, Exhs. A and B, at ¶¶ 16-

3   19.)

4       As shown, the allegations of the complaint conflict with the express terms of the

5   integrated agreements. *Alphonzo E. Bell Corp. v. Bell View Oil Syndicate*, 46 Cal.App.2d 684

6   (1941); *Chavez v. Times-Mirror Co.*, 185 Cal. 20 (1921). Plaintiffs seek to avoid the

7   consequences of the Purchase Contracts by omitting them from the pleadings. Hence any

8   contrary allegation should be disregarded. As explained in *Parrino, supra,* at 706 (superseded

9   by statute on other grounds as recognized in *Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681

10   (9th Cir. 2006)), Plaintiffs may not survive a Rule 12(b)(6) motion by deliberately omitting

11   references to documents upon which their claims are based. *See also, Knievel v. ESPN*, 393 F.3d

12   1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to

13   situations in which the plaintiff's claim depends on the contents of a document, the defendant

14   attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of

15   the document, even though the plaintiff does not explicitly allege the contents of that document

16   in the complaint.").

17       The integrated Purchase Contracts govern Plaintiffs' and Bluegreen's rights in this action.

18   Their authenticity cannot be disputed. The claims should be dismissed as a result.

19       **5.**    **<u>PLAINTIFFS' BREACH OF CONTRACT CLAIM IS DEFICIENT IN ANY</u>**

20           **<u>EVENT</u>**

21       In support of the first claim, the pleadings do not identify what portions of the Purchase

22   Contracts were breached. The complaint includes Attachments FR-2.a. and FR-5 that generally

23   allege "misrepresentations" only, that there was "Fraud and misrepresentation in the inducement

24   to enter into each of the Contracts referenced in this Complaint." (Comp. ¶ 9.) From there,

25   Plaintiffs allege in conclusory fashion that they "sustained monetary damages of approximately

26   $50,000 consisting of principal and interest payments made on the two Contracts as well as

27   maintenance fees paid to Defendants from and after June 15, 2015." (Comp. BC-4.) Plaintiffs

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  also claim "emotional distress damages resulting from the absolute failure other Defendants to

2  perform in accordance with the terms of the Contracts…" (*Id.*)

3      These allegations fail to establish a breach of contract claim which requires: (1) the

4  existence of a contract; (2) a plaintiff's performance or excuse for nonperformance; (3)

5  defendant's breach; and (4) resulting damages to plaintiff. *Careau & Co. v. Security Pacific*

6  *Business Credit, Inc.*, 222 Cal.App.3d 1371, 1388 (1990). To plead the existence of a contract, a

7  plaintiff must attach the contract to the complaint or plead its express terms and conditions.

8  *Performance Plastering v. Richmond American Homes of California, Inc.*, 153 Cal. App. 4th

9  659, 672 (2007).

10     Again, it is uncertain from the complaint how the Purchase Contracts were breached.

11  Notwithstanding the generalized allegations of misrepresentations regarding "vacation points",

12  the pleadings are silent as to which precise terms or clauses in the agreements are at issue, *e.g.,*

13  "VACATION POINTS," "ESTABLISHMENT OF VACATION POINT VALUE," "SAVING

14  AND BORROWING OF VACATION POINTS," and "NON-TRANSFERABILITY OF

15  VACATION POINTS" (RJN, Exhs. A and B, at ¶¶ 16-19.)

16     In the same vein, the complaint lacks a single allegation as to *how* any agreement

17  concerning vacation points was breached, *i.e.,* what rights of Plaintiffs were impaired under the

18  contracts.

19     Plaintiffs also fail to allege that they fully performed the Purchase Contracts themselves

20  and/or were excused from performance. *Careau & Co., supra,* at 1388.

21     Moreover, Plaintiffs' claims of damages are implausible and show nothing more than

22  performance of the parties' agreements – which does not constitute damages. *Sutcliffe v. Wells*

23  *Fargo Bank, N.A.,* 283 F.R.D. 533, 553 (2012); *Reyes v. Wells Fargo Bank, N.A.,* 2011 U.S. Dist.

24  LEXIS 2235, at *48 (N.D. Cal. Jan. 3, 2011). Plaintiffs agreed to pay "approximately $50,000

25  consisting of principal and interest payments." (Comp. BC-4.) This alone does not give rise to

26  any inference of monetary loss supporting the claim. Rescission is not a prayer for relief in the

27  complaint.

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

6      MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 71

1    The claim of emotional distress damages is also problematic.  Case authority is clear that

2    "damages for mental suffering and emotional distress are generally not recoverable in an action

3    for breach of an ordinary commercial contract in California." *Erlich v. Menezes*, 21 Cal.4th 543,

4    558 (1999); *Kwan v. Mercedes-Benz of North America, Inc.*, 23 Cal. App. 4th 174, 188 (1994);

5    *Sawyer v. Bank of America*, 83 Cal. App. 3d 135, 139 (1978).  "Contract damages are generally

6    limited to those within the contemplation of the parties when the contract was entered into or at

7    least reasonably foreseeable by them at the time; consequential damages beyond the expectations

8    of the parties are not recoverable. [Citations.] This limitation on available damages serves to

9    encourage contractual relations and commercial activity by enabling parties to estimate in

10    advance the financial risks of their enterprise." *Applied Equipment Corp. v. Litton Saudi Arabia*

11    *Ltd.*, 7 Cal. 4th 503, 515 (1994).  As such, any claim that "Plaintiffs have also sustained

12    emotional distress damages" (Comp. BC-4) is not actionable.

13    No other damages are articulated.  The breach of contract claim is defective.

14    **6.    PLAINTIFFS' FRAUD CLAIM FALLS SHORT OF RULE 9(b)**

15    In support of the fraud claim for relief, Plaintiffs allege that Bluegreen made

16    misrepresentations "based upon the benefits of having a timeshare vacation property and

17    vacation points" (Comp. FR-2.a.) for both Transactions.  According to Plaintiffs, "[i]n justifiable

18    reliance upon defendant's conduct, plaintiff was induced to" entering into the Purchase

19    Contracts" and nothing more.  (Comp. FR-5.)  These conclusory allegations fail for several

20    reasons.

21    **A.    Plaintiffs Impermissibly Seek To Convert A Contract Claim Into A Tort.**

22    As a preliminary matter, Plaintiffs' tort claim for relief is procedurally defective.  The

23    Supreme Court has ruled a contract claim cannot be converted into a tort as Plaintiffs attempt to

24    do here.  As held in *Aas v. Superior Court*, 24 Cal.4th 627, 643 (2000):

25    A person may not ordinarily recover in tort for breach of duties that

26    merely restate contractual obligations. Instead, '[c]ourts will

27    generally enforce the breach of a contractual promise through

28

7

MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 72

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1    contract law, except when the actions that constitute the breach

2    violate a social policy that merits the imposition of tort remedies.'

3    A breach of contract, even if the breach is negligent or fraudulent, does not mutate into a

4  tort claim.  If the duty and obligations forming the basis for a tort claim are defined by contract,

5  then a plaintiff's claim cannot sound in tort.  *Erlich, supra,* at 552.

6    Here, Plaintiffs cannot articulate any duty that they believe Bluegreen breached other

7  than those specifically set forth in the Purchase Contracts.  This includes representations

8  regarding "VACATION POINTS," "ESTABLISHMENT OF VACATION POINT VALUE,"

9  "SAVING AND BORROWING OF VACATION POINTS," and "NON-TRANSFERABILITY

10  OF VACATION POINTS."  (RJN, Exhs. A and B, at ¶¶ 16-19.)

11    As the foregoing authorities make clear, no tort liability may be imposed from a breach of

12  the Purchase Contracts.  *Id.*  The motion should be granted as to the fraud claim on this ground

13  alone.

14  **B.**    **The Fraud Claim Fails Pursuant To Rule 9(b).**

15    Not only is this tort claim prohibited, but the conclusory allegations fail to meet the

16  specificity requirements under Rule 9(b).

17    The elements of fraud are: (1) misrepresentation; (2) knowledge of falsity; (3) intent to

18  defraud; (4) justifiable reliance; and (5) resulting damages.  Under Rule 9(b), fraud allegations

19  are subject to a higher pleading standard, and must be specifically pled.  *Glen Holly*

20  *Entertainment, Inc. v. Tektronix, Inc.,* 100 F. Supp. 2d 1086, 1093-1094 (C.D. Cal. 1999)

21  (reciting California elements).  The pleading requirement of Rule 9(b) mandates the explicit

22  identification of context.  "This means the who, what, when, where, and how…" *Id.* at 1094.

23    Where, as here, fraud is alleged against a corporation, the complaint must also allege:

24  (1) the names of the persons who made the misrepresentations; (2) their authority to speak for the

25  corporation; (3) to whom they spoke; (4) what they said or wrote; and (5) when it was said or

26  written.  *Lazar v. Superior Court,* 12 Cal.4th 631, 645 (1996).  Every element of a cause of

27  action for fraud must be alleged in full, factually and specifically.  *Wilhelm v. Pray, Price,*

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

8    MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 73

1   *Williams & Russell*, 186 Cal. App. 3d 1324, 1332 (1986).

2       The complaint does not meet this standard.  First, no actionable misrepresentation is

3   raised in the pleadings.  It is well-settled law that "[t]he mere making of a promise which the

4   promisor afterwards fails or refuses to perform does not constitute actionable fraud.  (citations

5   omitted.)  In the absence of confidential relations between the parties it is only when such

6   promise is made without any intention of performing it that it becomes fraudulent in law or

7   equity.  (Civ. Code, sec. 1572…" *Rheingans v. Smith,* 161 C. 362, 366 (1911); *Regus v.*

8   *Schartkoff*, 156 Cal. App. 2d 382, 389 (1957); *Grid Sys. Corp. v. Texas Instruments, Inc.*, 1992

9   U.S. Dist. LEXIS 14582, at ** 10-11 (N.D. Cal. Sept. 9, 1992) ("[f]irst, the promisor must have

10   made some promise to perform, or to not perform, some act in the future.  Second, at the time the

11   promise was made, the promisor must have intended not to honor the promise...")

12       Here, the alleged "misrepresentations" concerning use of vacations amount to broken

13   promises only – involving contract claims only. *Tenzer v. Superscope*, 39 Cal. 3d 18, 30 (1985)

14   ("something more than nonperformance is required to prove the defendant's [fraudulent] intent

15   not to perform his promise.")  No facts are pled remotely suggesting Bluegreen intended to

16   defraud Plaintiffs in June and August 2015 in support of this claim.  *See Abramson v. Marriott*

17   *Ownership Resorts, Inc.,* 2016 U.S. Dist. Lexis 2311, at *16 (C.D. Cal. Jan. 4, 2016) (the court

18   granted motion to dismiss under Rule 9(b) holding the plaintiffs/timeshare owners "merely allege

19   that their ability to reserve was not ideal" and that "not ideal" was insufficient for fraud.)

20       Moreover, any possible misrepresentation regarding "the benefits of having a timeshare

21   vacation property" is not legally cognizable and cannot sustain an actionable representation of

22   fact. *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir. 1997) ("claims that

23   are vague or highly subjective often amount to nonactionable puffery...")  "[T]he determination

24   of whether an alleged misrepresentation is a 'statement of fact' or is instead 'mere puffery' is a

25   legal question that may be resolved on a Rule 12(b)(6) motion." *Newcal Industries, Inc. v. Ikon*

26   *Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (quoting *Cook, Perkiss, & Liehe v.*

27   *Northern California Collection Service, Inc.*, 911 F. 2d 242, 245 (9th Cir. 1990)); *Kabbash v.*

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

9                    MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 74

1    *Jewelry Channel, Inc.*, 2015 U.S. Dist. Lexis 150675, at **7-9 (C.D. Cal. Nov. 2, 2015).  To

2    constitute an affirmative misrepresentation, a statement must make a "specific and measurable

3    claim, capable of being proved false or of being reasonably interpreted as a statement of

4    objective fact." *Coastal Abstract Serv. v. First Am. Title Ins. Co*, 173 F.3d 725, 731 (9th Cir.

5    1999).  Here, any alleged misrepresentation about the "benefits" of the timeshare interests is not

6    based on objective facts.  *Id.*  It is vague and not a measurable claim, constituting non-actionable

7    puffery at most.

8         Similarly, any possible misrepresentation concerning use of vacation points in the future

9    does not constitute an actionable representation.  *Henry v. Continental Bldg. & Loan Assn.*, 156

10   C. 667, 680 (1909); *Rheingans v. Smith*, 161 C. 362, 266 (1911) (statements relating to what may

11   happen in the future are generally not actionable, and the mere failure to perform a promise is not

12   a tort).  The representation must ordinarily be about past or existing facts; statements about

13   future events are deemed opinions and not actionable.  *Neu-Visions Sports, Inc., v.*

14   *Soren/McAdam/Bartells*, 86 Cal.App.4th 303, 308 (2000); *Church of Merciful Saviour v.*

15   *Volunteers of America*, 184 C.A.2d 851, 859 (1960); *San Francisco Design Center Assoc. v.*

16   *Portman Cos.*, 41 Cal. App. 4th 29, 43-44 (1995) ("it is hornbook law that an actionable

17   misrepresentation must be made about past or existing facts; statements regarding future events

18   are merely deemed opinions").  In the instant case, the disputed representations are not only

19   governed and/or contradicted by the Purchase Contracts, but any statement on how vacation

20   points may be used pertains to a future possibility only – having nothing to do with a past or

21   existing fact.  This is insufficient.

22        The pleadings also do not identify any of Bluegreen' agents and/or their authority (*e.g.,*

23   Officer, Director, etc.) to speak as required.  *Lazar, supra*, at 645.  "Fraud is never presumed.

24   'So…, if the plaintiff would charge the defendant corporation with making fraudulent

25   misrepresentations it was necessary for him to allege the name of the person who spoke, his

26   authority to speak…But the amended complaint is wholly wanting in such allegations.  Therefore

27   it did not state facts sufficient to charge the corporate defendants.'[Citation.]"  *Archuleta v.*

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

10                              MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 75

1   *Grand Lodge etc. of Machinists*, 262 Cal.App.2d 202, 208-209 (1968).

2          Next, the complaint fails to plead facts supporting falsity, knowledge, or reasonable

3   reliance.  A claim for fraud must specifically allege facts supporting each of these elements.

4   *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004) ("[T]he mere assertion of

5   'reliance' is insufficient.  The plaintiff must allege the specifics of his or her reliance on the

6   misrepresentation to show a bona fide claim of actual reliance."); *Engalla v. Permanente*

7   *Medical Group, Inc.*, 15 Cal. 4th 951, 976 (1997); *Wilhelm, supra,* at 1332 (actual reliance

8   requires allegations showing that the representation was an "immediate cause" that altered their

9   legal relations).  No facts are proffered showing how Plaintiffs relied on any statement

10  concerning vacation points in purchasing the timeshare estates.  *Mirkin v. Wasserman*, 5 Cal. 4th

11  1082, 1092 (1993) ("specific pleading is necessary to 'establish a complete causal relationship'

12  between the alleged misrepresentations and the harm claimed to have resulted therefrom.").

13         With respect to any purported oral misrepresentation, Plaintiffs expressly agree in the

14  Purchase Contracts that they did not "RELY UPON REPRESENTATIONS OTHER THAN

15  THOSE INCLUDED" in the parties' written agreements.  (RJN, Exhs. A and B, at p. 3.)

16  Plaintiffs' conclusory allegations are therefore deficient.

17         Furthermore, the complaint pleads no facts showing the falsity of any alleged

18  representation, *e.g.,* regarding the use of vacation points in accordance to with the "reservation

19  procedures" acknowledged in the Purchase Contracts.  (RJN, Exhs. A and B, at ¶ 5.)

20         Lastly, no damages are articulated supporting the fraud claim.  The complaint merely

21  checks off box FR-6, that "[b]ecause of plaintiff's reliance upon defendant's conduct, plaintiff

22  has been damaged."  There are no factual allegations showing damages whatsoever.  As

23  discussed above, the damages asserted in connection with the breach of contract claim are not

24  actionable.  The fraud claim lacks allegations of damages as required under Rule 9(b)

25  accordingly.  *Glen Holly Entertainment, Inc., supra,* at 1093-1094.

26         "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more

27  than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  not do." *Bell Atlantic Corp., supra,* at 555 (citation, alteration, and internal quotations omitted).

2  Similarly, a court need not "accept as true allegations that are merely conclusory, unwarranted

3  deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d

4  979, 988 (9th Cir. 2001). "[T]he tenet that a court must accept as true all of the allegations

5  contained in a complaint is inapplicable to legal conclusions." *Iqbal, supra,* at 678-79; *see also*

6  *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir. 2003).

7       The integrated Purchase Contracts plainly govern the parties' relationship.  Plaintiffs'

8  bald allegations of the complaint fail to meet the specificity required under Rule 9(b) and/or

9  otherwise escape the reach of the parties' written contracts.

10          **7.**    **CONCLUSION**

11       For all of the foregoing reasons, defendant Bluegreen Vacations Unlimited, Inc.

12  respectfully requests an order dismissing the complaint without leave to amend.

13

14                               Respectfully submitted,

15  Dated: May 16, 2018            ANGLIN, FLEWELLING, RASMUSSEN,
                                CAMPBELL & TRYTTEN LLP

16

17                          By:   */s/ D. Dennis La*

18                             D. Dennis La
                           dla@afrct.com

19                           Attorneys for Defendant
                         BLUEGREEN VACATIONS UNLIMITED, INC.

20                           erroneously sued herein as "BLUEGREEN
                         VACATIONS CORPORATION"
                         ("Bluegreen")

21

22

23

24

25

26

27

28

                       12               MEMORANDUM OF POINTS AND

*(left margin, vertical)* ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 77

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 301 N. Lake Ave., Suite 1100, Pasadena, California 91101.

On the date below, I served a copy of the foregoing document entitled:

**DEFENDANT BLUEGREEN VACATIONS UNLIMITED, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

on the interested parties in said case as follows:

**Served Electronically Via the Court's CM/ECF System**

Stephen M. Dake, Esq.
DAKE, BRAUN, & MONJE, LLP
1801 18th Street
Bakersfield, CA  93301
Tel: (661) 322-0991

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  This declaration is executed in Pasadena, California on May 16, 2018.

| Rachelle H. Guillory | /s/ Rachelle H. Guillory |
|---|---|
| (Type or Print Name) | (Signature of Declarant) |

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

13                                                  MEMORANDUM OF POINTS AND

EXHIBIT C TO NOTICE OF REMOVAL
PAGE 78

EXHIBIT D

1    Robert A. Bailey (# 214688)
        rbailey@afrct.com
2    D. Dennis La (# 237927)
        dla@afrct.com
3    ANGLIN, FLEWELLING, RASMUSSEN,
     CAMPBELL & TRYTTEN LLP
4    301 N. Lake Ave, Suite 1100
     Pasadena, CA  91101-4158
5    Telephone: (626) 535-1900
     Facsimile:  (626) 577-7764
6
     Attorneys for Defendant
7    BLUEGREEN VACATIONS UNLIMITED,
     INC. erroneously sued herein as "BLUEGREEN
8    VACATIONS CORPORATION"
     ("Bluegreen")
9

10                      UNITED STATES DISTRICT COURT

11                      EASTERN DISTRICT OF CALIFORNIA

12

13   RAYMOND SCOTT AND CARLA SCOTT        CASE NO.:  1:18-CV-00649-AWI-JLT

14            Plaintiffs,                 [Assigned to the Hon. Anthony W. Ishii]

15        v.                              **DEFENDANT BLUEGREEN VACATIONS
                                          UNLIMITED, INC.'S REQUEST FOR
16   BLUEGREEN VACATIONS                  JUDICIAL NOTICE IN SUPPORT OF
     CORPORATION and DOES 1 TO 20,        MOTION TO DISMISS PLAINTIFFS'
17                                        COMPLAINT**
              Defendants.
18
                                          Date:     June 18, 2018
19                                        Time:     1:30 p.m.
                                          Ctrm:     2
20

21

22

23

24

25

26

27

28

1    Pursuant to Federal Rule of Evidence 201(b)(2), defendant Bluegreen Vacations

2  Unlimited, Inc. erroneously sued herein as Bluegreen Vacations Corporation ("Bluegreen")

3  hereby request that the Court take judicial notice of the following facts and documents submitted

4  in support of its motion to dismiss plaintiffs' complaint:

5    1.    Purchase Contract No. 906775, dated June 5, 2015, signed by plaintiffs Raymond

6  Scott and Carla Scott, a true and correct copy is attached as **Exhibit A.**

7    2.    Purchase Contract No. 925678, dated August 22, 2015, signed by plaintiffs

8  Raymond Scott and Carla Scott, a true and correct copy is attached as **Exhibit B.**

9    Grounds for judicial notice of Exhibits A and B are that they are true and correct copies

10  of documents that are referred to in the complaint or which form the basis of Plaintiffs' claims,

11  and its authenticity is not believed to be in question.  A court may consider evidence on which

12  the complaint "necessarily relies" if (1) the complaint refers to the document; (2) the document is

13  central to the Plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to

14  the 12(b)(6) motion.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Parrino v. FHP, Inc.*,

15  146 F.3d 699, 706 (9th Cir. 1998) (plaintiff may not deliberately omit references to documents

16  upon which his claim is based to survive a 12(b)(6) motion); *Branch v. Tunnell*, 14 F.3d 449,

17  453-54 (9th Cir. 1994) (documents that are not attached to the complaint may be incorporated by

18  reference if the plaintiff has referred to the document in the complaint or if the document forms

19  the basis of the plaintiff's claims).

20

21                                        Respectfully submitted,

22  Dated:  May 16, 2018                   ANGLIN, FLEWELLING, RASMUSSEN,

23                                            CAMPBELL & TRYTTEN LLP

24

25  By: _____/s/ D. Dennis La_____

        D. Dennis La

26      dla@afrct.com

    Attorneys for Defendant

27  BLUEGREEN VACATIONS UNLIMITED,

    INC. erroneously sued herein as "BLUEGREEN

28  VACATIONS CORPORATION"

    ("Bluegreen")

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

EXHIBIT D TO NOTICE OF REMOVAL
PAGE 80
CASE NO.:  1:18-CV-00649-AWI-JLT
BLUEGREEN'S RJN RE: MTD COMPLAINT

### CERTIFICATE OF SERVICE

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 301 N. Lake Ave, Suite 1100 Pasadena, CA 91101-4158

On the date below, I served a copy of the foregoing document entitled:

**DEFENDANT BLUEGREEN VACATIONS UNLIMITED, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

on the interested parties in said case as follows:

#### Served Electronically Via the Court's CM/ECF System:

*Counsel for Plaintiffs:*

Stephen M. Dake, Esq.
DAKE, BRAUN, & MONJE, LLP
1801 18th Street
Bakersfield, CA 93301

Tel: (661) 322-0991

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. This declaration is executed in Pasadena, California on May 16, 2018.

| | |
|---|---|
| Rachelle Guillory | /s/ Rachelle Guillory |
| (Type or Print Name) | (Signature of Declarant) |

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Case 1:19-cv-01807-DAD-JLT   Document 1   Filed 12/27/19   Page 87 of 167

Case 1:19-cv-00849-AA filed by which you agree to purchase 05/16/18 interest in Page 2 of 20
share project. You should examine the statement of your right to revoke this
contract within 5 days which is contained elsewhere in this contract.

**BLUEGREEN OWNER BENEFICIARY AGREEMENT**
**BLUEGREEN VACATION CLUB**
**[LAS VEGAS PREVIEW CENTER SELLING THE CLUB AT BIG BEAR VILLAGE INVENTORY]**

MULTI-SITE TIMESHARE PLAN: BLUEGREEN VACATION CLUB
DEVELOPER/SELLER: BLUEGREEN VACATIONS UNLIMITED, INC.
4960 CONFERENCE WAY N, STE 100, BOCA RATON, FLORIDA 33431-3311

Contract Reference #: 906775

Purchaser(s)   RAYMOND PAUL SCOTT                Social Security No.
               CARLA DEANN SCOTT                 Social Security No.

Street Address  5704 SCARPA ST        Phone(Home)  661 703 0646   Phone(Bus)  661 831 2321
City            BAKERSFIELD           State  CA    Zip  93311      Country  United States of America

Developer/Seller agrees to sell, and the Purchaser agrees to purchase a timeshare estate, being the Property described below. The Property shall be acquired and accepted by the Purchaser upon the following terms and conditions and, in connection therewith, Purchaser is to be designated as an Owner Beneficiary and allocated Vacation Points as set out below. By execution of this Bluegreen Owner Beneficiary Agreement, Purchaser voluntarily appoints and designates the Trustee as his/her lawful agent to be delivered the deed to the Property described below.

By execution hereof, Purchaser is designated an Owner Beneficiary under the Bluegreen Vacation Club Trust Agreement, which was made and entered into as of the 18th day of May 1994, as amended and restated, by and between Developer/Seller and Vacation Trust, Inc., a Florida corporation, as Trustee (the "Trust Agreement"). Each Owner Beneficiary is entitled to exercise Owner Beneficiary Rights. Owner Beneficiary Rights include as an appurtenance thereto an allocation of the below-described Vacation Points and the right to be conveyed, subject to the terms of the Trust Agreement, the below-described Property upon termination of the Trust Agreement. The Vacation Points represent the opportunity to use and enjoy Accommodations and Facilities subject to the Trust Agreement and have been determined in relation to current occupancy demand for the below described Property. The Property is defined as Condominium/Unit No. or as an undivided interest in a particular phase of the Resort as may be further described in the deed for such Property:

Resort Name: THE CLUB AT BIG BEAR VILLAGE  Resort Address:  40671 Village Drive, Big Bear Lake, CA 92315

Accommodation(s) consisting of: Condominium Unit No. / Vacation Week No. [together with "F" (Full Timeshare Interest) or "E" or "O"
(Biennial Timeshare Interest/Even or Odd)].   17CJ/4F, 17CJ/5F, 17CJ/6F, 17CJ/7F

The Vacation/Unit Week No., above set forth, and the Vacation Points associated therewith, are either designated as Annual (by use of the letter "F", indicating a full Timeshare Interest) or Biennial (by use of the letter "E" or "O", indicating Even Numbered or Odd Numbered Years and one half of a Timeshare Interest). An Annual Vacation/Unit Week with Annual Vacation Points means the period of time during which the owner thereof is afforded the opportunity to use the Accommodations of the Plan on an annual recurring basis. A Biennial Vacation/Unit Week with Biennial Vacation Points means the period of time during which the owner thereof is afforded the opportunity to use the Accommodations of the timeshare Plan on a biennial recurring basis. A Vacation/Unit Week created initially as an Annual Vacation/Unit Week or a Biennial Vacation/Unit Week shall remain so. For purposes of this Agreement, the following definitions shall be controlling.

"Biennial" means every other year and the same shall be determinative on a calendar year basis, except as otherwise provided herein.
"Odd Numbered Years" means those years ending in 1, 3, 5, 7 or 9 and the same shall be determinative on a calendar year basis.
"Even Numbered Years" means those years ending in 2, 4, 6, 8 or 0 and the same shall be determinative on a calendar year basis.

The number of Vacation Points allocated to the Property and the Owner Beneficiary Rights and the designation as "F," "E" or "O" as described below is: 20000 F.

Allocated Vacation Points are used to determine occupancy of Accommodations and Facilities during an Owner's Use Year, although no additional consideration is paid for occupancy allowed by Vacation Points allocated to a respective Owner Beneficiary. The Owner's Use Year commences the first day of the month following execution of this Agreement by Purchaser and Developer/Seller, terminates upon expiration of twelve (12) months following such commencement, and recurs for each succeeding twelve (12) months thereafter. Biennial Vacation Points allow occupancy and use of accommodations only during alternate Owner Use Years, beginning with the initial Owner Use Year following the purchase of the Property, except as otherwise provided herein. Such uses are also subject to provisions for saving and borrowing of Vacation Points, as explained elsewhere herein.

Purchaser shall be obligated to pay Common Assessment Fees and Club Dues in accordance with Part E of the Trust Fund Budget as set forth in Paragraph 4 hereof.

03-BG Regular Contract (electronic device)
Rev. 11/2014

906775/SCOTT                    Regular Contract

EXHIBIT 1 TO NOTICE OF REMOVAL
EXHIBIT A TO AMENDED COMPLAINT
PAGE 3

1.  Purchase Price of Property payable by Purchaser.                                                                    $27,500.00

2.  Down Payment ( 20.55% of Line 1)                                                                                    $ 5,650.00

3.  Closing Costs (Settlement Fees)                                                                                     $ 350.00

4.  State/Local Sales Tax (0.0000000 of Line 1).                                                                        $   0.00

5.  Total Purchase Price (U.S. Funds) (Add lines 1, 3, and 4).                                                          $ 27,850.00

6.  Total Down Payment (Add lines 2, 3, and 4).                                                                         $ 6,000.00

7.  Initial Deposit Received $ 6,000.00 (CK, MO, MC/VISA, AMEX, DISC)                                                    $ 6,000.00

8.  Balance of Down Payment Required on or before N/A                                                                   $   0.00

9.  Amount Financed $ 21,850.00 for 120 months at 15.990%  (Line 1 minus line 2).

10. Monthly Payments of: $  365.88 beginning on July 05, 2015.

Purchaser agrees to have Chicago Title Company
issue lender's title insurance policy.

Pre-Authorized Check Plan Accepted (Initial if "Yes")

I have reviewed and agree to the Purchase Terms above:

**REQUIRED DISCLOSURES AND SIGNATURES ON THE NEXT PAGE**

03-BG Regular Contract *(electronic device)*
Rev. 11/2014

906775/SCOTT                                    Regular Contract

Case 1:19-cv-01807-AWI-JLT   Document 1   Filed 05/16/18   Page 4 of 20

CONSISTENT WITH ALL TERMS AND CONDITIONS OF ALL DOCUMENTS ATTACHED HERETO, WHICH ARE INCORPORATED HEREIN BY REFERENCE.   BY SIGNING BELOW, PURCHASER ACKNOWLEDGES HAVING READ AND AGREED TO ALL SUCH TERMS AND CONDITIONS AND FURTHER ACKNOWLEDGES RECEIPT OF THE BLUEGREEN VACATION CLUB MULTI-SITE PUBLIC OFFERING STATEMENT AND ANY APPLICABLE EXCHANGE COMPANY DISCLOSURE STATEMENT.

NO PURCHASER SHOULD RELY UPON REPRESENTATIONS OTHER THAN THOSE INCLUDED IN THIS AGREEMENT AND IN THE DOCUMENTS REFERRED TO HEREIN.

If you execute this agreement in Nevada, your cancellation rights are subject to and protected by Nevada law. The references to the ten (10) day cancellation period pursuant to Florida Statutes, Chapter 721, contained in the text of the Bluegreen Vacation Club Public Offering Statement are not applicable to you, as they only to apply to contracts executed in the state of Florida.  Nevada law provides you with the following cancellation right:

The purchaser of a timeshare may cancel, by written notice, the contract of sale until midnight of the fifth calendar day following the date of execution of the contract.  The right of cancellation may not be waived. Any attempt by the developer to obtain a waiver results in a contract which is voidable by the purchaser.  The notice of cancellation may be delivered personally to the developer, sent by certified mail, return receipt requested, or sent by express, priority or recognized overnight delivery service, with proof of service, to the business address of the developer at: Bluegreen Vacations Unlimited, Inc. at 4960 Conference Way North, suite 100, Boca Raton, Florida 33431, attn: Corporate Sales Accounting. The developer shall, within 20 days after receipt of the notice of cancellation, return all payments made by the purchaser.

PURCHASER(S):

_____   06/05/2015
RAYMOND PAUL SCOTT                (Date)

_____   05/05/2015
CARLA DEANN SCOTT                 (Date)

DEVELOPER/SELLER:
BLUEGREEN VACATIONS UNLIMITED, INC.

By _____   06/05/2015
   Authorized Agent                (Date)

EXHIBIT 1 TO NOTICE OF REMOVAL
EXHIBIT A TO PLAINTIFFS' COMPLAINT
PAGE 5

**This is a binding contract by which you agree to purchase an interest in a time-share project. You should examine the statement of your right to revoke this contract within 5 days which is contained elsewhere in this contract.**

### CALIFORNIA ADDENDUM TO
### OWNER BENEFICIARY AGREEMENT
### FOR
### BLUEGREEN VACATION CLUB AND THE CLUB AT BIG BEAR VILLAGE

Contract Reference #: **906775**

| | | |
|---|---|---|
| Purchaser(s) | **RAYMOND PAUL SCOTT** | Social Security No.   ****5542 |
| | **CARLA DEANN SCOTT** | Social Security No.   ****0132 |

| | | |
|---|---|---|
| Street Address | **5704 SCARPA ST** | Phone(Home)   **661 703 0646**   Phone(Bus)   **661 831 2321** |
| City | **BAKERSFIELD** | State   **CA**   Zip   **93311**   Country   **United States of America** |

The following provisions are hereby incorporated into the above Purchaser's Owner Beneficiary Agreement (timeshare purchase contract):

(A) Paragraph 8-Closing contained in the Owner Beneficiary Agreement to which this Addendum is attached is hereby amended by inserting the following sentence as the new sixth sentence thereof:

"If the escrow for the sale of the Property does not close on or before one (1) year from the date of this Agreement, or a later closing date mutually agreed to by the Developer/Seller and Purchaser, within 15 days after the closing date set forth herein or the extended closing date mutually agreed to by the Developer/Seller and Purchaser, the Developer/Seller shall order all of the money remitted by the Purchaser under the terms of this Agreement for acquisition of the Property to be refunded to the Purchaser."

(B) Paragraph 9-Refund Provisions contained in the Owner Beneficiary Agreement to which this Addendum is attached is hereby deleted and replaced with the following:

"9. REFUND PRIVILEGES  In the event Purchaser cancels this Agreement during the applicable cancellation period, Developer/Seller (or Lender acting in lieu thereof) will refund to the Purchaser the total amount of all payments made by the Purchaser under this Agreement. The refund shall be made within fifteen (15) days after Bluegreen's receipt and acceptance of the notice of cancellation, or within five (5) days of receipt of funds from the Purchaser's cleared check, whichever is late."

(C) Paragraph 10-Purchaser's Breach/Default contained in the Owner Beneficiary Agreement to which this Addendum is attached is hereby deleted and replaced with the following:

PURCHASER'S BREACH/DEFAULT  Time is of the essence of this Agreement, except where otherwise specifically provided for herein. After expiration of the applicable cancellation period, failure to close after demand or to make payments within the time provided for herein, or failure to comply with any of the provisions of this Agreement, shall be considered a breach of this Agreement and all sums paid by Purchaser hereunder shall be retained by the Developer/Seller (or Lender) as liquidated and agreed damages and not as a penalty.  In addition, any termination of this Agreement as a result of Purchaser's breach/default of any provisions herein shall not relieve Purchaser of any obligations as may be owed to Developer/Seller (or Lender) or Bluegreen Vacation Club, Inc. hereby, including without limitation, obligations relating to payment of the remaining balance of the purchase price and outstanding Club Dues and Common Assessment Fees. Purchaser shall be liable for Developer/Seller's reasonable attorney's fees and costs incurred by it by virtue of any litigation as to the parties' rights hereunder if the Developer/Seller is the prevailing party.  Purchaser acknowledges and agrees that in the event Bluegreen Vacation Club, Inc. (or the Vacation Club Managing Entity), refers Purchaser's outstanding Club Dues and/or Common Assessment Fees account(s) for collection, Purchaser shall also be obligated to pay, in addition to the principal amount owed by Purchaser hereunder in respect thereto, costs and collection fees in the maximum amount permitted by law.  Purchaser agrees to defend and indemnify Developer/Seller (and Lender) against all claims of real estate brokers or sales personnel due to acts of Purchaser or Purchaser's representatives, other than brokers or sales personnel employed by the Developer/Seller (and Lender).

Without limiting the generality of the foregoing, the following provisions also apply:

Cancellation and Default

A.  Default.  Purchaser will be in Default if (a) Purchaser does not pay, or (b) Purchaser does not pay on time, or (c) Purchaser does not keep any other promise in this Agreement.  Developer/Seller has no duty to notify or warn Purchaser about their Default or possible Default, either before or after it happens.

B.  What Happens if Purchaser Defaults.

(1)  Procedure and Notice  If, after expiration of any rescission right period provide for by law, Purchaser Defaults, Developer/Seller may elect to terminate this Agreement by giving written notice of cancellation (the "Termination Notice") in duplicate to Purchaser and Escrow Agent.  Within three (3) days of receipt of the Termination Notice, Escrow Agent shall mail one copy to Purchaser by postage prepaid certified mail, return receipt requested.  The Termination Notice shall contain a statement that Developer/Seller has determined that Purchaser is in Default hereunder and that if no written objection is received by Escrow Agent from Purchaser within twenty (20) days of receipt of the Termination Notice, Developer/Seller is canceling this Agreement and electing to retain the amount of the liquidated damages provided for below. Unless written notice (the "Objection Notice") of Purchaser's objection to Developer/Seller's determination of Purchaser's Default is received by Escrow Agent within 20 days following the date on which the Termination Notice is received by Purchaser, Escrow Agent shall deliver to Developer/Seller the amount of liquidated damages set forth below; Developer/Seller shall thereupon be released and discharged of any and all further obligation to Purchaser, including the obligation to sell the Property to Purchaser.  In the event that Purchaser timely delivers to Escrow Agent the Objection Notice, the dispute

California OBA Addendum
Rev 03/14

906775/SCOTT

CA OBA ADDENDUM

regarding the disposition of Purchaser funds deposited with Developer/Seller, and every other cause of action which has arisen between Developer/Seller and Purchaser under this Agreement, shall be settled by judicial reference. Thereafter, Developer/Seller shall be released and discharged of any and all further obligation to Purchaser, including the obligation to sell the Property to Purchaser.

(2)     Liquidated Damages. Purchaser understands that the Property is part of a program consisting of numerous time-share interests and that upon the execution of this Agreement, Developer/Seller shall remove the Property from its list of time-share interests being offered for sale and the sale of such Property will not be available to other prospective purchasers because of the execution of this Agreement. In such event, Developer/Seller will thereby be deprived of an opportunity to sell the Property described herein from and after the date hereof. It is therefore agreed by the parties that it is impractical and extremely difficult to fix the damages which may result from any failure on Purchaser's part to perform under this Agreement. Accordingly, should Purchaser fail to complete the purchase of the Property by reason of any default by Purchaser hereunder, Developer/Seller shall be released from its obligation to sell the Property to Purchaser and Developer/Seller may proceed against Purchaser upon any claim or remedy which Developer/Seller may have in law or equity; provided, however, that by subscribing your initials hereafter, Purchaser and Developer/Seller agree that Developer/Seller may retain a sum equal to all deposits Purchaser has paid under this Agreement, as Developer/Seller's liquidated damages and not as a penalty, which amount substantially compensates Developer/Seller for any damages it sustains.

INITIALS: Purchaser(s) _____   Developer/Seller _____

C.    Developer/Seller's Other Rights to Cancel. In addition to its other rights to cancel, Developer/Seller may cancel this Agreement, in its sole discretion, before the Closing if Purchaser is financing this purchase and if Developer/Seller or Lender does not give its unqualified approval of Purchaser's credit report or loan application. If this Agreement is canceled under this paragraph, the Escrow Agent will refund Purchaser's Funds without interest.

(D)    To the extent that there is any inconsistency between the terms of this Addendum and the Escrow Agreement Relating to Deposits of Purchasers, then the terms of this Addendum shall control and apply.

(E)    You have the right to cancel this transaction in accordance with the terms of the cancellation notice contained within the Owner Beneficiary Agreement to which this Addendum is attached; provided, however, if California's seven day cancellation period contained in the following notice is longer than the cancellation period contained in the Owner Beneficiary Agreement, then your cancellation rights shall be governed by the following:

**You may cancel this contract without any penalty or obligation within seven calendar days of receipt of the Public Report or after the date you sign this contract, whichever is later. If you decide to cancel this contract, you must notify the developer in writing of your intent to cancel. Your notice of cancellation shall be effective upon the date sent and shall be sent to Bluegreen Vacations Unlimited, Inc. at 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431, Attn: Corporate Sales Accounting. Your notice of cancellation may also be sent by facsimile to (561) 912-7991 or by hand-delivery. Any attempt to obtain a waiver of your cancellation right is void and of no effect.**

PURCHASER(S):                        DEVELOPER/SELLER:
                                   BLUEGREEN VACATIONS UNLIMITED, INC

_____   06/05/2015        _____   06/05/2015
RAYMOND PAUL SCOTT   (Date)      Authorized Agent   (Date)

_____   06/05/2015
CARLA DEANN SCOTT   (Date)

EXHIBIT D TO NOTICE OF REMOVAL
EXHIBIT A TO AMENDED COMPLAINT
PAGE 7

**1.  TRUST AGREEMENT.**  The Bluegreen Vacation Club multi-site timeshare plan has been established pursuant to the Trust Agreement (timeshare instrument) and related documents.  Vacation Trust, Inc., a Florida corporation, currently acts as the Trustee of the Trust Agreement. The address of Vacation Trust, Inc. is 4950 Communication Avenue, Suite 900, Boca Raton, FL 33431. Each Purchaser pursuant to an Owner Beneficiary Agreement is designated as an Owner Beneficiary pursuant to the terms of the Trust Agreement. The interest of each Owner Beneficiary under the Trust Agreement consists of and is identified as the right to performance by the Trustee of its obligations as set forth in the Trust Agreement. Each Owner Beneficiary's right to performance by the Trustee includes the Trustee holding title or Occupancy Rights relating to the Accommodations and Facilities within the Bluegreen Vacation Club Trust Estate as agent for each Owner Beneficiary and for the beneficial use and enjoyment of each Owner Beneficiary and the right, subject to the terms of the Trust Agreement, to have the Property conveyed to the Owner Beneficiary named herein upon termination of the Trust Agreement.  The Owner Beneficiaries are entitled to use, occupy and enjoy the Property (including Occupancy Rights related to the Property) within the Bluegreen Vacation Club Trust Estate, subject to availability and to the terms of the Trust Agreement and related instruments.

(a)  The timeshare interest being sold and acquired hereunder consists of the Property described above, being a fee simple real estate timeshare estate and, in connection therewith, Purchaser is designated as Owner Beneficiary entitled to the Owner Beneficiary Rights and appurtenant Vacation Points referred to above.  Owner Beneficiary Rights include the right to use, occupy and enjoy the Accommodations and Facilities within the Bluegreen Vacation Club Trust Estate coupled with the freehold estate conveyed to the Trustee by Developer/Seller or its affiliate on behalf of the Purchaser upon Purchaser becoming an Owner Beneficiary under the Trust Agreement.  Owner Beneficiary Rights are an interest in the Bluegreen Vacation Club Trust, which interest is defined as a "timeshare estate" under F.S. Ch. 721. The duration of this timeshare interest is intended to be perpetual, so long as the Trust Agreement continues. The term of the Vacation Plan is intended to be perpetual; provided, however, that the Resort Interests at each Component Site included within the Vacation Plan are fee simple property interests and either (1) continue until such time as indicated in the Component Site Underlying Declaration at which time the timeshare plans may be extended for one or more additional periods; or (2) are intended to be perpetual pursuant to the Component Site Underlying Declaration.  The Trust Agreement is irrevocable, so long as any Owner Beneficiary has a right to occupy any portion of the Trust Estate. Upon termination of the Trust, the Trustee is obligated under the Trust Agreement and as part of the Owner Beneficiary Rights to convey the Property to Purchaser by quitclaim deed if title to the Property is held by the Trustee, so long as Purchaser is not in default of his or her Owner Beneficiary Obligations.  Such transfer shall be subject to the rights of a holder of any outstanding loan or mortgage related to the Property created by the Purchaser and related to the Property to request conveyance of the Property to it.

(b)  The Property and other Accommodations and Facilities comprising the Trust Estate (and subject to the Trust Agreement) are owned in fee simple (or leasehold title, if within the Club Pono Kai Component Site Resort) by Developer/Seller at the time of Purchaser's execution hereof and are to be or have been conveyed to the Trustee by deed from Developer/Seller or its affiliate.  The Trustee's obligation, pursuant to the Trust Agreement, is to make such Property and other Accommodations and Facilities within the Bluegreen Vacation Club Trust Estate available for the use, occupancy and enjoyment of the Owner Beneficiaries.  Purchaser, by the acquisition hereunder, shall be an Owner Beneficiary pursuant to the Trust Agreement. The interest of Developer/Seller in the Accommodations and Facilities is that Developer/Seller presently owns such. Developer/Seller is entitled to designate Owner Beneficiary Rights with appurtenant Vacation Points to Purchasers pursuant to the terms of the Trust Agreement.  After conveyance to the Trustee as set forth herein, Developer/Seller has no other actual interest, including interest to control, the Accommodations or Facilities conveyed to the Trustee.  Prior to Developer/Seller issuing a deed of the Property to the Trustee as agent for Purchaser, the Property (timeshare interest) shall be released from any lien as may exist encumbering the Property by payment of release fees to the lender thereof or by full satisfaction of said mortgage or lien instrument.  Upon such conveyance of the Property, Purchaser directs and authorizes Trustee, if the balance of the purchase price above referred to is not paid in full in cash or certified check, to establish a mortgage against the Property in favor of Developer/Seller or Lender or their designee pursuant to the terms herein to secure the Purchaser's payment therefor.

**2.  DEPOSITS.**  All deposits, negotiable instruments and money received by the Developer/Seller from the Purchaser pursuant to this Bluegreen Owner Beneficiary Agreement shall, prior to the expiration of the revocation period, be held in escrow pursuant to the provisions of Section 119A.420, Nevada Revised Statutes ("NRS") and Section 119A.258 of the Nevada Administrative Code ("NAC"), with Resort Title Agency, Inc., 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431 ("Escrow Agent").  The Purchaser shall be furnished with a written receipt for the initial deposit and subsequent payments.  All monetary amounts recited in this Agreement shall be paid in U.S. Funds.

**3.  THE PROPERTY.**  The Property shall be the Property, as identified above, which has been allotted a number of Vacation Points determinative of occupancy rights and equivalent to the Vacation Points set out hereinabove provided to Purchaser hereunder. The Property is a Resort Interest under the Trust Agreement. By execution hereof, Purchaser directs and authorizes conveyance of the Property to the Trustee. For each Purchaser provided the Owner Beneficiary Rights and appurtenant Vacation Points from Developer/Seller, Developer/Seller agrees to convey to Trustee a Resort Interest; or cause its affiliates, Facilitator or other third party facilitator to convey to Trustee a Resort Interest, which has been established as requiring for occupancy Vacation Points equivalent to the Vacation Points appurtenant to the Owner Beneficiary Rights of the respective purchaser.  The Property and all other property conveyed to the Trustee pursuant to this Agreement and any other Bluegreen Owner Beneficiary Agreement is considered the Trust Estate and property available for personal use and occupancy by all purchasers of Owner Beneficiary Rights, subject to the Trust Agreement and established reservation procedures. The Property conveyed to the Trustee pursuant to this Agreement is in fee simple (or leasehold, if within the Club Pono Kai Component Site Resort) and is intended to remain in title to the Trustee perpetually, subject to deletion rights as set forth hereinafter and as otherwise provided for in the Trust Agreement. The Property is subject to the applicable Underlying Declaration identified in Exhibit 9 of the Bluegreen Vacation Club Public Offering Statement.

**4.  COMMON ASSESSMENT FEES AND CLUB DUES.**  Purchaser, as an Owner Beneficiary, agrees to pay Common Assessment Fees and Club Dues as set forth in the Bluegreen Vacation Club Public Offering Statement, Trust Agreement, the related documents, including the Club By-Laws, and this paragraph.  Purchaser, as an Owner Beneficiary, agrees to pay common expense assessments, as set forth in the Underlying Declaration related to the Property, to the extent they are not included in the Common Assessment Fees.  Such obligation to pay the foregoing amounts shall continue regardless of the conveyance of the Property to the Trustee.  Purchaser shall pay to the Vacation Club Managing Entity (as hereafter defined) such foregoing amounts related to the Property at the time that the same are due and payable.  Such obligation shall include the obligation to pay any special assessments related to the Property, as well as any real estate taxes attributable to the Property that are not otherwise included in the Common Assessment Fees.

The annual Common Assessment Fees, inclusive of ad valorem real estate taxes, currently payable by Purchaser acquiring Annual Vacation Points and a Full Timeshare Interest hereunder shall equal a base amount of Three Hundred Thirty Five Dollars ($335.00) plus an added amount equal to $0.0508 times the number of Vacation Points appurtenant to the Owner Beneficiary Rights herein allocated to the Purchaser; provided, however, the Annual Common Assessment Fees, inclusive of taxes, currently payable by a Purchaser acquiring Biennial Vacation Points and a Biennial Timeshare Interest shall equal a base amount of Three Hundred Thirty Five Dollars ($335.00) plus an added amount equal to $0.0254 times the number of Vacation Points appurtenant to the Owner Beneficiary Rights herein allocated to the Purchaser.  Each Purchaser/Owner Beneficiary shall only be assessed one base amount (currently $335.00) annually without regard to the number of Vacation Points allocated to such Purchaser/Owner Beneficiary.  The calculation of Common Assessment Fees is set forth in Part E to the Trust Fund Budget attached in Exhibit 8 of the Public Offering Statement and is calculated by comparison of the number of Vacation Points appurtenant to the Owner Beneficiary Rights allocated Purchaser as set forth herein compared to the total number of Vacation Points allocated to all Owner Beneficiaries within Purchaser's respective Common Assessment Fee method group.  This allocation may

EXHIBIT D TO NOTICE OF REMOVAL
EXHIBIT A TO CLASS ACTION COMPLAINT
PAGE 8                    VP06/05/2015

Assessment Fees... Purchaser will be responsible for the payment of its proportionate share of any increase or decrease. Bluegreen Vacation Club, Inc. has the right, pursuant to the Club By-Laws, to increase or decrease such Common Assessment Fees from time to time.

In the event Purchaser is already an Owner Beneficiary at the time of execution of this Agreement, Purchaser agrees to have the Annual Common Assessment Fees determined in this same manner as to all of the Vacation Points allocated to Purchaser, whether allocated previously or hereunder. The Annual Common Assessment Fees due annually on the first day of the respective Purchaser's Owner Use Year. Purchaser will be billed a few days after closing for the Annual Common Assessment Fees for the current year, and the month prior to the start of the Purchaser's Owner Use Year each year thereafter. If the foregoing Annual Common Assessment Fees are not paid when due, default interest plus a late fee may be charged by the Trustee, which default interest is 1.5% of the unpaid balance per month and which late fee shall be in an amount of 5% of the amount due or $25.00, whichever is greater.

Purchaser understands and agrees that Purchaser shall be responsible for the payment of Club Dues, in addition to common expenses and Common Assessment Fees. Club Dues are assessments resulting from the implementation of the Bluegreen Vacation Club plan and are representative of a common expense attributable to such implementation. Club Dues are established pursuant to the Estimated Operating Budget and Line Item Analysis attached in Exhibit 8 of the Public Offering Statement, which describes the various revenues and expenses associated with the operation of Bluegreen Vacation Club. Club Dues for the first year of participation within the Bluegreen Vacation Club will be billed to Purchaser a few days after closing. Thereafter, Club Dues for all Owner Beneficiaries, including Biennial Owner Beneficiaries, are due annually on the first day of the respective Purchaser's Owner Use Year. Each Purchaser/Owner Beneficiary shall only be assessed one Club Dues amount annually without regard to the number of Vacation Points allocated to such Purchaser/Owner Beneficiary. Club Dues are payable without a late fee, within 15 days after the due date. If Club Dues are not paid within 15 days after the due date, default interest in the amount of 1.5% of the unpaid balance per month and a late fee in the amount of 5% of the amount due or $25.00, whichever is greater, may be charged by the Trustee. Club Dues are currently $129.00 per year (plus tax, if applicable) and automatically include Purchaser's membership in the external exchange program then affiliated with Bluegreen Vacation Club (which includes the exchange program's annual renewal fee). Unless otherwise permitted by the Florida Vacation Club Act, as may be amended from time to time, in no event shall Club Dues in a given year exceed one hundred twenty five percent (125%) of the Club Dues for the previous year. Purchasers will only be assessed a special assessment in accordance with the Club By-laws. Failure to pay Common Assessment Fees or Club Dues when due shall cause a lien to be filed against the Property pursuant to the Trust Agreement and Club By-Laws.

5.  **PURCHASER'S ACKNOWLEDGMENTS.** Purchaser acknowledges by execution of this Agreement that, prior to the execution of this Agreement, Purchaser has received and had an opportunity to read a copy of the Bluegreen Vacation Club Multi-Site Public Offering Statement and the Exhibits attached thereto relating to the Bluegreen Vacation Club and the Property, as well as a copy of any applicable exchange program documents. Purchaser further acknowledges and agrees that Purchaser's reservation and/or use of the Accommodations and Facilities is subject to the Trust Agreement and the reservation procedures and that each Owner Beneficiary shall have rights to reserve use of the Accommodations and Facilities on a first-come-first-serve basis, subject to the home resort priority reservation right held by Purchaser and certain other Owner Beneficiaries. Purchaser further acknowledges, agrees and represents that the Property and the rights and appurtenances described herein (in particular the allocated appurtenant Vacation Points) and membership in the Bluegreen Vacation Club are being purchased only for Purchaser's personal use and not for any investment potential or any possible rent returns, tax advantages, depreciation, guaranteed buy-back, as Purchaser's principal residence, or for any commercial purpose whatsoever ("commercial purpose" includes, but is not limited to, a use or purpose that the Developer or the Board of the Association, in its discretion, could reasonably conclude constitutes a commercial enterprise or which otherwise suggests an intent or expectation to derive profit), all of which Purchaser acknowledges and agrees are prohibited and not part of the subject transaction. Purchaser acknowledges that the Property as hereinabove designated, and other real property has been or will be submitted to a timeshare regime in accordance with the applicable Underlying Declaration. The Property shall be allocated voting rights, assessments and other obligations as set forth within the applicable Underlying Declaration and related legal documentation. Transfer to the Trustee of the Property as specified herein by Purchaser constitutes Trustee's membership in the owners' association existing in respect to the Property.

6.  **MODIFICATIONS AND CHANGES.** Purchaser hereby authorizes the Developer/Seller and/or its affiliates, as the Developer/Seller may deem necessary, to record among the public records of the counties in which the Accommodations and Facilities contained within the Trust Estate may be located, such documents, instruments and exhibits as are required to be filed under the laws of the State of Florida, or other applicable state, in order to create and maintain the Accommodations and Facilities pursuant to Florida law, or other applicable state law, including but not limited to the Florida Timeshare Act. Developer/Seller reserves the right to make changes itself, or through any of its designees, to any such documents, instruments and exhibits as aforesaid, or as Developer/Seller, governmental authorities having jurisdiction over any of the Accommodations and Facilities, or the title insurance company may require or deem necessary, provided the changes do not materially and adversely alter Purchaser's rights as an Owner Beneficiary.

7.  **FINANCED PURCHASE.** If Purchaser desires purchase money financing in connection with the transaction contemplated hereunder, a loan application will be completed and submitted by Purchaser as part of this Agreement. In such event, this Agreement shall be contingent upon Purchaser obtaining a loan equivalent to a commitment for the amount specified in the face of this Agreement. If the Purchaser fails to qualify for purchase money financing, this Agreement is null and void and all moneys paid by Purchaser will be refunded. Purchaser acknowledges any such loan shall require Trustee to execute, grant, and deliver a mortgage or an equivalent instrument encumbering the Property (the "Mortgage") to Developer/Seller or Lender or their designee on behalf of Purchaser, which Mortgage shall provide the Property as collateral for such loan, and to the extent that the Trustee is required by Developer/Seller or Lender to execute such Mortgage, Purchaser hereby directs and authorizes the Trustee to execute, grant, and deliver such Mortgage. Purchaser shall deliver to Developer/Seller or Lender a Promissory Note (the "Note") (together with the Mortgage executed by Trustee and such security instruments requested by Developer/Seller or Lender) for the balance of the Purchase Price if such is not paid for fully, at closing, in cash or certified funds. Purchaser agrees to provide a security instrument, including a UCC financing statement, to Developer/Seller, Lender, or their designee and their respective assignees, respecting Purchaser's Owner Beneficiary Rights, including appurtenant Vacation Points, if requested to do so in connection with any such purchase money financing. Trustee shall not be liable or responsible for payment of any Mortgage executed by Trustee on behalf of Purchaser nor shall Trustee assume any such Mortgage upon its acceptance of title to the Property. Developer/Seller and Lender reserve the right to charge Purchaser a reasonable fee for services performed by or on behalf of Developer/Seller or Lender in connection with this loan, including but not limited to services such as providing a payment history or copies of statements to Purchaser, etc. Upon repayment in full of such purchase money loan, Purchaser shall pay to Developer/Seller or Lender the stipulated cost of $25 for a loan payoff processing fee. In no event shall the interest rate charged in connection with the purchase money financing exceed the maximum interest rate permitted by applicable law.

8.  **CLOSING AND TITLE.** Purchaser shall execute any necessary documents in the form supplied by Developer/Seller as relates to the Property and this transaction prior to closing and pay all closing costs set forth above. Trustee shall be delivered at closing on behalf of Purchaser a Deed conveying to it fee simple title (or leasehold title, if within the Club Pono Kai Component Site Resort) in the Property free and clear of all encumbrances except conditions, limitations, zoning and easements of record at the time of closing, the terms and conditions of the Underlying Declaration and taxes for the then current and all subsequent years. Purchaser agrees that he/she shall be obligated to keep current such purchase money financing as is owed in respect to its acquisition of the Property and Purchaser acknowledges that any failure by Purchaser to do so may result in the deletion, cancellation or suspension of Purchaser from the Bluegreen Vacation Club. At closing, Developer/Seller may deliver to Purchaser a certificate or other evidence of the transactions set out herein as relates to the Property, Owner Beneficiary Rights and appurtenant Vacation Points. Closing will be on such date and at such place as is specified by Developer/Seller or it may be by mail, if authorized by Developer/Seller, estimated to be no later than ninety (90) days from the date of this Agreement, or the

conditions of this Agreement shall survive the Closing. Trustee may deliver a Mortgage to Developer/Seller, Lender, or their designee in respect to the Property at closing, provided such Mortgage is limited to the Purchaser's loan and such creates no liability to the Trustee other than recourse to the Property. As used herein, closing shall mean delivery of deed and transfer to the Trustee. Pursuant to the terms of the Trust Agreement, the conveyance of the Property to the Trustee will be subject to the foregoing Mortgage granted by Trustee on behalf of Purchaser, provided that Trustee shall not assume any liability therefor. It shall be Purchaser's obligation to maintain all payments on the Note and to assure performance of the Mortgage, including all terms, conditions and covenants thereof. Please refer to Section III.9.C of the Text of the Multi-Site Public Offering Statement for a full description of the status of title of the Accommodations and Facilities in the Bluegreen Vacation Club.

9.   **REFUND PRIVILEGES.**   In the event Purchaser cancels this Agreement during the applicable cancellation period, Developer/Seller (or Lender acting in lieu thereof) will refund to the Purchaser the total amount of all payments made by the Purchaser under this Agreement, reduced by the retail value of any Contract Benefits the Purchaser has actually received prior to the effective date of the cancellation. Such Contract Benefits shall include, but not be limited to:, (a): an electronic device loaded with the Bluegreen Owners Kit if not returned by the Purchaser to the Developer/Seller in satisfactory condition, reasonable wear and tear excepted which, depending upon brand and model provided, has a cost to the Developer/Seller between two hundred nine dollars and ninety five cents ($209.95) and four hundred thirty-five dollars and fifty-eight cents ($435.58); (b) a conventional Owner's Kit which has a retail value of seventy-five dollars ($75.00) if not returned by the Purchaser to the Developer/Seller in satisfactory condition, reasonable wear and tear excepted, (c) the retail value of any other documents required to be provided to Purchaser under applicable Florida law, and not returned by the Purchaser to the Developer/Seller in satisfactory condition, reasonable wear and tear, excepted, or (d) if the Purchaser has used or occupied any Bluegreen Vacation Club Component Site resort for more than 12 hours prior to delivering a notice of cancellation in accordance with the provisions hereof, a reasonable occupancy charge equal to the fair market nightly rental rate hereby stipulated to be not less than one hundred fifty dollars ($150.00) per night plus the cost for damages, if any, to the applicable Component Site resort directly attributable to the Purchaser's use or occupancy thereof. The refund shall be made within twenty (20) days after Bluegreen's receipt and acceptance of the notice of cancellation, or within five (5) days of receipt of funds from the Purchaser's cleared check, whichever is later.

10.   **PURCHASER'S BREACH/DEFAULT.**   Time is of the essence of this Agreement, except where otherwise specifically provided for herein. After expiration of the applicable cancellation period, failure to close after demand or to make payments within the time provided for herein, or failure to comply with any of the provisions of this Agreement, shall be considered a breach of this Agreement and all sums paid by Purchaser hereunder shall be retained by the Developer/Seller (or Lender) as liquidated and agreed damages and not as a penalty. In addition, any termination of this Agreement as a result of Purchaser's breach/default of any provisions herein shall not relieve Purchaser of any obligations as may be owed to Developer/Seller (or Lender) or Bluegreen Vacation Club, Inc. hereby, including without limitation, obligations relating to payment of the remaining balance of the purchase price and outstanding Club Dues and Common Assessment Fees. Purchaser shall be liable for Developer/Seller's reasonable attorney's fees and costs incurred by it by virtue of any litigation as to the parties' rights hereunder if the Developer/Seller is the prevailing party. Purchaser acknowledges and agrees that in the event Bluegreen Vacation Club, Inc. (or the Vacation Club Managing Entity), refers Purchaser's outstanding Club Dues and/or Common Assessment Fees account(s) for collection, Purchaser shall also be obligated to pay, in addition to the principal amount owed by Purchaser hereunder in respect thereto, costs and collection fees in the maximum amount permitted by law. Purchaser agrees to defend and indemnify Developer/Seller (and Lender) against all claims of real estate brokers or sales personnel due to acts of Purchaser or Purchaser's representatives, other than brokers or sales personnel employed by the Developer/Seller (and Lender).

11.   **RADON GAS.**   Radon is naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over a period of time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida and other states. Additional information regarding radon and radon testing may be obtained from your County Public Health Unit. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Developer/Seller does not conduct radon testing with respect to any Accommodations in any Component Site resort and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with any Component Site resort.

12.   **BLUEGREEN VACATION CLUB MEMBERSHIP.**   Purchaser acknowledges that as an Owner Beneficiary, he/she will be a Class A Member of the Bluegreen Vacation Club, Inc., a Florida non-profit corporation. Purchaser agrees to be bound by the Articles of Incorporation and By-Laws, together with all rules and regulations as may be adopted from time to time by Bluegreen Vacation Club Class A Membership and the voting rights related thereto are not separable from Owner Beneficiary Rights.

13.   **INCORPORATION OF TRUST AGREEMENT.**   The parties hereto agree that the terms of the Trust Agreement are incorporated herein by this reference. The parties hereto further agree that the Trust Agreement may be amended, from time to time, pursuant to the terms of paragraph 10.4 of such Trust Agreement.

14.   **ADDITIONS TO, DELETIONS FROM, AND SUBSTITUTIONS OF TRUST ESTATE.**   Developer/Seller is authorized and empowered to add to the Trust Estate additional Accommodations and Facilities, as it may, in its sole discretion, determine from time to time. Any such additions shall be made pursuant to the terms of the Trust Agreement. Deletions of Accommodations and Facilities comprising the Trust Estate may occur as a result of deletion by casualty, deletion by eminent domain, or automatic deletion, all as further set forth in the Trust Agreement. Deletions of Component Sites may occur as a result of automatic deletion as further set forth in the Trust Agreement. In the event all or any portion of the Trust Estate is deleted from the Trust, a sufficient number of Owner Beneficiaries of the Trust will also be deleted so as to maintain no greater than a One-to-One Owner Beneficiary to Accommodation Ratio. Deletions shall comply with the terms of the Trust Agreement. Upon an Owner Beneficiary defaulting on his or her Owner Beneficiary Obligations, the Trustee may delete and cancel such Owner Beneficiary as a Beneficiary under the Trust Agreement subject to the terms of the Trust Agreement and compliance with the lockout rules of F.S. §721.13(6). Upon such deletion, the Trustee shall perform pursuant to the terms of the Trust Agreement. Neither the Trustee nor any Beneficiary shall be authorized to make any substitutions to any of the Trust Estate, except for replacements as provided above or except as may otherwise be permitted pursuant to F.S. Ch. 721.

15.   **DELETION, CANCELLATION OR SUSPENSION OF PURCHASER.**   If Purchaser defaults in his or her Owner Beneficiary Obligations, the Purchaser may be deleted, suspended or cancelled as a Beneficiary under the Trust Agreement pursuant to the terms of the Trust Agreement, the By-Laws of the Club and subject to compliance with the lock-out rules of F.S. §721.13(6); provided, however, before any such deletion, cancellation or suspension, Purchaser shall be entitled to the rights as set forth in the lockout rules of F.S. §721.13(6) and the Trust Agreement and By-Laws of the Club, including the right to cure such default.

16.   **VACATION POINTS.**   The number of Vacation Points authorizing the personal, non-commercial use of Accommodations and Facilities within the Bluegreen Vacation Club Trust outstanding and allocated to individual purchasers who are members of the Club shall at all times correspond equally to (or an amount less than) the actual Vacation Point value of Accommodations and Facilities owned/held by the Trustee. Each time an Owner Beneficiary is added (through issuance of Owner Beneficiary Rights and appurtenant Vacation Points pursuant to a Bluegreen Owner Beneficiary Agreement entered into by Developer), (i) Developer, Facilitator or their affiliate shall convey to the Trustee an additional Resort Interest equivalent in Vacation Points value as has been provided to the incoming Purchaser or (ii) the incoming Purchaser shall convey to the Trustee his or her Resort Interest equivalent in Vacation Points as has been provided to the incoming Purchaser. Vacation Points and Class A Membership in the Club are not separable from Owner Beneficiary Rights and may not be used for any commercial purpose.

EXHIBIT D TO NOTICE OF REMOVAL
EXHIBIT A TO BUGREBOURTD COMPLAINT
PAGE 10                                         V006050YV

Vacation Points. The minimum number of Vacation Points presently required to be allocated to any one Purchaser is 3,000. The allotted use allocation of each Vacation Point was initially established at a $1.00 use valuation per Vacation Point, which allocation relates to a balancing of demand for requested occupancy with a determined number of Vacation Points equating to a daily use. Such valuation is for demonstrative use purposes only and Vacation Points have no independent cash or other monetary value. Developer/Seller reserves the right to increase or decrease such use allocation, from time to time, as determined by Developer/Seller in its sole discretion. Each Resort Interest made a part of the Bluegreen Vacation Club will be assigned a Vacation Point use value. The number of Vacation Points allocated to a Purchaser will determine which Accommodations or Facilities, and at which times of the year, such may be reserved and occupied by Purchaser or any other Owner Beneficiary. In establishing the Vacation Point value of each Accommodation, Developer/Seller will take into account the location and anticipated relative use demand at each Component Site that the Developer/Seller intends to offer to the Trustee as a part of the Bluegreen Vacation Club Trust, and Developer/Seller shall use its best efforts, in good faith and based upon all reasonably available evidence under the circumstances, to further the best interests of all Purchasers of the Bluegreen Vacation Club as a whole with respect to the opportunity to use and enjoy the Accommodations and Facilities of the Bluegreen Vacation Club Trust. The Vacation Point value may be periodically adjusted from time to time in order to respond to actual Purchaser use pattern and changes in Purchaser use demands for the Accommodations existing at that time within the Bluegreen Vacation Club Trust.

**18. SAVING AND BORROWING OF VACATION POINTS.** Purchasers will be allowed to save Vacation Points from their current Owner Use Year for use in the next succeeding Owner Use Year and borrow Vacation Points from the next succeeding Owner Use Year for use in the current Owner Use Year in accordance with the Club rules on saving and borrowing, as such may exist from time to time, including the following, if required by the Vacation Club Managing Entity, Purchasers must pay all Club Dues and Common Assessment Fees attributable to all saved or borrowed Vacation Points. The rules on saving and borrowing may require that Purchasers notify the Vacation Club Managing Entity in writing prior to the termination of the Owner Use Year for which Purchaser desires to save Vacation Points. If Purchaser fails to provide any such required notice all unused Vacation Points for that Owner Use Year shall expire upon expiration of such Owner Use Year. Vacation Points that are properly borrowed but not used in the current Owner Use Year may be saved if permitted by the Vacation Club Managing Entity. The rules on saving and borrowing may also require that Purchasers notify the Vacation Club Managing Entity in writing prior to the commencement of the Owner Use Year for which Purchaser desires to borrow Vacation Points. Vacation Points that are properly borrowed but not used in the current Owner Use Year shall expire upon expiration of the current Owner Use Year and cannot be re-borrowed or saved. Saving and borrowing may be limited, on an annual basis, to a percentage determined, from time to time, by the Vacation Club Managing Entity, whose decision to authorize saving and borrowing will be based upon anticipated relative use demand of each Component Site. The rules regarding saving and borrowing will be exercised by the Vacation Club Managing Entity in good faith and based upon all reasonably available evidence under the circumstances with the objective to further the best interest of the Purchasers of the Bluegreen Vacation Club Trust as a whole with respect to their opportunity to use and enjoy the Accommodations and Facilities of the Plan. The rules may provide that any saving and borrowing may be subject to a charge.

**19. NON-TRANSFERABILITY OF VACATION POINTS.** Vacation Points are not separable from Owner Beneficiary Rights and will not be transferable from one Owner Beneficiary to another so as to authorize increased year to year usage. All Owner Beneficiaries are subject to the By-Laws of the Club. In addition, as further set forth in the text of the Multi-site Public Offering Statement and the Club By-Laws, certain benefits and facilities of the Plan including, without limitation, membership in the Bluegreen VIP Program, whether Basic or Enhanced/Traveler Plus Membership, are personal to each Owner Beneficiary and are not assignable or transferable, unless such transfer is facilitated by the Developer/Seller or its authorized agents.

**20. RESERVATION GUIDELINES.** The Vacation Club Managing Entity shall establish, from time to time, reservation guidelines and rules and regulations which shall be binding upon the Purchaser and all other Owner Beneficiaries. Such reservation guidelines and rules and regulations may establish the nightly minimum basis for use of Accommodations and Facilities, weekend and holiday use of Accommodations and Facilities, split-week reservations regarding Accommodations and Facilities, and bonus time use of Accommodations and Facilities.

**21. CONVERTING MEMBER RIGHTS.** Purchaser acknowledges that the Club includes Converting Owner Beneficiaries (Converting Members) who are those who held title to a Resort Interest prior to their converting into membership within the Bluegreen Vacation Club. Rights of Converting Members are set forth in the Bylaws of the Club.

**22. PRE-AUTHORIZED CHECK PLAN.** Purchasers who enroll in the Pre-Authorized Check Plan ("PAC Plan") (a) authorize the withdrawal, by debit entry or otherwise, from a depository account specified by Purchaser (the "Account"), amounts on the recurring dates each month sufficient to make payments required under this Agreement and/or the Note contemplated hereunder and (b) acknowledge and agree that the terms and conditions respecting the PAC Plan as set forth in the Note and the PAC Plan Agreement are incorporated herein by this reference.

**23. CONSTRUCTION OF SUBJECT PROPERTY AND AMENITIES.** If the subject Property is not complete, it is anticipated that it will be complete by the date estimated for initial possible occupancy, provided, however, in any event Developer/Seller shall complete the subject Property within two (2) years of the date this Agreement is signed by Purchaser, subject only to delays caused by Acts of God, strikes, material shortages or other conditions beyond the Developer/Seller's control which constitute impossibility of Developer/Seller's performance under the law of the state in which the Property is located. As of the date of this Agreement, certain amenities to be completed by the Developer/Seller may not have been completed. To the extent such amenities are identified in the current Bluegreen Vacation Club Multi-Site Public Offering Statement as being not yet completed, the Developer/Seller estimates that such amenities will be completed within two (2) years of the date this Agreement is signed by Purchaser, subject to delays caused by acts of God or other conditions or circumstances beyond the reasonable control of Developer/Seller. Otherwise, the recreational facilities and amenities located in the Bluegreen Vacation Club Component Site Resorts are complete and available for use.

**24. NO ORAL OR WRITTEN REPRESENTATIONS, WARRANTIES.** The parties hereto agree that this Agreement, along with the documents referred to herein, are the only agreements and disclosures between them. Purchaser should not rely upon any representations, oral or written, which are not herein set forth. This Agreement will become effective and binding upon the parties hereto when signed by Purchaser in the space provided herein and received and accepted by Developer/Seller. Except as otherwise provided by law, Developer/Seller makes no warranties, express or implied, whatsoever, regarding the Property, Units, Common Elements or Common Furnishings including but not limited to warranties of merchantability or fitness for a particular purpose. The Multi-site Public Offering Statement, which should be reviewed by each Purchaser, provides additional specificity and explanations regarding the information set out herein and shall provide guidance in the interpretation of any provisions hereof.

**25. FURNISHINGS.** Although all model units are for display purposes only, the Property described herein shall have furniture, appliances, equipment and all accent furnishings substantially similar to or of equal quality to those shown or used in the model. Such furnishings shall be provided by Developer/Seller or by Bluegreen Interiors, LLC, a wholly-owned subsidiary of the Developer/Seller. The stipulated retail value of the furnishings will vary between resorts, but is between approximately 2% and 4% of the purchase price of the Property, and is subject to any applicable sales tax. The owners association at the respective component site resort shall own such furnishings or such shall be part of the common elements of the condominium, and in each case the owners association shall be responsible for maintaining and replacing such furnishings within the Property.

**26. INSULATION.** Pursuant to the FTC Regulations, notice is hereby given that each Unit will have blown, rigid or batt insulation installed in all exterior walls to a minimum thickness of one and one-half (1 1/2) inches, which, according to the manufacturer, will yield an average insulation value of at least R-5. Further, each Unit with a roofed ceiling will have blown, rigid or batt insulation installed in the ceiling to a minimum thickness of two (2) inches, which, according to the manufacturer, will yield an average insulation value of at least R-7. Purchaser understands and acknowledges that insulation thickness may be greater and may vary, depending upon local conditions and construction factors, including, but not limited to, such items as wall openings and plumbing or other structures or obstructions within the

03-BG Regular Contract *(electronic device)*
Rev. 11/2014

906775/SCOTT                    Regular Contract

the insulation is based upon information supplied by the insulation installer, and Developer/Seller makes no representations or warranty regarding same.

27. MISCELLANEOUS. The terms and provisions hereof shall be deemed independent and severable, and the invalidity of any one provision or portion thereof shall not affect the validity or enforceability of any other provision hereof.

   (a)  BINDING EFFECT. This Agreement is binding upon the parties hereto and their heirs, legal representatives, successors and assigns. This Agreement represents the entire agreement between the parties hereto and may only be amended or modified by an instrument in writing between the parties. This Agreement shall be construed in accordance with the laws of the State of Florida or elsewhere and shall not be recorded. The recording of this Agreement by the Purchaser shall be considered a breach of this Agreement and, if Purchaser records this Agreement, it may terminate at Developer/Seller's option.

   (b)  DEFINITIONS. The capitalized terms used herein shall be given the meanings as prescribed to them within the Bluegreen Vacation Club Public Offering Statement and the Trust Agreement and, if not defined therein, shall be given the meanings as provided for in F.S. Chapter 721. If a term used herein is not defined as aforesaid, then the term shall be given its normal and customary meaning.

   (c)  NOTICES. Any notice to be given under this Agreement shall be duly given to the last known address of the Purchaser by regular certified mail, return receipt requested, and will be effective three (3) days after placing the same in the U.S. Mail, postage prepaid. Any notice to be given under this Agreement to the Developer/Seller shall be given by certified mail, return receipt requested, at the address set forth hereinabove, unless the Purchaser is notified in writing of an alternative address. By execution of this Agreement, Purchaser agrees to receive future solicitations at the address/phone number(s) given above from Developer/Seller and its affiliates (including, without limitation, Encore Rewards, Inc. and Great Vacation Destinations, Inc.) for their products and services, including without limitation, solicitation by mail, email, fax, and telephone (including by automatic dialing equipment and/or pre-recorded messages).

   (d)  FURTHER DESCRIPTION OF PROPERTY. The parties hereto acknowledge and agree that the Property to be conveyed hereunder is more specifically set forth in the warranty deed conveying the Property to the Trustee as agent for Purchaser, a copy of which will be provided to the Purchaser and terms of which are incorporated herein by this reference.

   (e)  OFAC COMPLIANCE. Purchaser warrants and represents to Developer/Seller that Purchaser is not, and shall not become, a person or entity with whom Developer/Seller is restricted from doing business with under regulations of the Department of Treasury Office of Foreign Asset Control ("OFAC"). Such representation shall include, but not be limited to persons or entities named on OFAC's Specially Designated list and/or Blocked Persons list, or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism); or, other governmental action. Purchaser further warrants and represents that it is not and shall not engage in any dealings or transaction or be otherwise associated with such persons or entities prohibited by OFAC regulations.

   (f)  Americans with Disabilities Act. Certain Accommodations located within the Component Site resorts will be designed for and equipped with handicapped facilities, as set forth and depicted more particularly in the Underlying Declaration and the exhibits thereto. Developer/Seller has advised Purchaser whether the Property that Purchaser is acquiring hereunder is or will be equipped with such facilities.

   (g)  Mold Disclaimer. Mold is found both indoors and outdoors. The presence of mold may cause property damage or health problems. Additional information regarding mold and a mold inspection may be obtained from your county public health unit or a professional trained in that field. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Developer/Seller does not conduct mold inspection with respect to any Accommodations in any Component Site resort, and specifically disclaims any and all representations or warranties as to the absence of mold in connection therewith.

   (h)  Florida Construction Disclosure. CHAPTER 558, FLORIDA STATUTES, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT, CONDOMINIUM, OR INTEREST THEREIN. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE DEVELOPER/SELLER, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER, WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

28. MANAGEMENT AGREEMENT. Bluegreen Vacation Club, Inc. has entered into a Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity") for the management of the Bluegreen Vacation Club Multi-Site timeshare plan. The initial term of the Club Management Agreement was three (3) years commencing May 18, 1994. The Club Management Agreement, pursuant to Section 4 thereof, was automatically renewed for successive three (3) year periods, the most recent of which will expire on May 15, 2009. The Club Management Agreement will continue to be automatically renewed for successive three (3) year terms unless terminated by either party pursuant to its terms. Purchaser understands that the Vacation Club Managing Entity is an affiliate of the Developer/Seller and that management fees are paid to the Vacation Club Managing Entity for management of the Plan pursuant to the Club Management Agreement.

29. For the purpose of Ad Valorem Assessment, Taxation and Special Assessments, the Vacation Club Managing Entity will be considered the taxpayer as your agent pursuant to F.S. §192.037.

30. Accommodations and Facilities may be added to this Multi-Site Vacation Plan without the consent of the Purchasers. The addition of Accommodations and Facilities to this Plan may result in the addition of new Purchasers who will compete with existing Purchasers in making reservations for the use of available Accommodations and Facilities within the Plan, and may also result in an increase in the Annual Assessment against Purchasers for Common Expenses. For more complete details, please refer to Section III.A.6 of the Text of the Multi-Site Public Offering Statement.

31. The Developer is required to provide the Vacation Club Managing Entity with a copy of the approved Multi-Site Public Offering Statement Text and Exhibits filed with the Division and any approved amendments thereto, and any other Component Site documents as described in F.S. §§721.07 or 721.55, that are not required to be filed with the Division, to be maintained by the Vacation Club Managing Entity for inspection as part of the books and records of the Bluegreen Vacation Club Multi-site Vacation Plan.

32. Any resale of this Timeshare Interest must be accompanied by certain disclosures in accordance with F.S. §721.065.

33. This contract is to be construed according to the laws of the state of Florida. Any purchaser solicited in Nevada retains those rights granted him/her under chapter 119A or NRS.

34. The purchaser is relieved of all obligations under this contract if his/her interests are defeated because of the foreclosure of liens against the Project.

03-BG Regular Contract (electronic device)
Rev. 11/2014

906775/SCOTT                    Regular Contract

EXHIBIT D TO NOTICE OF REMOVAL
EXHIBIT A TO CLASS ACTION COMPLAINT
PAGE 12                          VPU605/2015

# EXHIBIT B

This is a binding contract by which you agree to purchase an interest in a time-share project. You should examine the statement of your right to revoke this contract within 5 days which is contained elsewhere in this contract.

RELOAD

BLUEGREEN OWNER BENEFICIARY AGREEMENT
BLUEGREEN VACATION CLUB
[LAS VEGAS PREVIEW CENTER SELLING THE CLUB AT BIG BEAR VILLAGE INVENTORY]

MULTI-SITE TIMESHARE PLAN: BLUEGREEN VACATION CLUB
DEVELOPER/SELLER: BLUEGREEN VACATIONS UNLIMITED, INC.
4960 CONFERENCE WAY N, STE 100, BOCA RATON, FLORIDA 33431-3311

Contract Reference #: 925678

Purchaser(s)  RAYMOND PAUL SCOTT            Social Security No.
              CARLA DEANN SCOTT             Social Security No.

IN HOUSE

Street Address  5704 SCARPA ST          Phone(Home)  661 703 0646   Phone(Bus)
City            BAKERSFIELD             State  CA    Zip  93311      Country  United States of America

Developer/Seller agrees to sell, and the Purchaser agrees to purchase a timeshare estate, being the Property described below. The Property shall be acquired and accepted by the Purchaser upon the following terms and conditions and, in connection therewith, Purchaser is to be designated as an Owner Beneficiary and allocated Vacation Points as set out below. By execution of this Bluegreen Owner Beneficiary Agreement, Purchaser voluntarily appoints and designates the Trustee as his/her lawful agent to be delivered the deed to the Property described below.

By execution hereof, Purchaser is designated an Owner Beneficiary under the Bluegreen Vacation Club Trust Agreement, which was made and entered into as of the 18th day of May 1994, as amended and restated, by and between Developer/Seller and Vacation Trust, Inc., a Florida corporation, as Trustee (the "Trust Agreement"). Each Owner Beneficiary is entitled to exercise Owner Beneficiary Rights. Owner Beneficiary Rights include as an appurtenance thereto an allocation of the below-described Vacation Points and the right to be conveyed, subject to the terms of the Trust Agreement, the below-described Property upon termination of the Trust Agreement. The Vacation Points represent the opportunity to use and enjoy Accommodations and Facilities subject to the Trust Agreement and have been determined in relation to current occupancy demand for the below described Property. The Property is defined as Condominium/Unit No. or as an undivided interest in a particular phase of the Resort as may be further described in the deed for such Property:

Resort Name: THE CLUB AT BIG BEAR VILLAGE  Resort Address:  40671 Village Drive, Big Bear Lake, CA 92315

Accommodation(s) consisting of: Condominium Unit. No. / Vacation Week No. [together with "F" (Full Timeshare Interest) or "E" or "O" (Biennial Timeshare Interest/Even or Odd)]:  17BG/27F, 17BL/14F, 17DL/40F

The Vacation/Unit Week No., above set forth, and the Vacation Points associated therewith, are either designated as Annual (by use of the letter "F", indicating a full Timeshare Interest) or Biennial (by use of the letter "E" or "O", indicating Even Numbered or Odd Numbered Years and one half of a Timeshare Interest). An Annual Vacation/Unit Week with Annual Vacation Points means the period of time during which the owner thereof is afforded the opportunity to use the Accommodations of the Plan on an annual recurring basis. A Biennial Vacation/Unit Week with Biennial Vacation Points means the period of time during which the owner thereof is afforded the opportunity to use the Accommodations of the timeshare Plan on a biennial recurring basis. A Vacation/Unit Week created initially as an Annual Vacation/Unit Week or a Biennial Vacation/Unit Week shall remain so. For purposes of this Agreement, the following definitions shall be controlling:

"Biennial" means every other year and the same shall be determinative on a calendar year basis, except as otherwise provided herein.
"Odd Numbered Years" means those years ending in 1, 3, 5, 7 or 9 and the same shall be determinative on a calendar year basis.
"Even Numbered Years" means those years ending in 2, 4, 6, 8 or 0 and the same shall be determinative on a calendar year basis.

The number of Vacation Points allocated to the Property and the Owner Beneficiary Rights and the designation as "F," "E" or "O" as described below is: 25000 F.

Allocated Vacation Points are used to determine occupancy of Accommodations and Facilities during an Owner's Use Year, although no additional consideration is paid for occupancy allowed by Vacation Points allocated to a respective Owner Beneficiary. The Owner's Use Year commences the first day of the month following execution of this Agreement by Purchaser and Developer/Seller, terminates upon expiration of twelve (12) months following such commencement, and recurs for each succeeding twelve (12) months thereafter. Biennial Vacation Points allow occupancy and use of accommodations only during alternate Owner Use Years, beginning with the initial Owner Use Year following the purchase of the Property, except as otherwise provided herein. Such uses are also subject to provisions for saving and borrowing of Vacation Points, as explained elsewhere herein.

Purchaser shall be obligated to pay Common Assessment Fees and Club Dues in accordance with Part E of the Trust Fund Budget as set forth in Paragraph 4 hereof.

03-BG Regular Contract (electronic device)
Rev. 11/2014

925678/SCOTT                          Regular Contract                          VP06/22/2015

EXHIBIT B TO FIRST AMENDED COMPLAINT
EXHIBIT D TO NOTICE OF REMOVAL
PAGE 94

**PURCHASE TERMS**

1. Purchase Price of Property payable by Purchaser.                                         $30,500.00
2. Down Payment ( 20.50% of Line 1).                                                        $ 6,252.50
3. Closing Costs (Settlement Fees)                                                          $ 350.00
4. State/Local Sales Tax (0.0000000 of Line 1).                                             $ 0.00
5. Total Purchase Price (U.S. Funds) (Add lines 1, 3, and 4).                               $ 30,850.00
6. Total Down Payment (Add lines 2, 3, and 4).                                              $ 6,602.50
7. Initial Deposit Received $ 6,602.50 (CK, MO, MC/VISA, AMEX, DISC).                       $ 6,602.50
8. Balance of Down Payment Required on or before N/A.                                       $ 0.00
9. Amount Financed $ 24,247.50 for 120 months at 15.990%  (Line 1 minus line 2).
10. Monthly Payments of: $ 406.03 beginning on September 21, 2015.

Purchaser agrees to have Chicago Title Company
issue lender's title insurance policy:

Pre-Authorized Check Plan Accepted (Initial if "Yes"):

I have reviewed and agree to the Purchase Terms above:


**REQUIRED DISCLOSURES AND SIGNATURES ON THE NEXT PAGE**

EXHIBIT B TO UNASSIGNED COMPLAINT
PAGE 95
EXHIBIT D TO NOTICE OF REMOVAL
PAGE 95

THIS AGREEMENT IS SUBJECT TO ALL TERMS AND CONDITIONS HEREINAFTER SET FORTH, OR ATTACHED HERETO, WHICH ARE INCORPORATED HEREIN BY REFERENCE. BY SIGNING BELOW, PURCHASER ACKNOWLEDGES HAVING READ AND AGREED TO ALL SUCH TERMS AND CONDITIONS AND FURTHER ACKNOWLEDGES RECEIPT OF THE BLUEGREEN VACATION CLUB MULTI-SITE PUBLIC OFFERING STATEMENT AND ANY APPLICABLE EXCHANGE COMPANY DISCLOSURE STATEMENT.

NO PURCHASER SHOULD RELY UPON REPRESENTATIONS OTHER THAN THOSE INCLUDED IN THIS AGREEMENT AND IN THE DOCUMENTS REFERRED TO HEREIN.

If you execute this agreement in Nevada, your cancellation rights are subject to and protected by Nevada law. The references to the ten (10) day cancellation period pursuant to Florida Statutes, Chapter 721, contained in the text of the Bluegreen Vacation Club Public Offering Statement are not applicable to you, as they only to apply to contracts executed in the state of Florida. Nevada law provides you with the following cancellation right:

The purchaser of a timeshare may cancel, by written notice, the contract of sale until midnight of the fifth calendar day following the date of execution of the contract. The right of cancellation may not be waived. Any attempt by the developer to obtain a waiver results in a contract which is voidable by the purchaser. The notice of cancellation may be delivered personally to the developer, sent by certified mail, return receipt requested, or sent by express, priority or recognized overnight delivery service, with proof of service, to the business address of the developer at: Bluegreen Vacations Unlimited, Inc. at 4960 Conference Way North, suite 100, Boca Raton, Florida 33431, attn: Corporate Sales Accounting. The developer shall, within 20 days after receipt of the notice of cancellation, return all payments made by the purchaser.

PURCHASER(S)

_____       08/22/2015
RAYMOND PAUL SCOTT                  (Date)

_____       08/22/2015
CARLA DEANN SCOTT                   (Date)

DEVELOPER/SELLER:
BLUEGREEN VACATIONS UNLIMITED, INC.

By: _____   08/22/2015
Authorized Agent                    (Date)

05-BG Regular Contract (electronic device)
Rev. 11/2014

925678/SCOTT                    Regular Contract                    VP08/22/2015

TERMS AND CONDITIONS

1. **TRUST AGREEMENT.** The Bluegreen Vacation Club multi-site timeshare plan has been established pursuant to the Trust Agreement (timeshare instrument) and related documents. Vacation Trust, Inc., a Florida corporation, currently acts as the Trustee of the Trust Agreement. The address of Vacation Trust, Inc. is 4960 Communication Avenue, Suite 900, Boca Raton, FL 33431. Each Purchaser pursuant to an Owner Beneficiary Agreement is designated as an Owner Beneficiary pursuant to the terms of the Trust Agreement. The interest of each Owner Beneficiary under the Trust Agreement consists of and is identified as the right to performance by the Trustee of its obligations as set forth in the Trust Agreement. Each Owner Beneficiary's right to performance by the Trustee includes the Trustee holding title to and Occupancy Rights relating to the Accommodations and Facilities within the Bluegreen Vacation Club Trust Estate as agent for each Owner Beneficiary and for the beneficial use and enjoyment of each Owner Beneficiary and the right, subject to the terms of the Trust Agreement, to have the Property conveyed to the Owner Beneficiary named herein upon termination of the Trust Agreement. The Owner Beneficiaries are entitled to use, occupy and enjoy the Property (including Occupancy Rights relating to the Property) within the Bluegreen Vacation Club Trust Estate, subject to availability and to the terms of the Trust Agreement and related instruments.

(a) The timeshare interest being sold and acquired hereunder consists of the Property described above, being a fee simple real estate timeshare estate and, in connection therewith, Purchaser is designated as Owner Beneficiary entitled to the Owner Beneficiary Rights and appurtenant Vacation Points referred to above. Owner Beneficiary Rights include the right to use, occupy and enjoy the Accommodations and Facilities within the Bluegreen Vacation Club Trust Estate coupled with the freehold estate conveyed to the Trustee by Developer/Seller or its affiliate on behalf of the Purchaser upon Purchaser becoming an Owner Beneficiary under the Trust Agreement. Owner Beneficiary Rights are an interest in the Bluegreen Vacation Club Trust, which interest is defined as a "timeshare estate" under F.S. Ch. 721. The duration of this timeshare interest is intended to be perpetual, so long as the Trust Agreement continues. The term of the Vacation Plan is intended to be perpetual; provided, however, that the Resort Interests at each Component Site included within the Vacation Plan are fee simple property interests and either (1) continue until such time as indicated in the Component Site Underlying Declaration at which time the timeshare plans may be extended for one or more additional periods; or (2) are intended to be perpetual pursuant to the Component Site Underlying Declaration. The Trust Agreement is irrevocable, so long as any Owner Beneficiary has a right to occupy any portion of the Trust Estate. Upon termination of the Trust, the Trustee is obligated under the Trust Agreement to convey by quitclaim deed if title to the Property is held by the Trustee, so long as Purchaser is not in default of his or her Owner Beneficiary Obligations. Such transfer shall be subject to the rights of a holder of any outstanding loan or mortgage related to the Property created by the Purchaser and related to the Property to request conveyance of the Property to it.

(b) The Property and other Accommodations and Facilities comprising the Trust Estate (and subject to the Trust Agreement) are owned in fee simple (or leasehold title, if within the Club Pono Kai Component Site) by Developer/Seller at the time of Purchaser's execution hereof and are to be or have been conveyed to the Trustee by deed from Developer/Seller or its affiliate. The Trustee's obligation, pursuant to the Trust Agreement, is to make such Property and other Accommodations and Facilities within the Bluegreen Vacation Club Trust Estate available for the use, occupancy and enjoyment of the Owner Beneficiaries. Purchaser, by the acquisition hereunder, shall be an Owner Beneficiary pursuant to the Trust Agreement. The interest of Developer/Seller in the Accommodations and Facilities is that Developer/Seller presently owns such. Developer/Seller is entitled to designate Owner Beneficiary Rights with appurtenant Vacation Points to Purchasers pursuant to the terms of the Trust Agreement. After conveyance to the Trustee as set forth herein, Developer/Seller has no other actual interest, including interest to control, the Accommodations or Facilities conveyed to the Trustee. Prior to Developer/Seller issuing a deed of the Property to the Trustee as agent for Purchaser, the Property (timeshare estate) shall be released from any lien as may exist encumbering the Property by payment of release fees to the lender thereof or by full satisfaction of said mortgage or lien instrument. Upon such conveyance of the Property, Purchaser directs and authorizes Trustee, if the balance of the purchase price above referred to is not paid in full in cash or certified check, to establish a mortgage against the Property in favor of Developer/Seller or Lender or their designee pursuant to the terms herein to secure the Purchaser's payment therefor.

2. **DEPOSITS.** All deposits, negotiable instruments and money received by the Developer/Seller from the Purchaser pursuant to this Bluegreen Owner Beneficiary Agreement shall, prior to the expiration of the revocation period, be held in escrow pursuant to the provisions of Section 119A.420, Nevada Revised Statutes ("NRS") and Section 119A.268 of the Nevada Administrative Code ("NAC"), with Resort Title Agency, Inc., 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431 ("Escrow Agent"). The Purchaser shall be furnished with a written receipt for the initial deposit and subsequent payments. All monetary amounts recited in this Agreement shall be paid in U.S. Funds.

3. **THE PROPERTY.** The Property shall be the Property, as identified above, which has been allotted a number of Vacation Points determinative of occupancy rights and equivalent to the Vacation Points set out hereinabove provided to Purchaser hereunder. The Property is a Resort Interest under the Trust Agreement. By execution hereof, Purchaser directs and authorizes conveyance of the Property to the Trustee. For each Purchaser provided the Owner Beneficiary Rights and appurtenant Vacation Points from Developer/Seller, Developer/Seller agrees to convey to Trustee a Resort Interest; or cause its affiliates, Facilitator or other third party facilitator to convey to Trustee a Resort Interest, which has been established as requiring for occupancy Vacation Points equivalent to the Vacation Points appurtenant to the Owner Beneficiary Rights of the respective purchaser. The Property and all other property conveyed to the Trustee pursuant to this Agreement and any other Bluegreen Owner Beneficiary Agreement is considered one Trust Estate and property available for personal use and occupancy by all purchasers of Owner Beneficiary Rights, subject to the Trust Agreement and established reservation procedures. The Property conveyed to the Trustee pursuant to this Agreement is in fee simple (or leasehold, if within the Club Pono Kai Component Site Resort) and is intended to remain in title to the Trustee perpetually, subject to deletion rights as set forth hereinafter and as otherwise provided for in the Trust Agreement. The Property is subject to the applicable Underlying Declaration identified in Exhibit 9 of the Bluegreen Vacation Club Public Offering Statement.

4. **COMMON ASSESSMENT FEES AND CLUB DUES.** Purchaser, as an Owner Beneficiary, agrees to pay Common Assessment Fees and Club Dues as set forth in the Bluegreen Vacation Club Public Offering Statement, Trust Agreement, the related documents, including the Club By-Laws, and this paragraph. Purchaser, as an Owner Beneficiary, agrees to pay common expense assessments, as set forth in the Underlying Declaration related to the Property, to the extent they are not included in the Common Assessment Fees. Such obligation to pay the foregoing amounts shall continue regardless of the conveyance of the Property to the Trustee. Purchaser shall pay to the Vacation Club Managing Entity (as hereinafter defined) such foregoing amounts related to the Property at the time that the same are due and payable. Such obligation shall include the obligation to pay any special assessments related to the Property, as well as any real estate taxes attributable to the Property that are not otherwise included in the Common Assessment Fees.

The annual Common Assessment Fees, inclusive of ad valorem real estate taxes, currently payable by Purchaser acquiring Annual Vacation Points and a Full Timeshare Interest hereunder shall equal a base amount of Three Hundred Thirty Five Dollars ($335.00) plus an added amount equal to $0.0508 times the number of Vacation Points appurtenant to the Owner Beneficiary Rights herein allocated to the Purchaser; provided, however, the Annual Common Assessment Fees, inclusive of taxes, currently payable by a Purchaser acquiring Biennial Vacation Points and a Biennial Timeshare Interest shall equal a base amount of Three Hundred Thirty Five Dollars ($335.00) plus an added amount equal to $0.0254 times the number of Vacation Points appurtenant to the Owner Beneficiary Rights herein allocated to the Purchaser. Each Purchaser/Owner Beneficiary shall only be assessed one base amount (currently $335.00) annually without regard to the number of Vacation Points allocated to such Purchaser/Owner Beneficiary. The calculation of Common Assessment Fees is set forth in Part E to the Trust Fund Budget attached in Exhibit 8 of the Public Offering Statement and is calculated by comparison of the number of Vacation Points appurtenant to the Owner Beneficiary Rights allocated Purchaser as forth herein compared to the total number of Vacation Points allocated to all Owner Beneficiaries within Purchaser's respective Common Assessment Fee method group. This allocation may

01-BG Regular Contract (electronic device)
Rev. 1/1/2014

EXHIBIT B TO NOTICE OF REMOVAL
PAGE 97

alter if additional or less Common Assessment Fees are needed because additional components or such Common Assessment Fees are needed because additional components or decrease. Bluegreen Vacation Club, Inc. has the right, pursuant to the Club By-Laws, to increase or decrease such Common Assessment Fees from time to time.

In the event Purchaser is already an Owner Beneficiary at the time of execution of this Agreement, Purchaser agrees to have the Annual Common Assessment Fees determined in this same manner as to all of the Vacation Points allocated to Purchaser, whether allocated previously or hereunder. The Annual Common Assessment Fees due annually on the first day of the respective Purchaser's Owner Use Year. Purchaser will be billed a few days after closing for the Annual Common Assessment Fees for the current year, and the month prior to the start of the Purchaser's Owner Use Year each year thereafter. If the foregoing Annual Common Assessment Fees are not paid when due, default interest plus a late fee may be charged by the Trustee, which default interest is 1.5% of the unpaid balance per month and which late fee shall be in an amount of 5% of the amount due or $25.00, whichever is greater.

Purchaser understands and agrees that Purchaser shall be responsible for the payment of Club Dues, in addition to common expenses and Common Assessment Fees. Club Dues are assessments resulting from the implementation of the Bluegreen Vacation Club plan and are representative of a common expense attributable to such implementation. Club Dues are established pursuant to the Estimated Operating Budget and Line Item Analysis attached in Exhibit 8 of the Public Offering Statement, which describes the various revenues and expenses associated with the operation of Bluegreen Vacation Club. Club Dues for the first year of participation within the Bluegreen Vacation Club will be billed to Purchaser a few days after closing. Thereafter, Club Dues for all Owner Beneficiaries, including Biennial Owner Beneficiaries, are due annually on the first day of the respective Purchaser's Owner Use Year. Each Purchaser/Owner Beneficiary shall only be assessed one Club Dues amount annually without regard to the number of Vacation Points allocated to such Purchaser/Owner Beneficiary. Club Dues are payable without a late fee, within 15 days after the due date. If Club Dues are not paid within 15 days after the due date, default interest in the amount of 1.5% of the unpaid balance per month and a late fee in the amount of 5% of the amount due or $25.00, whichever is greater, may be charged by the Trustee. Club Dues are currently $129.00 per year (plus tax, if applicable) and automatically include Purchaser's membership in the external exchange program then affiliated with Bluegreen Vacation Club (which includes the exchange program's annual renewal fee). Unless otherwise permitted by the Florida Vacation Club Act, as may be amended from time to time, in no event shall Club Dues in a given year exceed one hundred twenty five percent (125%) of the Club Dues for the previous year. Purchasers will only be assessed a special assessment in accordance with the Club By-laws. Failure to pay Common Assessment Fees or Club Dues when due shall cause a lien to be filed against the Property pursuant to the Trust Agreement and Club By-Laws.

5.   PURCHASER'S ACKNOWLEDGMENTS. Purchaser acknowledges by execution of this Agreement, that prior to the execution of this Agreement, Purchaser has received and had an opportunity to read a copy of the Bluegreen Vacation Club Multi-Site Public Offering Statement and the Exhibits attached thereto relating to the Bluegreen Vacation Club and the Property, as well as a copy of any applicable exchange program documents. Purchaser further acknowledges and agrees that Purchaser's reservation and/or use of the Accommodations and Facilities is subject to the Trust Agreement and the manner Owner Beneficiary shall have rights to reserve use of the Accommodations and Facilities on a first-come-first-serve basis, subject to the home resort priority reservation right held by Purchaser and certain other Owner Beneficiaries. Purchaser further acknowledges, agrees and represents that the Property and the rights and appurtenances described herein (in particular the allocated appurtenant Vacation Points) and membership in the Bluegreen Vacation Club are being purchased only for Purchaser's personal use and not for any investment potential or any possible rent returns, tax advantages, depreciation, guaranteed buy-back, as Purchaser's principal residence, or for any commercial purpose whatsoever ('commercial purpose' includes, but is not limited to, a use or purpose that the Developer or the Board of the Association, in its discretion, could reasonably conclude constitutes a commercial enterprise or which otherwise suggests an intent or expectation to derive profit), all of which Purchaser acknowledges and agrees are prohibited and not part of the subject transaction. Purchaser acknowledges that the Property as hereinabove designated, and other real property has been or will be submitted to a timeshare regime in accordance with the applicable Underlying Declaration. The Property shall be allocated voting rights, assessments and other obligations as set forth within the applicable Underlying Declaration and related legal documentation. Transfer to the Trustee of the Property as specified herein by Purchaser constitutes Trustee's membership in the owners' association existing in respect to the Property.

6.   MODIFICATIONS AND CHANGES. Purchaser hereby authorizes the Developer/Seller and/or its affiliates, as the Developer/Seller may deem necessary, to record among the public records of the counties in which the Accommodations and Facilities contained within the Trust Estate may be located, such documents, instruments and exhibits as are required to be filed under the laws of the State of Florida, or other applicable state, in order to create and maintain the Accommodations and Facilities pursuant to Florida law, or other applicable state law, including but not limited to the Florida Timeshare Act. Developer/Seller reserves the right to make changes itself, or through any of its designees, to any such documents, instruments and exhibits as aforesaid, or as Developer/Seller, governmental authorities having jurisdiction over any of the Accommodations and Facilities, or the title insurance company may require or deem necessary, provided the changes do not materially and adversely affect Purchaser's rights as an Owner Beneficiary.

7.   FINANCED PURCHASE. If Purchaser desires purchase money financing in connection with the transaction contemplated hereunder, a loan application will be completed and submitted by Purchaser as part of this Agreement. In such event, this Agreement shall be contingent upon Purchaser obtaining a loan equivalent to a commitment for the amount specified in the face of this Agreement. If the Purchaser fails to qualify for purchase money financing, this Agreement is null and void and all moneys paid by Purchaser will be refunded. Purchaser acknowledges any such loan will require Trustee to execute, grant, and deliver a mortgage or an equivalent instrument encumbering the Property (the 'Mortgage') to Developer/Seller or Lender or their designee on behalf of Purchaser, which Mortgage shall provide the Property as collateral for such loan, and to the extent that the Trustee is required by Developer/Seller or Lender to execute such Mortgage, Purchaser hereby directs and authorizes the Trustee to execute, grant, and deliver such Mortgage. Purchaser shall deliver to Developer/Seller or Lender a Promissory Note (the 'Note') (together with the Mortgage executed by Trustee and such security instruments requested by Developer/Seller or Lender) for the balance of the Purchase Price if such is not paid for fully, at closing, in cash or certified funds. Purchaser agrees to provide a security instrument, including a UCC financing statement, to Developer/Seller, Lender, or their designee and their respective assignees, respecting Purchaser's Owner Beneficiary Rights, including appurtenant Vacation Points, if requested to do so in connection with any such purchase money financing. Trustee shall not be liable or responsible for payment of any Mortgage executed by Trustee on behalf of Purchaser nor shall Trustee assume any such Mortgage upon its acceptance of title to the Property. Developer/Seller and Lender reserve the right to charge Purchaser a reasonable fee for services performed by or on behalf of Developer/Seller or Lender in connection with this loan, including but not limited to services such as providing a payment history or copies of statements to Purchaser, etc. Upon repayment in full of such purchase money loan, Purchaser shall pay to Developer/Seller or Lender the stipulated cost of $25 for a loan payoff processing fee. In no event shall the interest rate charged in connection with the purchase money financing exceed the maximum interest rate permitted by applicable law.

8.   CLOSING AND TITLE. Purchaser shall execute any necessary documents in the form supplied by Developer/Seller as relates to the Property and this transaction prior to closing and pay all closing costs set forth above. Trustee shall be delivered at closing on behalf of Purchaser a Deed conveying to it fee simple title (or leasehold title, if within the Club Pono Kai Component Site Resort) in the Property free and clear of all encumbrances except conditions, limitations, zoning and easements of record at the time of closing, the terms and conditions of the Underlying Declaration and taxes for the then current and all subsequent years. Purchaser agrees that he/she shall be obligated to keep current such purchase money financing as is owed in respect to its acquisition of the Property and Purchaser acknowledges that any failure by Purchaser to do so may result in the deletion, cancellation or suspension of Purchaser from the Bluegreen Vacation Club. At closing, Developer/Seller may deliver to Purchaser a certificate or other evidence of the transactions set out herein as relates to the Property, Owner Beneficiary Rights and appurtenant Vacation Points. Closing will be on such date and at such place as is specified by Developer/Seller or it may be by mail, if authorized by Developer/Seller, estimated to be no later than ninety (90) days from the date of this Agreement, or the

03-BG Regular Contract (electronic device)
Rev. 1/1/2014

925678/SCOTT                          Regular Contract

EXHIBIT B TO FIRST AMENDED COMPLAINT
EXHIBIT D TO NOTICE OF REMOVAL
PAGE 98

completion of the Property. Whichever occurs first, all representations, duties, obligations and agreements of the parties, together with the terms and conditions of this Agreement shall survive the Closing. Trustee may deliver a Mortgage to Developer/Seller, Lender, or their designee in respect to the Property at closing, provided such Mortgage is limited to the Purchaser's loan and such creates no liability to the Trustee other than recourse to the Property. As used herein, closing shall mean delivery of deed and transfer to the Trustee. Pursuant to the terms of the Trust Agreement, the conveyance of the Property to the Trustee will be subject to the foregoing Mortgage granted by Trustee on behalf of Purchaser, provided that Trustee shall not assume any liability therefor. It shall be Purchaser's obligation to maintain all payments on the Note and to assure performance of the Mortgage, including all terms, conditions and covenants thereof. Please refer to Section III.9.C of the Text of the Multi-Site Public Offering Statement for a full description of the status of title of the Accommodations and Facilities in the Bluegreen Vacation Club.

**9.  REFUND PRIVILEGES.**  In the event Purchaser cancels this Agreement during the applicable cancellation period, Developer/Seller (or Lender acting in lieu thereof) will refund to the Purchaser the total amount of all payments made by the Purchaser under this Agreement, reduced by the retail value of any Contract Benefits the Purchaser has actually received prior to the effective date of the cancellation. Such Contract Benefits shall include, but not be limited to:; (a)  an electronic device loaded with the Bluegreen Owners Kit if not returned by the Purchaser to the Developer/Seller in satisfactory condition, reasonable wear and tear excepted which, depending upon brand and model provided, has a cost to the Developer/Seller between two hundred nine dollars and ninety five cents ($209.95) and four hundred thirty-five dollars and fifty-eight cents ($435.58); (b) a conventional Owner's Kit which has a retail value of seventy-five dollars ($75.00) if not returned by the Purchaser to the Developer/Seller in satisfactory condition, reasonable wear and tear excepted; (c) the retail value of any other documents required to be provided to Purchaser under applicable Florida law, and not returned by the Purchaser to the Developer/Seller in satisfactory condition, reasonable wear and tear, excepted; or (d) if the Purchaser has used or occupied any Bluegreen Vacation Club Component Site resort for more than 12 hours prior to delivering a notice of cancellation in accordance with the provisions hereof, a reasonable occupancy charge equal to the fair market nightly rental rate-hereby stipulated to be not less than one hundred fifty dollars ($150.00) per night plus the cost for damages, if any, to the applicable Component Site resort directly attributable to the Purchaser's use or occupancy thereof. The refund shall be made within twenty (20) days after Bluegreen's receipt and acceptance of the notice of cancellation, or within five (5) days of receipt of funds from the Purchaser's cleared check, whichever is later.

**10.  PURCHASER'S BREACH/DEFAULT.**  Time is of the essence of this Agreement, except where otherwise specifically provided for herein. After expiration of the applicable cancellation period, failure to close after demand or to make payments within the time provided for herein, or failure to comply with any of the provisions of this Agreement, shall be considered a breach of this Agreement and all sums paid by Purchaser hereunder shall be retained by the Developer/Seller (or Lender) as liquidated and agreed damages and not as a penalty. In addition, any termination of this Agreement as a result of Purchaser's breach/default of any provisions herein shall not relieve Purchaser of any obligations as may be owed to Developer/Seller (or Lender) or Bluegreen Vacation Club, Inc. hereby, including without limitation, obligations relating to payment of the remaining balance of the purchase price and outstanding Club Dues and Common Assessment Fees. Purchaser shall be liable for Developer/Seller's reasonable attorney's fees and costs incurred by it by virtue of any litigation as to the parties' rights hereunder if the Developer/Seller is the prevailing party. Purchaser acknowledges and agrees that in the event Bluegreen Vacation Club, Inc. (or the Vacation Club Managing Entity), refers Purchaser's outstanding Club Dues and/or Common Assessment Fees account(s) for collection, Purchaser shall also be obligated to pay, in addition to the principal amount owed by Purchaser hereunder in respect thereto, costs and collection fees in the maximum amount permitted by law. Purchaser agrees to defend and indemnify Developer/Seller (and Lender) against all claims of real estate brokers or sales personnel due to acts of Purchaser or Purchaser's representatives, other than brokers or sales personnel employed by the Developer/Seller (and Lender).

**11.  RADON GAS.**  Radon is naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over a period of time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida and other states. Additional information regarding radon and radon testing may be obtained from your County Public Health Unit. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Developer/Seller does not conduct radon testing with respect to any Accommodations in any Component Site resort and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with any Component Site resort.

**12.  BLUEGREEN VACATION CLUB MEMBERSHIP.**  Purchaser acknowledges that as an Owner Beneficiary, he/she will be a Class A Member of the Bluegreen Vacation Club, Inc., a Florida non-profit corporation. Purchaser agrees to be bound by the Articles of Incorporation and By-Laws, together with all rules and regulations as may be adopted from time to time by Bluegreen Vacation Club. Class A Membership and the voting rights related thereto are not separable from Owner Beneficiary Rights.

**13.  INCORPORATION OF TRUST AGREEMENT.**  The parties hereto agree that the terms of the Trust Agreement are incorporated herein by this reference. The parties hereto further agree that the Trust Agreement may be amended, from time to time, pursuant to the terms of paragraph 10.4 of such Trust Agreement.

**14.  ADDITIONS TO, DELETIONS FROM, AND SUBSTITUTIONS OF TRUST ESTATE.**  Developer/Seller is authorized and empowered to add to the Trust Estate additional Accommodations and Facilities, as it may, in its sole discretion, determine from time to time. Any such additions shall be made pursuant to the terms of the Trust Agreement. Deletions of Accommodations and Facilities comprising the Trust Estate may occur as a result of casualty, deletion by eminent domain, or automatic deletion, all as further set forth in the Trust Agreement. Deletions of Component Sites may occur as a result of automatic deletion as further set forth in the Trust Agreement. In the event all or any portion of the Trust Estate is deleted from the Trust, a sufficient number of Owner Beneficiaries of the Trust will also be deleted so as to maintain no greater than a One-to-One Owner Beneficiary to Accommodation Ratio. Deletions shall comply with the terms of the Trust Agreement. Upon an Owner Beneficiary defaulting on his or her Owner Beneficiary Obligations, the Trustee may delete and cancel such Owner Beneficiary as a Beneficiary under the Trust Agreement subject to the terms of the Trust Agreement and compliance with the lockout rules of F.S. §721.13(6). Upon such deletion, the Trustee shall perform pursuant to the terms of the Trust Agreement. Neither the Trustee nor any Beneficiary shall be authorized to make any substitutions to any of the Trust Estate, except for replacements as provided above or except as may otherwise be permitted pursuant to F.S. Ch. 721.

**15.  DELETION, CANCELLATION OR SUSPENSION OF PURCHASER.**  If Purchaser defaults in his or her Owner Beneficiary Obligations, the Purchaser may be deleted, suspended or cancelled as a Beneficiary under the Trust Agreement pursuant to the terms of the Trust Agreement, the By-Laws of the Club and subject to compliance with the lock-out rules of F.S. §721.13(6); provided, however, before any such deletion, cancellation or suspension, Purchaser shall be entitled to the rights as set forth in the lockout rules of F.S. §721.13(6) and in the Trust Agreement and By-Laws of the Club, including the right to cure such default.

**16.  VACATION POINTS.**  The number of Vacation Points authorizing the personal, non-commercial use of Accommodations and Facilities within the Bluegreen Vacation Club Trust outstanding and allocated to individual purchasers who are members of the Club shall at all times correspond equally to (or an amount less than) the actual Vacation Point value of Accommodations and Facilities owned/held by the Trustee. Each time an Owner Beneficiary is added (through issuance of Owner Beneficiary Rights and appurtenant Vacation Points pursuant to a Bluegreen Owner Beneficiary Agreement entered into by Developer), (i) Developer, Facilitator or their affiliate shall convey to the Trustee an additional Resort Interest equivalent in Vacation Points value as has been provided to the incoming Purchaser or (ii) the incoming Purchaser shall convey to the Trustee his or her Resort Interest equivalent in Vacation Points as has been provided to the incoming Purchaser. Vacation Points and Class A Membership in the Club are not separable from Owner Beneficiary Rights and may not be used for any commercial purpose.

EXHIBIT B TO UNSIGNED COMPLAINT
EXHIBIT 1 TO NOTICE OF REMOVAL
VP08/22/201BG
PAGE 99

**17. ESTABLISHMENT OF VACATION POINT VALUES.** Developer/Seller has determined and established that each Accommodation within the Bluegreen Vacation Club Trust is assigned a value based upon Vacation Points. The minimum number of Vacation Points presently required to be allocated to any one Purchaser is 3,000. The allotted use allocation of each Vacation Point was initially established at a $1.00 use valuation per Vacation Point, which allocation relates to a balancing of demand for requested occupancy with a determined number of Vacation Points equating to a daily use. Such valuation is for demonstrative use purposes only and Vacation Points have no independent cash or other monetary value. Developer/Seller reserves the right to increase or decrease such use allocation, from time to time, as determined by Developer/Seller in its sole discretion. Each Resort Interest made a part of the Bluegreen Vacation Club will be assigned a Vacation Point use value. The number of Vacation Points allocated to a Purchaser will determine which Accommodations or Facilities, and at which times of the year, such may be reserved and occupied by Purchaser or any other Owner Beneficiary. In establishing the Vacation Point value of each Accommodation, Developer/Seller will take into account the location and anticipated value demand at each Component Site that the Developer/Seller intends to offer to the Trustee as a part of the Bluegreen Vacation Club Trust, and Developer/Seller shall use its best efforts, in good faith and based upon all reasonably available evidence under the circumstances, to further the best interests of all Purchasers of the Bluegreen Vacation Club as a whole with respect to the opportunity to use and enjoy the Accommodations and Facilities of the Bluegreen Vacation Club Trust. The Vacation Point value may be periodically adjusted from time to time in order to respond to actual Purchaser use pattern and changes in Purchaser use demands for the Accommodations existing at that time within the Bluegreen Vacation Club Trust.

**18. SAVING AND BORROWING OF VACATION POINTS.** Purchasers will be allowed to save Vacation Points from their current Owner Use Year for use in the next succeeding Owner Use Year and borrow Vacation Points from the next succeeding Owner Use Year for use in the current Owner Use Year in accordance with the Club rules on saving and borrowing, as such may exist from time to time, including the following: if required by the Vacation Club Managing Entity, Purchasers must pay all Club Dues and Common Assessment Fees attributable to all saved or borrowed Vacation Points. The rules on saving and borrowing may require that Purchasers notify the Vacation Club Managing Entity in writing prior to the termination of the Owner Use Year for which Purchaser desires to save Vacation Points. If Purchaser fails to provide any such required notice all unused Vacation Points for that Owner Use Year shall expire upon expiration of such Owner Use Year. Vacation Points that are properly borrowed but not used in the current Owner Use Year may be saved if permitted by the Vacation Club Managing Entity. The rules on saving and borrowing may also require that Purchasers notify the Vacation Club Managing Entity in writing prior to the commencement of the Owner Use Year for which Purchaser desires to borrow Vacation Points. Vacation Points that are properly borrowed but not used in the current Owner Use Year shall expire upon expiration of the current Owner Use Year and cannot be re-borrowed or saved. Saving and borrowing may be limited, on an annual basis, to a percentage determined, from time to time, by the Vacation Club Managing Entity, whose decision to authorize saving and borrowing will be based upon anticipated relative use demand of each Component Site. The rules regarding saving and borrowing will be exercised by the Vacation Club Managing Entity in good faith and based upon all reasonably available evidence under the circumstances with the objective to further the best interest of the Purchasers of the Bluegreen Vacation Club Trust as a whole with respect to their opportunity to use and enjoy the Accommodations and Facilities of the Plan. The rules may provide that any saving and borrowing may be subject to a charge.

**19. NON-TRANSFERABILITY OF VACATION POINTS.** Vacation Points are not separable from Owner Beneficiary Rights and will not be transferable from one Owner Beneficiary to another so as to authorize increased year to year usage. All Owner Beneficiaries are subject to the By-Laws of the Club. In addition, as further set forth in the text of the Multi-site Public Offering Statement and the Club By-Laws, certain benefits and facilities of the Plan including, without limitation, membership in the Bluegreen VIP Program, whether Basic or Enhanced/Traveler Plus Membership, are personal to each Owner Beneficiary and are not assignable or transferable, unless such transfer is facilitated by the Developer/Seller or its authorized agents.

**20. RESERVATION GUIDELINES.** The Vacation Club Managing Entity shall establish, from time to time, reservation guidelines and rules and regulations which shall be binding upon the Purchaser and all other Owner Beneficiaries. Such reservation guidelines and rules and regulations may establish the nightly minimum basis for use of Accommodations and Facilities, weekend and holiday use of Accommodations and Facilities, split-week reservations regarding Accommodations and Facilities, and bonus time use of Accommodations and Facilities.

**21. CONVERTING MEMBER RIGHTS.** Purchaser acknowledges that the Club includes Converting Owner Beneficiaries (Converting Members) who are those who held title to a Resort Interest prior to their converting into membership within the Bluegreen Vacation Club. Rights of Converting Members are set forth in the Bylaws of the Club.

**22. PRE-AUTHORIZED CHECK PLAN.** Purchasers who enroll in the Pre-Authorized Check Plan ("PAC Plan") (a) authorize the withdrawal, by debit entry or otherwise, from a depository account specified by Purchaser (the "Account"), amounts on the recurring dates each month sufficient to make payments required under this Agreement and/or the Note contemplated hereunder and (b) acknowledge and agree that the terms and conditions respecting the PAC Plan as set forth in the Note and the PAC Plan Agreement are incorporated herein by this reference.

**23. CONSTRUCTION OF SUBJECT PROPERTY AND AMENITIES.** If the subject Property is not complete, it is anticipated that it will be complete by the date estimated for initial possible occupancy; provided, however, in any event Developer/Seller shall complete the subject Property within two (2) years of the date this Agreement is signed by Purchaser, subject only to delays caused by Acts of God, strikes, material shortages or other conditions beyond the Developer/Seller's control which constitute impossibility of Developer/Seller's performance under the law of the state in which the Property is located. As of the date of this Agreement, certain amenities to be completed by the Developer/Seller may not have been completed. To the extent such amenities are identified in the current Bluegreen Vacation Club Multi-Site Public Offering Statement as being not yet completed, the Developer/Seller estimates that such amenities will be completed within two (2) years of the date this Agreement is signed by Purchaser, subject to delays caused by acts of God or other conditions or circumstances beyond the reasonable control of Developer/Seller. Otherwise, the recreational facilities and amenities located in the Bluegreen Vacation Club Component Site Resorts are complete and available for use.

**24. NO ORAL OR WRITTEN REPRESENTATIONS, WARRANTIES.** The parties hereto agree that this Agreement, along with the documents referred to herein, are the only agreements and disclosures between them. Purchaser should not rely upon any representations, oral or written, which are not herein set forth. This Agreement will become effective and binding upon the parties hereto when signed by Purchaser in the space provided herein and received and accepted by Developer/Seller. Except as otherwise provided by law, Developer/Seller makes no warranties, express or implied, whatsoever, regarding the Property. Units, Common Elements or Common Furnishings including but not limited to warranties of merchantability or fitness for a particular purpose. The Multi-site Public Offering Statement, which should be reviewed by each Purchaser, provides additional specificity and explanations regarding the information set out herein and shall provide guidance in the interpretation of any provisions hereof.

**25. FURNISHINGS.** Although all model units are for display purposes only, the Property described herein shall have furniture, appliances, equipment and all accent furnishings substantially similar to or of equal quality to those shown or used in the model. Such furnishings shall be provided by Developer/Seller or by Bluegreen Interiors, LLC, a wholly-owned subsidiary of the Developer/Seller. The stipulated retail value of the furnishings will vary between resorts, but is between approximately 2% and 4% of the purchase price of the Property, and is subject to any applicable sales tax. The owners association at the respective component site resort shall own such furnishings or such shall be part of the common elements of the condominium, and in each case the owners association shall be responsible for maintaining and replacing such furnishings within the Property.

**26. INSULATION.** Pursuant to the FTC Regulations, notice is hereby given that each Unit will have blown, rigid or batt insulation installed in all exterior walls to a minimum thickness of one and one-half (1 1/2) inches, which, according to the manufacturer, will yield an average insulation value of at least R-5. Further, each Unit with a roofed ceiling will have blown, rigid or batt insulation installed in the ceiling to a minimum thickness of two (2) inches, which, according to the manufacturer, will yield an average insulation value of at least R-7. Purchaser understands and acknowledges that insulation thickness may be greater and may vary, depending upon local conditions and construction factors, including, but not limited to, such items as wall openings and plumbing or other structures or obstructions within the

EXHIBIT B TO FIRST AMENDED COMPLAINT
VP03/22/2016
PAGE 100
EXHIBIT B TO NOTICE OF REMOVAL

walls or ceiling which describe the insulation. The Purchaser understands and agrees that the foregoing information regarding the R-value of the insulation is based upon information supplied by the insulation installer, and Developer/Seller makes no representations or warranty regarding same.

27. MISCELLANEOUS. The terms and provisions hereof shall be deemed independent and severable, and the invalidity of any one provision or any portion thereof shall not affect the validity or enforceability of any other provision hereof.

(a) BINDING EFFECT. This Agreement is binding upon the parties hereto and their heirs, legal representatives, successors and assigns. This Agreement represents the entire agreement between the parties hereto and may only be amended or modified by an instrument in writing between the parties. This Agreement shall be construed in accordance with the laws of the State of Florida or elsewhere and shall not be recorded. The recording of this Agreement by the Purchaser shall be considered a breach of this Agreement and, if Purchaser records this Agreement, it may terminate at Developer/Seller's option.

(b) DEFINITIONS. The capitalized terms used herein shall be given the meanings as prescribed to them within the Bluegreen Vacation Club Public Offering Statement and the Trust Agreement and, if not defined therein, shall be given the meanings as provided for in F.S. Chapter 721. If a term used herein is not defined as aforesaid, then the term shall be given its normal and customary meaning.

(c) NOTICES. Any notice to be given under this Agreement shall be duly given to the last known address of the Purchaser by regular certified mail, return receipt requested, and will be effective three (3) days after placing the same in the U.S. Mail, postage prepaid. Any notice to be given under this Agreement to the Developer/Seller shall be given by certified mail, return receipt requested, at the address set forth hereinabove, unless the Purchaser is notified in writing of an alternative address. By execution of this Agreement, Purchaser agrees to receive future solicitations at the address/phone number(s) given above from Developer/Seller and its affiliates (including, without limitation, Encore Rewards, Inc. and Great Vacation Destinations, Inc.) for their products and services, including without limitation, solicitation by mail, email, fax, and telephone (including by automatic dialing equipment and/or pre-recorded messages).

(d) FURTHER DESCRIPTION OF PROPERTY. The parties hereto acknowledge and agree that the Property to be conveyed hereunder is more specifically set forth in the warranty deed conveying the Property to the Trustee as agent for Purchaser, a copy of which will be provided to the Purchaser and terms of which are incorporated herein by this reference.

(e) OFAC COMPLIANCE. Purchaser warrants and represents to Developer/Seller that Purchaser is not, and shall not become, a person or entity with whom Developer/Seller is restricted from doing business with under regulations of the Department of Treasury Office of Foreign Asset Control ("OFAC"). Such representation shall include, but not be limited to persons or entities named on OFAC's Specially Designated list and/or Blocked Persons list, or under any statute, executive order (including, but not limited to, the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism); or, other governmental action. Purchaser further warrants and represents that it is not and shall not engage in any dealings or transaction or be otherwise associated with such persons or entities prohibited by OFAC regulations.

(f) Americans with Disabilities Act. Certain Accommodations located within the Component Site resorts will be designed for and equipped with handicapped facilities, as set forth and depicted more particularly in the Underlying Declaration and the exhibits thereto. Developer/Seller has advised Purchaser whether the Property that Purchaser is acquiring hereunder is or will be equipped with such facilities.

(g) Mold Disclaimer. Mold is found both indoors and outdoors. The presence of mold may cause property damage or health problems. Additional information regarding mold and a mold inspection may be obtained from your county public health unit or a professional trained in that field. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Developer/Seller does not conduct mold inspection with respect to any Accommodations in any Component Site resort, and specifically disclaims any and all representations or warranties as to the absence of mold in connection therewith.

(h) Florida Construction Disclosure. CHAPTER 558, FLORIDA STATUTES, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT, CONDOMINIUM, OR INTEREST THEREIN. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE DEVELOPER/SELLER, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER, WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

28. MANAGEMENT AGREEMENT. Bluegreen Vacation Club, Inc. has entered into a Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity") for the management of the Bluegreen Vacation Club Multi-Site timeshare plan. The initial term of the Club Management Agreement was three (3) years commencing May 18, 1994. The Club Management Agreement, pursuant to Section 4 thereof, was automatically renewed for successive three (3) year periods, the most recent of which will expire on May 15, 2009. The Club Management Agreement will continue to be automatically renewed for successive three (3) year terms unless terminated by either party pursuant to its terms. Purchaser understands that the Vacation Club Managing Entity is an affiliate of the Developer/Seller and that management fees are paid to the Vacation Club Managing Entity for management of the Plan pursuant to the Club Management Agreement.

29. For the purpose of Ad Valorem Assessment, Taxation and Special Assessments, the Vacation Club Managing Entity will be considered the taxpayer as your agent pursuant to F.S. §192.037.

30. Accommodations and Facilities may be added to this Multi-Site Vacation Plan without the consent of the Purchasers. The addition of Accommodations and Facilities to this Plan may result in the addition of new Purchasers who will compete with existing Purchasers in making reservations for the use of available Accommodations and Facilities within the Plan, and may also result in an increase in the Annual Assessment against Purchasers for Common Expenses. For more complete details, please refer to Section III.A.6 of the Text of the Multi-Site Public Offering Statement.

31. The Developer is required to provide the Vacation Club Managing Entity with a copy of the approved Multi-Site Public Offering Statement Text and Exhibits filed with the Division and any approved amendments thereto, and any other Component Site documents as described in F.S. §§721.07 or 721.55, that are not required to be filed with the Division, to be maintained by the Vacation Club Managing Entity for inspection as part of the books and records of the Bluegreen Vacation Club Multi-site Vacation Plan.

32. Any resale of this Timeshare Interest must be accompanied by certain disclosures in accordance with F.S. §721.065.

33. This contract is to be construed according to the laws of the state of Florida. Any purchaser solicited in Nevada retains those rights granted him/her under chapter 119A or NRS.

34. The purchaser is relieved of all obligations under this contract if his/her interests are defeated because of the foreclosure of liens against the Project.

EXHIBIT D TO RIN ISO NTD COMPLAINT
EXHIBIT D TO NOTICE OF REMOVAL

EXHIBIT E

1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                    **EASTERN DISTRICT OF CALIFORNIA**

8   **RAYMOND SCOTT and**                    | **CASE NO. 1:18-CV-649 AWI EPG**
    **CARLA SCOTT,**
9
                          **Plaintiffs**     | **ORDER ON**
10                                           | **UNOPPOSED MOTIONS TO DISMISS**
                             **v.**          | **UNDER RULE 12(B)(6)**
11
12  **BLUEGREEN VACATIONS CORP. and**
    **Does 1-20,**                           | (Doc. No. 5)
13
                          **Defendants**
14

15          In the summer of 2015, Raymond and Carla Scott contracted with Bluegreen Vacations

16   Corp. to purchase two timeshare properties and "Vacation Points," usable at other Bluegreen

17   facilities and on cruise lines.  *Id.*  In early 2018, the Scotts filed suit against Bluegreen in

18   California state court, alleging breach of contract and fraud for Bluegreen's failure to honor the

19   Contracts.  *Id.* at p. 2.  Bluegreen removed to this Court on diversity grounds.  Doc. No. 1.

20          Bluegreen now moves for dismissal, contending for multiple reasons that the breach-of-

21   contract and fraud claims fail as a matter of law.  *See* Doc. No. 5-1.

22          For the reasons discussed below, the Court finds:

23          (I)     The breach-of-contract claim falls short of federal pleading standards in
24                  some respects but not others, and the Scotts' prayer for emotional-distress
                    damages under this claim is barred by California law;
25          (II)    The fraud claim is not duplicative of the contract claim, but lacks the
                    requisite specificity required by Rule 9(b); and
26          (III)   It is yet to be determined whether the integrated writings bar the claims.

27   For the reasons stated below, Bluegreen's motion will be granted, and the Scotts will be given

28   leave to amend.

## *Background*[1]

On June 6, 2015, Raymond and Carla Scott purchased an interest in a timeshare owned by Bluegreen. Doc. 1-4 at p. 6. In exchange for approx. $27,000, the Scotts acquired ownership of a property located in Big Bear Lake, California, as well as "Vacation Points" to be used at other Bluegreen facilities and on cruise lines. *Id.* On August 22, 2015, the Scotts entered into a second contract with Bluegreen, for approx. $30,000, that gave the Scotts an interest in another timeshare property and "promised additional preferential treatment in the form of Vacation Points . . . ." *Id.* On September 4, 2015, and at multiple times thereafter, Bluegreen "failed to accommodate [the Scotts] travel plans or to otherwise provide any of the benefits designated in the Contract[s]." *Id.* at p. 13.

In March of 2018, the Scotts filed suit against Bluegreen in the Superior Court of California, Kern County, alleging claims for breach of contract and fraud. *Id.* at p. 2. Bluegreen removed to this Court on diversity grounds, and now moves to dismiss for failure to state a claim on which relief might be granted. Doc. Nos. 1, 5.

## *Parties' Arguments*

Bluegreen asserts the Complaint is deficient as a matter of law in three respects:

(I)   The breach-of-contract claim fails to plausibly identify how/what portions of the Contracts were breached, whether the Scotts fully performed/were excused from performing, or how they were damaged;

(II)  The fraud claim fails because it impermissibly attempts to convert a contract action into a tort, and otherwise falls short of the specificity requirements of Fed. R. Civ. P. 9(b); and

(III) The integrated writings (the Contracts) bar both the contract and fraud claims.

Doc. No. 5-1. The Scotts did not file a response.[2] *See* Doc. No. 7.

---

[1] The facts derive from the Complaint (Doc. No. 1-4), as well as the two Contracts submitted by Bluegreen (Doc. No. 6-1)—which the Court judicially notices as "evidence on which the Complaint 'necessarily relies.'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). All facts are construed in the light most favorable to the Scotts—the non-moving party. *Faulkner v. ADT Sec. Servs.*, 706 F.3d 1017, 1019 (9th Cir. 2013).

[2] Bluegreen claims the Scotts' failure to respond is grounds alone for dismissal, citing to *Ghazali v. Moran*, 46 F.3d 52, 53–54 (9th Cir. 1995). *Ghazali* is distinguishable, as the Ninth Circuit in that case merely affirmed a Nevada court's dismissal for failure to comply with that district's local rule. However, the local rule in this district only provides that "[n]o party will be entitled to be heard in opposition to a motion at oral arguments if opposition to the motion has not been timely filed by that party." L.R. 230. The Court took this matter under submission, vacating the hearing, and so Bluegreen's reliance on *Ghazali* is inapposite.

*Legal Standard*

Under Rule 12(b)(6),[3] a claim may be dismissed because of the plaintiff's failure to state a claim upon which relief can be granted.  This encompasses two scenarios: where the complaint lacks a cognizable legal theory, or where it lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mollett v. Netflix, Inc.,* 795 F.3d 1062, 1065 (9th Cir. 2015).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility."  *Id.*  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party.  *Faulkner v. ADT Sec. Servs.*, 706 F.3d 1017, 1019 (9th Cir. 2013).  The Ninth Circuit has distilled the following principles courts are to apply to Rule 12(b)(6) motions:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.
> Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).

If a motion to dismiss is granted, the district court should grant leave to amend—even if no request to amend the pleading was made—unless amendment "would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities." *Garmon v. County of L.A.*, 828 F.3d 837, 842 (9th Cir. 2016).

---

[3] Citations to the "Rule" or "Rules" are to the Federal Rules of Civil Procedure, unless otherwise specified.

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 104

*Analysis*

## I.   Breach of Contract Claim

In California, the elements of a cause of action for breach of contract are (1) the existence of the contract, (2) defendant's breach, (3) plaintiff's performance or excuse for nonperformance, and (4) the resulting damages to the plaintiff.  *Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011); *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 735 F. App'x 241, 245 (9th Cir. 2018).  "Federal law does not require a plaintiff to recite the contract terms verbatim or to attach a copy of the contract to the complaint[;] [i]nstead, a plaintiff may plead a contract's 'legal effect.'"  *Habtemariam v. Vida Capital Grp., LLC*, 2017 WL 2930846, at *3 (E.D. Cal. July 10, 2017) (citing *Securimetrics, Inc. v. Hartford Cas. Ins. Co.*, 2005 WL 1712008, at *2 (N.D. Cal. July 21, 2005)); *see also Gates v. L. G. DeWitt, Inc.*, 528 F.2d 405, 411 n. 7 (5th Cir.); Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1235 Statement of Particular Matters—Contracts (3d ed.) ("In pleading the existence of an express written contract, the plaintiff, at her election, may set it forth verbatim in the complaint, attach a copy as an exhibit, or plead it according to its legal effect.").  "While it is unnecessary for a plaintiff to allege the terms of the alleged contract with precision, the Court must be able generally to discern at least what material obligation of the contract the defendant allegedly breached."  *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 979 (N.D. Cal. 2014) (citations omitted); *cf. Kassa v. BP W. Coast Prod., LLC*, 2008 WL 3494677, at *4 (N.D. Cal. Aug. 12, 2008) ("Of course, this case would be easier to understand had [plaintiff] attached a copy of the 2005 franchise agreement.").

The Scotts state their breach-of-contract claim as follows:

- On June 5, 2015, the Scotts entered into a written agreement (Contract No. 906775) to purchase a timeshare from Bluegreen, which also allowed them to "use [Bluegreen's] vacation properties . . . at any number of locations throughout the United States and various destinations in other countries."  On August 22, 2015, the parties entered into another written agreement (Contract No. 925678) "intended to elevate [the Scotts'] membership status and entitle [them] to additional benefits offered to [Bluegreen's] preferred customers."
- On September 4 and various times thereafter, Bluegreen breached the agreements by "fail[ing] to accommodate travel plans or to otherwise provide any of the benefits designated in the Contract[s]."

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 105

- The Scotts have "performed all obligations to [Bluegreen] except those [they were] prevented or excused from performing."
- The Scotts suffered monetary damages of approximately $50,000 from payments made on the Contracts, and emotional distress damages of approximately $50,000 from Bluegreen's failure to perform both on the Contracts and in accordance with contemporaneous oral representations.

Doc. No 1-4 at pp. 11-14.

Under *Levitt*, the Scotts' Complaint contains "sufficient allegations of underlying facts" concerning the existence of a contract, Bluegreen's alleged breach, and damages, such that Bluegreen has "fair notice" of these elements. 765 F.3d at 1135. The Complaint lists the contract numbers, and Bluegreen is on notice that the Scotts believe the company has failed to uphold its end of the bargain by not honoring their travel plans or other benefits, all to the tune of approx. $50,000. Is it true Bluegreen failed to provide the Scotts with the benefits of the Contract, such that a large portion of the Scotts' payments provided no value? That is for the parties to root out in discovery, and for Bluegreen to argue against on the assumed-forthcoming summary judgment motion. Is it plausible the Scotts attempted to use their timeshare and Vacation Points, as per the terms of the Contracts, and Bluegreen failed to accommodate them? Certainly. *Cf. Securimetrics*, 2005 WL 1712008, at *2 (finding federal pleading standards satisfied where the complaint sufficiently alleged the legal effect—that the parties insurance contract required defendant-insurer to defend plaintiff in insurance actions of the particular kind at issue, and that defendant-insurer refused to defend); *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 865 (N.D. Cal. 2011) ("[A]t the present pleading stage, plaintiff has sufficiently alleged a general basis for harm by alleging that the breach of his [personally identifiable information] has caused him to lose some ascertainable but unidentified "value" and/or property right inherent in the PII."); *with Langan*, 69 F. Supp. 3d at 980 (granting 12(b)(6) motion where there was "no way for the Court know even generally what the terms of the contract or contracts were, or even how many agreements are at issue[, as the plaintiff] had at least six different contracts with [defendant]."); *Rasidescu v. Midland Credit Mgmt., Inc.*, 435 F. Supp. 2d 1090, 1093 (S.D. Cal. 2006) (granting motion to dismiss on breach-of-contract claim where the complaint failed to identify any alleged contract between the parties, nor any facts and circumstances surrounding the alleged breach of contract).

5

1    However, Bluegreen is correct about two points.  First, the Scotts have not alleged facts to

2    support their allegation that they have performed their end of the bargain.  The entirety of the

3    Scotts' allegation for this element, as stated in the Complaint, is that they "performed all

4    obligations to [Bluegreen] except those [they were] prevented or excused from performing."  Doc.

5    No. 1-4 at p. 11.  This is merely a recitation of the "plaintiff's performance" element for breach of

6    contract in California, which does not pass muster to state a claim under Ninth Circuit precedent.

7    *See Levitt*, 765 F.3d at 1135 ("[T]o be entitled to the presumption of truth, allegations in a

8    complaint or counterclaim may not simply recite the elements of a cause of action, but must

9    contain sufficient allegations of underlying facts to give fair notice and to enable the opposing

10   party to defend itself effectively."); *see also Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123,

11   1131 (S.D. Cal. 2012) (finding a breach of contract claim failed under the 'plaintiff performance'

12   element as it was unclear "how [plaintiff] has performed all obligations under the contract or [was]

13   otherwise excused from performing such obligations.").  For this reason, the Scotts' breach-of-

14   contract claim is deficient, and must be dismissed.  As the Court sees no reason why this issue

15   cannot be remedied, the Scotts will be granted leave to amend the breach-of-contract claim.

16   *Garmon*, 828 F.3d at 842 (9th Cir. 2016).

17   Second, as to the Scotts' claim for "emotional distress damages . . . for failure to perform

18   on the Contracts[,]" California law is clear that such damages are not allowed in typical breach-of-

19   contract claims.  *See Erlich v. Menezes*, 21 Cal. 4th 543, 558 (1999) ("Damages for mental

20   suffering and emotional distress are generally not recoverable in an action for breach of an

21   ordinary commercial contract in California."); *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th

22   Cir. 2011) (affirming dismissal of claim for emotional distress damages under a typical breach-of-

23   contract claim).  An exception does exist when the breach also caused bodily harm or "is of such a

24   kind that serious emotional disturbance was a particularly likely result[,]" but the facts here do not

25   indicate the applicability of such an exception.  *See Erlich*, 21 Cal. 4th at 558-59 (citing cases on

26   the types of mental anguish required).  Upon amendment, the Scotts shall omit the prayer for

27   emotional-distress damages from the breach-of-contract claim.

28   / / /

6

## II.     Fraud Claims

Bluegreen raises two arguments as to why the Scotts' fraud claims should fail: (A) that these claims are barred by California law as duplicative of their contract claim; and (B) that the facts alleged in the Complaint fall short the specificity requirement of Rule 9(b).

### A.   The Scotts' fraud claims are not precluded by their contract claim

Bluegreen first contends the Scotts are impermissibly attempting to convert their contract claim into a tort, asserting that the California Supreme Court precludes this. *See Aas v. Superior Court*, 24 Cal. 4th 627, 643 (2000) ("A person may not ordinarily recover in tort for breach of duties that merely restate contractual obligations. Instead, '[c]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.") (citing *Erlich*. 21 Cal.4th at 552). However, a simple cite check of *Erlich* reveals the kinds of acts constituting a breach of those social policies meriting tort remedies; among them—fraud. 21 Cal.4th at 552 ("Tort damages have been permitted in contract cases . . . where the contract was fraudulently induced."); *see also Lazar v. Super. Ct.*, 12 Cal.4th 631, 645 (1996) ("[I]t has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for fraud."); *Hannibal Pictures, Inc. v. Sonja Productions LLC*, 432 Fed. Appx. 700, 701 (9th Cir. 2011) ("Under California law, tort damages may accompany contract claims when the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm.").

The Scotts have alleged two theories of fraud under California law. Doc. No. 1-4 at pp. 4-5. Each give rise to a duty separate and apart from Bluegreen's obligations under the Contracts—a duty not to defraud—and so are not barred by California law. *Erlich*, 21 Cal.4th at 552.

### B.   The Scotts' complaint falls short of Rule 9(b)'s specificity requirement

In California, the general elements of fraud are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 960 (9th Cir. 2013) (quoting *Lazar*, 12 Cal.4th at 638).

/ / /

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 108

1      Under Rule 9(b), when alleging fraud, "a party must state with particularity the

2  circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9; *see also Vess v. Ciba–Geigy Corp. USA*,

3  317 F.3d 1097, 1103 (9th Cir. 2003) ("While a federal court will examine state law to determine

4  whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b)

5  requirement that the circumstances of the fraud must be stated with particularity is a federally

6  imposed rule.").  Intent and other mental conditions may be alleged generally.  Rule 9(b).

7      To properly plead fraud with particularity under Rule 9(b), "a pleading must identify the

8  who, what, when, where, and how of the misconduct charged, as well as what is false or

9  misleading about the purportedly fraudulent statement, and why it is false."  *Davidson v.*

10  *Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018); *Neubronner v. Milken*, 6 F.3d 666, 672

11  (9th Cir. 1993) ("The complaint must specify such facts as the times, dates, places, benefits

12  received, and other details of the alleged fraudulent activity.").[4]  Further, Rule 9(b) does not allow

13  a complaint to "lump multiple defendants together," but instead requires plaintiffs to "differentiate

14  their allegations when suing more than one defendant . . . and inform each defendant separately of

15  the allegations surrounding his alleged participation in the fraud."  *Swartz v. KPMG LLP*, 476 F.3d

16  756, 764–765 (9th Cir. 2007).  At a minimum, a plaintiff must "identify the role of each defendant

17  in the alleged fraudulent scheme."  *Altman v. PNC Mortg.*, 850 F.Supp.2d 1057, 1070 (E.D. Cal.

18  2012) (quoting *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)).

19      The Scotts allege two theories of fraud against Bluegreen and twenty of its agents:

20  negligent or intentional misrepresentation, and promise without intent to perform.  The Complaint

21  alleges these theories as follows:

22

---

23  [4] A number of California federal courts also cite to *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153,
157 (1991), for the proposition that, in a fraud action against a corporation, a plaintiff must "allege the names of the
24  persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they
said or wrote, and when it was said or written."  *See Moss v. Infinity Ins. Co.,* 197 F. Supp. 3d 1191, 1198 (N.D. Cal.
25  2016); *Tapia v. Davol, Inc.*, 116 F. Supp. 3d 1149, 1163 (S.D. Cal. 2015); *Meixner v. Wells Fargo Bank, N.A.*, 101 F.
Supp. 3d 938, 956 (E.D. Cal. 2015); *Delarosa v. Boiron, Inc.*, 818 F. Supp. 2d 1177, 1191 (C.D. Cal. 2011).
26  This Court questions the reliance on this specific provision of *Tarmann* as properly interpreting Rule 9(b), since
*Tarmann* is a state court decision regarding California state procedure.  *See Boring v. Nationstar Mortg., LLC*, 2014
27  WL 5473118, at *5 (E.D. Cal. Oct. 28, 2014) ("In an action pending in federal court, 'the Federal Rules of Civil
Procedure apply ... irrespective of whether the substantive law at issue is state or federal.'" (quoting *Vess*, 317 F.3d at
28  1102)).  While *Tarmann's* level of detail may be important against a corporation to satisfy Rule 9(b), this should be
considered under the circumstances of each case, not as a hard-and-fast rule of federal procedure.

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 109

- Intentional or Negligent Misrepresentation:
  - Bluegreen defrauded the Scotts by making two misrepresentations of fact. On June 5, 2015, Bluegreen represented that the Scotts would acquire "the benefits of having a timeshare vacation property and vacation points that could be used for purposes of staying at a number of vacations [sic] sites purportedly owned or controlled by [Bluegreen] throughout the U.S. as well as being able to use these points on various cruise lines." On August 22, Bluegreen "promised additional preferential treatment in the form of vacation points to be used at various vacation sites and cruise lines."
  - These representations were in fact false, when the truth was that Bluegreen "will not honor [its] representations," despite the Scotts having made "substantial efforts to use the vacation points and to book reservations at various facilities" owned by Bluegreen.  Bluegreen had no reasonable ground for believing these representations were true.
  - Bluegreen "made the representations with the intent to defraud and induce plaintiff to [enter into the Contracts]."
  - The Scotts "did not know the representations were false and believed they were true."  They "acted in justifiable reliance upon the truth of the representations."
- Promise without Intent to Perform:
  - Bluegreen made a promise about a material matter—that the Scotts could "use vacation points and [] book reservations at various facilities" owned by Bluegreen—without any intention of performing on these promises.
  - Bluegreen intended to defraud and induce the Scotts to rely upon these promises so as to enter into the Contracts.
  - The Scotts were unaware of Bluegreen's intention not to perform.
  - They acted in justifiable reliance upon the promise, and were induced to enter into the Contracts.

Doc. No. 1-4 at pp. 4-9. As to damages under both theories, the Scotts allege they "suffered monetary damages of approximately $50,000 from payments made on the Contracts, and emotional distress damages of approximately $50,000 from Bluegreen's failure to perform both on the Contracts and in accordance with contemporaneous oral representations." *Id*. at p. 10.

Taken in a light most favorable to the Scotts, the Complaint falls short of Rule 9(b)'s requirement to identify "the who, what, when, where, and how" of the fraudulent schemes, what about the schemes is false, why so, and which defendant took what actions. *Davidson*, 889 F.3d at 964; *Swartz*, 476 F.3d at 764–765.  The Scotts have identified the two dates on which meetings took place, but then only generally allege "preferential treatment."  They only generally allege that "Bluegreen" made the representations and promises, but do not identify who specifically said what. *Swartz*, 476 F.3d at 764-765; *Renner v. Bluegreen Corp.*, 2016 WL 10835981, at *3 (C.D. Cal. Aug. 15, 2016) (dismissing under Rule 9(b) where the plaintiffs did not allege the employees'

9

1    titles, responsibilities, or the contexts in which they represented themselves as being authorized to

2    speak for defendants regarding the timeshare interests);[5] *Multifamily Captive Grp., LLC v.*

3    *Assurance Risk Managers, Inc.*, 578 F. Supp. 2d 1242, 1249 (E.D. Cal. 2008) ("Rule 9(b) does not

4    require plaintiffs to provide the identity of the individual(s) making the alleged fraudulent

5    statements, [but at] a minimum, plaintiffs must identify the role of each defendant in the alleged

6    fraudulent scheme."); *but see Smith v. Jenkins*, 626 F. Supp. 2d 155, 167 (D. Mass. 2009), *rev'd on*

7    *other grounds*, 732 F.3d 51 (1st Cir. 2013) ("Smith's inability to provide the name of one of the

8    Century 21 brokers is not fatal to his claim [under Rule 9(b)]. At the initial phases of a case, the

9    civil law takes a permissive view of the propriety of 'John Doe' pleading when the identity of a

10   party can only be ascertained through discovery."). Finally, the Scotts merely allege they made

11   "*substantial* efforts use the vacation points and to book reservations at *various* facilities" (Doc.

12   No. 1-4 at p. 7, emphasis added), which is too general an allegation to withstand Rule 9(b). *See*

13   *Dorian v. Harich Tahoe Dev.*, 1996 WL 925859, at *3 (N.D. Cal. Jan. 16, 1996) (dismissing under

14   Rule 9(b) where the allegations merely stated the defendant committed "hundreds of acts of . . .

15   fraud"). Finally, the Complaint merely recites the element for "justifiable reliance" without

16   providing facts to buttress the Scotts' allegation, which falls short not only of Rule 9(b) but also

17   Rule 8. *See Levitt*, 765 F.3d at 1135 ("[T]o be entitled to the presumption of truth, allegations in a

18   complaint or counterclaim may not simply recite the elements of a cause of action . . . .").

19          For these reasons, the Scotts' claim for fraud must be dismissed. *Levitt*, 765 F.3d at 1135.

20   As with the breach-of-contract claim, the Court sees no reason why the Scotts cannot amend to

21   rectify the Complaint's deficiencies, and so leave to amend will be granted. *Garmon*, 828 F.3d at

22   842 (9th Cir. 2016). Upon amendment, the Scotts must be mindful to plead all elements of fraud,

23   under both theories, with the requisite specificity required by Rule 9(b). *Cf. Keicy Chung v.*

24   *Vistana Vacation Ownership, Inc.*, 2017 WL 6886721, at *7 (C.D. Cal. Oct. 19, 2017) (dismissing

25   under Rule 9(b) where documents attached to the complaint demonstrated that the defendants did

26   not make any false representations or false statements); *Abramson v. Marriott Ownership Resorts,*

27
     ―――――――――――――
28   [5] *Renner* relies on the holding of *Tarmann*, 2 Cal.App.4th 153, when dismissing for lack of specificity as to corporate
     agency. Though the Court questions *Tarmann's* applicability in *every* Rule 9(b) situation, here, the principle is
     applicable due to the number of Bluegreen's alleged agents, some of whom are listed as Doe Defendants.

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 111

1   *Inc.*, 155 F. Supp. 3d 1056, 1065 (C.D. Cal. 2016) (dismissing under Rule 9(b) where the plaintiffs

2   "merely allege that their ability to reserve was not ideal."); *with Westgate Resorts, Ltd v. Reed*

3   *Hein & Assoc., LLC*, 2018 WL 5279156, at \*5 (M.D. Fla. Oct. 24, 2018) (stating, in dicta, that the

4   allegations meet Rule 9(b) when a plaintiffs "identify and detail [defendants'] statements, when

5   and where they were made, why their statements were false or misleading, how the statements

6   deceived [plaintiff into] stopping their required Timeshare Agreement payments, how [p]laintiffs

7   were damaged, and what [defendants] obtained as a consequence of their purported fraud.").

8   **III.   Integrated Writings as a Bar to Oral Representations**

9          Under California law, contract terms must be interpreted to give effect to the mutual

10   intention of the parties at the time the contract was formed. *See Ameron Intern. Corp. v.*

11   *Insurance Co. of State of Pennsylvania*, 50 Cal. 4th 1370, 1378 (2010).  Extrinsic evidence may

12   not be considered "to vary or contradict the clear and unambiguous terms of a written, integrated

13   contract." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (2008).

14   However, under California law, fraud may be based on prior or contemporaneous statements

15   which are inconsistent with the terms of a written integrated agreement.  *See Riverisland Cold*

16   *Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1183 (2013); *see also May v.*

17   *Semblant, Inc.*, 2014 WL 3725296, at \*4 (N.D. Cal. July 23, 2014) ("Under California law, the

18   parol evidence rule does not bar introduction of prior or contemporaneous understandings to plead

19   fraud.  What the parol evidence rule *does* bar is Plaintiff's introduction of evidence of prior or

20   contemporaneous understandings to contradict the terms of an integrated written agreement

21   without seeking a remedy on that contract.").

22          Due to the ambiguous nature of the allegations in the Scotts' initial Complaint, the Court

23   will reserve any discussion on the effect of the Contracts on the Scotts' claims. *See Grouse River*

24   *Outfitters Ltd v. NetSuite, Inc.*, 2016 WL 5930273, at \*8 (N.D. Cal. Oct. 12, 2016) ("The []

25   disclaimers may defeat one or more of the fraud claims, or they may not. There are limits, under

26   California law, on the ability to contractually insulate oneself from liability for one's own

27   fraud[.]").  The parties are advised to consider the effect of this area of California law when

28   amending (and moving to dismiss).

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 112

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1. Defendants' Motion to Dismiss (Doc. No. 5) is GRANTED;

2. Plaintiffs are granted 21 days from the date of service of this Order to file a First
   Amended Complaint; and

3. If after 21 days, Plaintiffs have not filed a First Amended Complaint, the dismissal will
   be deemed granted with prejudice and the case will be closed.

IT IS SO ORDERED.

Dated:   November 20, 2018

SENIOR  DISTRICT  JUDGE

12

EXHIBIT E TO NOTICE OF REMOVAL
PAGE 113

EXHIBIT F

1

Stephen M. Dake, SBN 89289
DAKE, BRAUN & MONJE, LLP

2

1626 - 19th Street, Suite 23
Bakersfield, CA 93301

3

Telephone: (661) 322-0991
Facsimile: (661) 322-0650

4

5

Attorneys for RAYMOND SCOTT and CARLA
SCOTT

6

7

8

UNITED STATED DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

9

10

11

RAYMOND SCOTT and CARLA SCOTT,

Case No. 1:18-cv-00649-AWI-JLT

Plaintiffs,

12

**NOTICE OF DISMISSAL PURSUANT
TO FEDERAL RULES OF CIVIL
PROCEDURE 41(a)**

v.

13

BLUEGREEN VACATIONS
CORPORATION, et al.,

14

15

Defendants.

16

17

PLEASE TAKE NOTICE:

18

This action is dismissed by the Plaintiffs in its entirety, without prejudice.  The dismissal is

19

made pursuant to Fed.R.Civ.P. 41(a)(1)(A)(i).

20

DATED:  December 11, 2018.

DAKE, BRAUN & MONJE, LLP

21

22

By _____

23

Stephen M. Dake, Attorneys for Plaintiffs

24

25

26

27

28

1

NOTICE OF DISMISSAL

1
2

## PROOF OF SERVICE (CODE CIV. PROC. SECTIONS 1013A, 2015)

### STATE OF CALIFORNIA, COUNTY OF KERN

3            I am employed in the County of Kern, State of California.  I am over the age of 18
years and not a party to the within entitled action.  My business address is 1626 - 19th Street, Suite
4  23, Bakersfield, California, 93301.

5            On **December 11, 2018**, I served the foregoing document entitled **NOTICE OF
DISMISSAL PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 41(a)** on the
6  interested parties in this action as follows:

7  BY MAIL:

8  D. Dennis La, Esq.
ANGLIN FLEWELLING RASMUSSEN CAMPBELL
9  & TRYTTEN LLP (AFRCT)
301 North Lake Avenue, Suite 1100
10  Pasadena, CA  91101

11            By first class U.S. Mail with postage thereon fully prepaid.

12            I am "readily familiar" with the business practice of my firm for collection and
processing of correspondence and pleadings for mailing with the U.S. Postal Service.  Under that
13  practice, such correspondence and pleadings are processed and deposited with the U.S. Postal Service
that same day, with postage thereon fully prepaid, at **Bakersfield, California**, in the ordinary course
14  of business.  The above sealed envelope(s) was/were placed for deposit with the U.S. Postal Service
on the date stated above, with postage thereon fully prepaid, following the firm's ordinary business
15  practice.

16            I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct.

17

18  Executed on **December 11, 2018**, at Bakersfield, California.

19

20                   Nina J. Ballantine

21
22
23
24
25
26
27
28

2

NOTICE OF DISMISSAL

EXHIBIT G

1  G. MARK ALBRIGHT, ESQ.
2  Nevada Bar No. 001394
   D. CHRIS ALBRIGHT, ESQ.
3  Nevada Bar No. 4904
   **ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
4  801 South Rancho Drive, Suite D-4
   Las Vegas, Nevada  89106
5  Tel:  702.384.7111
   Fax: 702.384.0605
6  gma@albrightstoddard.com
7  dca@albrightstoddard.com
   *Attorneys for Plaintiffs*
8

9              **UNITED STATES DISTRICT COURT**

10                 **DISTRICT OF NEVADA**

11

12  JOSEPH M. DROPP, MARY E. DROPP,         CASE NO.:
    ROBERT LEVINE, SUSAN LEVINE, and
13  KAARINA PAKKA, Individually and on Behalf
    of All Others Similarly Situated,
14

15                   Plaintiffs,

16  v.                                      **CLASS ACTION COMPLAINT**

17
    DIAMOND RESORTS INTERNATIONAL,          **JURY TRIAL DEMANDED**
18  INC.; DIAMOND RESORTS HOLDINGS,
    LLC; DIAMOND RESORTS CORPORATION;
19  DIAMOND RESORTS INTERNATIONAL
    CLUB, INC., a/k/a THE CLUB OPERATING
20  COMPANY; DIAMOND RESORTS U.S.
    COLLECTION DEVELOPMENT, LLC;
21  DIAMOND RESORTS U.S. COLLECTION
    MEMBERS ASSOCIATION; APOLLO
22  MANAGEMENT VIII, L.P., APOLLO
    GLOBAL MANAGEMENT, LLC, MICHAEL
23  FLASKEY; and KENNETH SIEGEL,
24

25                   Defendants.

26

27      **COME NOW** Plaintiffs JOSEPH M. DROPP, MARY E. DROPP, ROBERT LEVINE,

28  SUSAN LEVINE, and KAARINA PAKKA (the "Plaintiffs"), by and through their undersigned

---

1   attorneys, and bring this action on behalf of themselves and all persons similarly situated, against

2   Defendants DIAMOND RESORTS INTERNATIONAL, INC.; DIAMOND RESORTS

3   HOLDINGS, LLC; DIAMOND RESORTS CORPORATION; THE CLUB OPERATING

4   COMPANY; DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC; DIAMOND

5   RESORTS U.S. COLLECTION MEMBERS ASSOCIATION; DIAMOND RESORTS HAWAII

6   COLLECTION DEVELOPMENT LLC; and DIAMOND RESORTS HAWAII COLLECTION

7   MEMBERS ASSOCIATION (collectively "Diamond" or "DRI"), APOLLO MANAGEMENT

8   VIII L.P. and APOLLO GLOBAL MANGEMENT, LLC (collectively, "Apollo"), and MICHAEL

9   FLASKEY and KENNETH SIEGEL (collectively "Individual Defendants," and together with

10   DRI and Apollo the "Defendants"), based on personal knowledge with respect to themselves and,

11   on information and belief derived from, among other things, investigation of counsel and review

12   of public documents as to all other matters, and complain and allege as follows:

13                                 **NATURE OF THE CASE**

14       1.      This action arises out of Defendants' sale of unregistered securities in violation of

15   Section 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

16   §§ 77e(a), 77e(c), 77*l*(a)(1) & 77o(a).  Sections 5(a), 5(c), and 12(a)(1) require that any securities

17   sold in the United State be registered with the United States Securities and Exchange Commission

18   ("SEC").

19       2.      Diamond is in the business of selling "points," which are marketed to prospective

20   purchasers as an investment which will appreciate in value and can be easily resold.  These

21   "points" are aggregated in exchange pools.  Every purchaser of points simultaneously becomes a

22   member of one or more vacation Associations or Clubs, which enables the owner of the points to

23   reserve rooms in one of Diamond's resort or hotel properties.  Diamond sells points to new point

24   purchasers, as well as existing owners, in person, at sales centers in several Diamond resorts

25   throughout the United States.

26       3.      The common practice utilized by the Diamond sales operation throughout the

27   United States is as follows:  Prospective purchasers (including new purchasers as well as existing

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

owners to whom Diamond seeks to sell additional points) are typically provided with some kind of conditional benefit or incentive, such as a gift certificate, free vacations, free tickets to shows or a reduced room rate at a condominium or hotel. In order to realize such a benefit, the prospective purchaser is required to attend a 60 to 90 minute sales presentation. No contract or other official DRI document describing the terms of the point investment is provided to the prospective purchasers until the time of closing.

4.      Prospective purchasers are organized by DRI depending upon their characteristics and the perceived likelihood that they will agree to purchase points. DRI then assigns these prospective purchasers to work with DRI salespeople who are also called vacation counselors. The sales presentations exceed 90 minutes and often last five to six hours in length or longer. Moreover, DRI tells prospective purchasers that they will forfeit their benefits if they leave the sales presentation before the respective salespeople agree that the presentation is over. Prospective purchasers are not permitted to take any contract, information sheets, Purchase and Security Agreements ("PSAs" or "Agreements"), Credit Sales Contracts, notes, or other written materials with them off premises prior to closing, nor are prospective purchasers given time to consult with their own advisors, attorneys or any other person during the sales presentation.

5.      DRI salespeople's common practice is to pitch the points to prospective purchasers (including Plaintiffs and the other members of the Class) as more than just a way to vacation. Rather, DRI pitches its points as an investment that will appreciate in value due to continuing improvements made by Diamond in the quality and number of its resort and hotel properties, the general appreciation of real estate in the future and the managerial skill that DRI provides in operating the properties it holds in its Collections. DRI salespeople tell their unwitting targets – over the course of hours-long, high pressure sales pitches – that, by purchasing points "now," the purchasers will receive a discounted purchase price that is only available on the day of the sales presentation; they are investing in their future; their points will increase in value; they can use their points to pay annual maintenance fees; they can bequeath the points to their heirs as an inheritance;

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

-3-

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   and they can sell their points – at a profit – at any time.  Thus, these "points" are actually investment

2   contracts, and therefore securities, under the United States securities laws.

3         6.      Once the prospective purchasers succumb to the sales pitches and agree to purchase

4   points, they are individually shepherded to a sales center "quality control" person (or otherwise

5   labeled individual), whose job it is to obtain the purchaser's signature on a lengthy, densely-

6   worded sales contract (the PSA) and to instruct the purchaser to initial numerous items on a lengthy

7   information sheet (often the initials are generated electronically by the sales people for the

8   purchasers' "convenience").   In reality, purchasers are not given sufficient time to read the

9   documents, nor are they permitted to take the documents with them off premises before the closing,

10   nor may purchasers discuss the terms and conditions of the PSAs, and/or any other contracts or

11   documents given to them by DRI with any other person prior to signing and initialing these

12   documents.  Moreover, by the time that the typical purchaser goes through the closing process, he

13   or she is too exhausted to read or understand the provisions of these documents and is not capable,

14   by training, to understand the substance or legal ramifications of executing them. The closing

15   documents contradict parts of what the prospective purchasers are told and/or shown during the

16   sales presentations.

17         7.      Many of DRI's point purchasers are induced to buy tens of thousands of points,

18   representing many weeks of vacations that the typical purchaser could never possibly utilize.

19   These points can cost hundreds of thousands of dollars, and the purchases are often financed by

20   DRI at credit card interest rates. In addition, the points are accompanied by an obligation to pay

21   yearly "maintenance" fees for use of the various resorts found in the particular Collection the

22   purchaser bought into. Maintenance fees have risen at a rate far higher and faster than ordinary

23   inflation despite the economies of scale that DRI has in place to manage its properties. As such, a

24   common complaint by purchasers is that maintenance fees have become unaffordable over time.

25   DRI is allowed to increase maintenance fees by as much as 25% per year. As a result, existing

26   point investors or members are often induced to purchase additional points in order to reach

27   "preferred" thresholds.  DRI tells these point purchasers or members that if they buy more points,

28

<div align="center">-4-</div>

1    the DRI member will no longer be required to pay "maintenance" fees. By way of example, DRI

2    investors are told that by becoming platinum members (platinum members own 50,000 or more

3    points), the investors may redeem their points at the rate of 30 cents each to pay for maintenance

4    fees. Since maintenance fees are currently approximately 18 cents each, the DRI investor is told

5    that he or she can actually profit "off the spread" by purchasing more points. However, when DRI

6    investors try to redeem points, they discover that there is no such program in place.

7         8.    Unfortunately for Plaintiffs and other Class members, Defendants' sales pitches

8    regarding the investment value of the points are false.  DRI points do not increase in value, there

9    is no viable secondary market for them, and DRI severely restricts the resale of points.  Rather

10   than receiving a return on their investment, Plaintiffs and other Class members are on the hook for

11   massive annual maintenance fees that keep going up and up each year.  This is in addition to the

12   exorbitant cost of the points themselves (and any interest payments thereon).  Moreover, these DRI

13   contracts or PSAs last in perpetuity.  There is no way for the DRI member to sell their membership.

14   In fact, DRI memberships are liabilities not assets.

15        9.    The Securities Act of 1933 requires all sellers of securities to register those

16   securities with the Securities and Exchange Commission ("SEC") to prevent precisely the types of

17   abuses perpetrated by Defendants in connection with the sale of their "points."  The Securities Act

18   was passed in response to the stock market crash of 1929, which was caused in part by issuers

19   selling stocks or other investments based on false representations, without disclosure of material

20   information, and/or without and continuing reporting obligations.  Investors had no way of

21   knowing whether they were receiving an interest in a meaningful enterprise, or a stock certificate

22   that was not worth the paper it was printed on. In response to this disaster, Congress passed the

23   Securities Act to require that all securities sold in the United States be registered with the SEC.

24        10.    Defendants are selling purchasers investment contracts, and hence securities, even

25   if they are not explicitly described as such and even though the written contracts contradict in part

26   the promises of the sale pitches. Defendants have not followed the registration requirements under

27

28

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 120

1  the securities laws and SEC regulations, and thus, they have violated and are in continuing

2  violation of the Securities Act of 1933.

3  <div align="center">**THE PARTIES**</div>

4  **I.**  **PLAINTIFFS**

5     **A.**  **Plaintiffs Joseph and Mary Dropp**

6        11.    Plaintiffs JOSEPH M. DROPP and MARY E. DROPP (the "Dropp Plaintiffs") are

7  a married couple who, at all times relevant hereto, were and are residents of Hornell, New York.

8        12.    On August 6, 2016, the Dropp Plaintiffs purchased 8,500 points in the Diamond

9  Resorts U.S. Collection for a price of $25,710 following a sales pitch they received in the sales

10  office of DRI in Virginia.

11       13.    On November 9, 2016, the Dropp Plaintiffs purchased 50,000 additional points in

12  the Diamond Resorts U.S. Collection for a price of $140,000, following a sales pitch they received

13  in the Las Vegas sales office of DRI.

14       14.    The DRI salespeople represented to the Dropp Plaintiffs that their points were tied

15  to real property, that the points would increase in value over time as a result of efforts bestowed

16  by DRI, that the points could be sold for a profit, and that the Dropp Plaintiffs could bequeath the

17  points to their heirs.

18       15.    The Dropp Plaintiffs purchased these points in reliance upon the DRI salespeople's

19

20  representations.

21     **B.**  **Plaintiffs Robert and Susan Levine**

22       16.    Plaintiffs ROBERT LEVINE and SUSAN LEVINE (the "Levine Plaintiffs") are a

23  married couple who, at all times relevant hereto, were and are residents of West Hills, California.

24       17.    On October 25, 2016, the Levine Plaintiffs purchased 30,000 points in the Diamond

25  Resorts Hawaii Collection for a price of $84,650 following a sales pitch they received in the sales

26  office of DRI in Kona, Hawaii.

27

28

<div style="text-align:left; writing-mode: vertical;">Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106</div>

<div align="center">-6-</div>

18.     On May 11, 2017, the Levine Plaintiffs purchased 25,000 points in the Diamond Resorts U.S. Collection for a price of $71,250 following a sales pitch they received at the Miami sales office of DRI.

19.     On July 11, 2017, the Levine Plaintiffs purchased 50,000 points in the Diamond Resorts U.S. Collection for a price of $144,000 following a sales pitch they received at the Las Vegas sales office of DRI.

20.     The DRI salespeople represented to the Levine Plaintiffs that their points were tied to real property, that the points would increase in value over time as a result of efforts bestowed by DRI, that the points could be sold for a profit, and that they could bequeath the points to their heirs.

21.     The Levine Plaintiffs purchased their points in reliance upon the DRI salespeople's representations.

**C.     Plaintiff Kaarina Pakka**

22.     Plaintiff KAARINA PAKKA ("Plaintiff Pakka") is an individual who, at all times relevant hereto, was a resident of Ontario, Canada.

23.     On November 16, 2016, Plaintiff Pakka purchased 50,000 points in the Diamond Resorts Hawaii Collection for a price of $175,356, following a sales pitch she received in the Maui sales office of DRI.

24.     The DRI salespeople represented to Plaintiff Pakka that her points were tied to real property, that the points would increase in value over time as a result of efforts bestowed by DRI, that the points could be sold for a profit, and that she could bequeath the points to her heirs.

25.     Plaintiff Pakka purchased these points in reliance upon the DRI salespeople's representations.

**II.     DEFENDANTS**

26.     Defendant DIAMOND RESORTS INTERNATIONAL, INC. ("DRII"), is a Delaware corporation and has a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  Prior to September 2, 2016, DRII was a publically-held

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

company.  On September 2, 2016, DRII was merged into, and therefore acquired by, a fund managed by Defendant Apollo Management VIII, L.P., which is controlled by Defendant Apollo Global Management, LLC, in an all-cash transaction.  Since September 2, 2016 – the date this "going private" transaction was consummated – DRII and all of its various affiliates and subsidiaries have been owned and controlled by Apollo.

27.    Defendant DIAMOND RESORTS HOLDINGS, LLC ("DRH"), is a Nevada limited liability corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  DRH is a subsidiary of DRII, and is the parent of DRC.

28.    Defendant DIAMOND RESORTS CORPORATION ("DRC"), is a Maryland corporation with a principal place of business located at 300 E. Lombard Street, Baltimore, Maryland 21202.  DRC is a subsidiary of Defendant DRH.  DRC owns Defendant THE Club.

29.    Defendant DIAMOND RESORTS INTERNATIONAL CLUB, INC. ("THE Club Operating Company" or "THE Club"), is a Florida corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  Defendant Diamond Resorts International Club does business under the name THE Club Operating Company.  THE Club is wholly owned by Defendant DRC.

30.    Defendant DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, LLC (the "U.S. Collection"), is a Delaware limited liability corporation with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135.  The U.S. Collection is an affiliate of DRII.  When a member-investor purchases membership in the U.S. Collection Association, he or she enters into a purchase and security agreement with the U.S. Collection.

31.    Defendant DIAMOND RESORTS U.S. COLLECTION MEMBERS ASSOCIATION ("the U.S. Collection Association"), is a non-stock, non-profit Delaware corporation with a principal place of business located in Clark County, Nevada.  When a member-investor purchases "points" in DRI's U.S. Collection, he or she is purchasing membership in the U.S. Collection Association.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

-8-

32.     Defendant DIAMOND RESORTS HAWAII COLLECTION DEVELOPMENT, LLC (the "Hawaii Collection"), is a Delaware limited liability company with a principal place of business located at 10600 West Charleston Boulevard, Las Vegas, Nevada 89135. The Hawaii Collection is an affiliate of DRII. When a member-investor purchases membership in the Hawaii Collection Association, he or she enters into a purchase and security agreement with the Hawaii Collection.

33.     Defendant DIAMOND RESORTS HAWAII COLLECTION MEMBERS ASSOCIATION (the "Hawaii Collection Association"), is a non-stock, non-profit Delaware corporation with a principal place of business located in Clark County, Nevada. When a member-investor purchases "points" in DRI's Hawaii Collection, he or she is purchasing membership in the Hawaii Collection Association.

34.     Defendant APOLLO MANAGEMENT VIII, L.P., is a Delaware limited partnership with a principal place of business in New York, New York. Apollo Management VIII, L.P. is an affiliate of Defendant Apollo Global Management, LLC. Apollo Management VIII, L.P. manages the funds, also owned by Apollo Global Management, that in turn own Diamond Resorts International following its acquisition by Apollo on September 2, 2016.

35.     Defendant APOLLO GLOBAL MANAGEMENT, LLC, is a Delaware limited liability corporation with a principal place of business in New York, New York. Apollo Global Management is a private equity fund that, through its affiliates, including Defendant Apollo Management VIII, L.P., currently owns of Diamond Resorts International, following Apollo's acquisition of DRI on September 2, 2016.

36.     Defendant MICHAEL FLASKEY, is the Chief Executive Officer of DRII. He has held senior leadership positions within DRII since 2010, serving as Executive Vice President of Sales and Marketing, North America, and Executive Vice President and Chief Sales and Marketing Officer, and Chief Operating Officer. He has served as CEO since March 2017.

37.     Defendant KENNETH SIEGEL, is the President and Chief Administrative Officer of DRII.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 124

**JURISDICTION AND VENUE**

38.    This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 77*l*, and 28 U.S.C. § 1331 for Plaintiffs' claims arising under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "Securities Act"); and pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C.§ 1332(d)(1)(B), in which a member of the putative class action is a citizen of a different state than the Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

39.    Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b) because acts giving rise to Plaintiffs' claims occurred within this judicial district; DRII, DRH, THE Club, the U.S. Collection, the U.S. Collection Association, the Hawaii Collection, and the Hawaii Collection Association have their principal places of business in this judicial district; and all Defendants regularly conduct business in and have engaged and continue to engage in the wrongful conduct alleged herein – and thus, are subject to personal jurisdiction – in this judicial district.

**FACTUAL ALLEGATIONS**

40.    DRI purports to be in the vacation business, but in reality, it is in the investment business – specifically, the business of selling unregistered, illiquid securities in the form of exchange pools of "points", using high pressure sales techniques.  DRI sells its "points" as an "investment," when, in reality, all the "points" provide (other than an opportunity to try to book rooms at resorts and hotels, which can be done without purchasing points) is a source of debt for DRI's investor-members, who must pay onerous maintenance fees and/or borrow money from a DRI affiliate in order to own and continue to own these points.  At high-pressure, mandatory sales presentations, DRI salespeople convince investor-members that DRI's points (i) appreciate in value; (ii) can be readily sold;  (iii)  are a hedge against inflation; and (iv) constitute an appreciating asset that DRI members can pass along to their children. These representations are false.

**I.    DRI'S BUSINESS MODEL**

41.    DRI's investment scheme is premised upon a convoluted system of "vacation ownership interests" ("VOI").  DRI is commonly thought of as a "timeshare" company, but it does

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

not sell traditional timeshare interests, and indeed, does not refer to itself as such.

42.    In a traditional timeshare model, the timeshare owner purchases the right to use the particular timeshare property in question for a certain number of weeks per year.  The timeshare owner may choose to utilize an exchange program that allows them to swap their weeks at a particular resort with another time share owner's weeks at another resort, but his or her ownership interest is in a particular resort, for a particular period of time.  Indeed, Nevada law protects timeshare owners in this respect by prohibiting timeshare companies from selling more than 365 use-days in any particular timeshare property in any particular year.  *See* Nev. Rev. Stat. §§ 119A.525(1)(c); 119A.307(3)(h).

43.    Although investor-members purchasing points in Nevada are provided a form stating that the DRI salesperson is a licensed real estate agent who has a fiduciary duty to disclose all facts material to the transaction, DRI points are in no way tied to the value of any real estate, and DRI investor-members are not purchasing an interest in real estate, as described in further detail below.

44.    DRI's points provide nothing more than an opportunity to attempt to reserve rooms at various properties during various times of the year.  DRI has developed a matrix that sets forth how many points are required to reserve a room at each of its properties, a calculation that factors in the location, size of the room, time of year, and how far in advance reservations are made.  However, because the points are not tied to a right to use a particular property for a particular period of time, as a traditional time share does, investor-members are not "guaranteed" access to any particular resort or property at any particular time, no matter how many points they own.  Instead, DRI doles out rooms on a first come, first serve basis.  As such, there is no guarantee that Diamond members will ever be able to vacation where or when they want to.

II.    **THE CONVOLUTED RELATIONSHIP BETWEEN DRI, THE CLUB, AND THE U.S. AND HAWAII COLLECTIONS**

45.    Investor-members who purchase points from DRI are actually purchasing membership in a particular "Diamond Collection."  There are nine Diamond Collections located

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  throughout the world, including the U.S. Collection, which consists of interests in resorts located
2  in Arizona, California, Colorado, Florida, Indiana, Missouri, Nevada, New Mexico, South
3  Carolina, Tennessee, Virginia, and St. Maarten, and the Hawaii Collection, which consists of
4  interests in resorts that are primarily located in Hawaii.

5       46.    According to the Purchase and Security Agreement (the "PSA") that an investor-
6  member must sign in order to purchase points in the U.S. Collection, the investor purchases a
7  membership in one of several "Homeowners' Associations" in the U.S. Collection. An investor-
8  member signs a "Credit Sales Contract" to buy into the Hawaii Members Association for the
9  Hawaii Collection.  The PSA further provides that "the basis for the Membership is certain real
10  property interests in various resorts, hotels, and other vacation properties and that title to those
11  interests is held in a trust for the benefit of the Association."  In other words, the investor has no
12  direct ownership interest in any real property, as he or she would in a traditional time share
13  arrangement.  Instead, the real property is owned by or held by the trust, for the benefit of an
14  Association in which the investor is a member solely by virtue of his or her ownership of points.

15       47.    Each Association is administered through a board of directors elected by members
16  – but crucially, DRI owns a "significant number of points"[1] in each Collection, which points are
17  weighted, thereby enabling DRI to control the votes electing the boards of directors for each
18  Association.  Indeed, this is evidenced by the fact that the board of every single Association has
19  hired DRI to provide management services for the Association – services for which DRI receives
20  substantial fees.

21       48.    In addition, each investor-member who purchases points in a Collection is
22  simultaneously enrolled in an entity known as "THE Club" which is a trade name used by DRI.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
Law Offices
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

---

[1] *See* DRII Amended Annual Report on Form 10-k for the year ending Dec. 31, 2015, filed with the S.E.C. on August 8, 2016 (the "DRI 10-k"), at 13.  This was the last annual report on Form 10-k filed with the SEC by DRII before its acquisition by Apollo.  Since Apollo took DRII private, it no longer has SEC filing obligations.

-12-

1  All investor-members who purchase/invest in a U.S. or Hawaii Members Association are

2  automatically enrolled in THE Club.

3       49.    THE Club is a wholly owned subsidiary of DRI.

4       50.    THE Club operates the exchange pool of points. "Points" are defined as "the

5  symbolic currency utilized by THE Club Operating Company to quantify the reservation, use

6  and/or other rights of a Member based on the Member's Qualifying Interest." In turn, "Qualifying

7  Interest" is defined as

8       (a) an interest in an Affiliated Resort, in an Affiliated Collection or in some other
9       program or system entitling the owner thereof to the use or occupancy or both of
         an Accommodation or to obtain an Other Redemption Opportunity, including but
10      not limited to (i) a fee simple estate, an estate for years, or some other ownership
         interest in real property coupled with a right to occupy an Accommodation or one
11      of a group of Accommodations in that real property according to the applicable
         Declaration, (ii) a leasehold or "right to use" interest, or other contractual right to
12      use or occupy an Accommodation or one of a group of Accommodations or to
         obtain an Other Redemption Opportunity, (iii) "points' or any other medium
13      symbolically representing the right to use or occupy an Accommodation or one of
         a group of Accommodations or to obtain an Other Redemption Opportunity, or (b)
14      such interest as THE Club Operating Company may choose to accept in connection
         with bestowing membership on the owner or holder thereof from time to time in
15      accordance with the provisions of these Articles.[2]
16

17      51.    Although "points" in THE Club are defined as quantifying a member's "Qualifying

18  Interest," a "Qualifying Interest" may itself be based on the points purchased to become a member

19  of an Association.

20      52.    In other words, there are two points systems at play – the points an investor-member

21  is assigned when he or she purchases a membership in the Association, and the points he or she is

22  assigned in "THE Club."

23      53.    Of course, these nuances are never explained to investor-members, including

24  Plaintiffs and the Class, during the high pressure sales pitch DRI utilizes to induce them to

25  purchase points.

26

27  _____

28  [2] *See* THE Club Articles, May 2015, at 40.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

54.    The convoluted relationship among the various legal entitles is set forth in this chart from DRI's most recent Form 10-k filing with the SEC.:



*See* DRI 10-k at 20. The relationships among these entities as set forth in this Form 10-k filing are not explained to points purchasers, nor provided to them in written form during the sales presentation or closing.

## III.    THE POINTS HAVE NO INTRINSIC VALUE

55.    THE Club is described as an exchange pool of points. DRI describes this system in sale pitches as permitting investor-members to utilize their points to reserve rooms at resorts all over the world, and therefore not being limited to resorts or hotels within the U.S. Collection. However, because there is no cap on how many investor-members can join THE Club, or the Association, and therefore DRI reserves the right to, and does, add additional points to THE Club from time to time, it is impossible for any investor-member to quantify the vacation stays available to the investor-member by virtue of his or her point ownership or otherwise determine  the value

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 129

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  of his or her investment, especially since these values can change, and do change, based upon how

2  many points the DRI sales operation is able to sell.

3       56.    In fact, rooms at DRI resorts are doled out on a first come, first served basis,

4  meaning that many investor-members cannot vacation when and where they want despite DRI's

5  sales pitch that a points-based model offers members greater flexibility than a traditional timeshare

6  model. Thus, many investor-members end up using their points to book vacations at less desirable

7  locations, and/or during off-peak seasons.

8       57.    Thus, it is impossible to determine what the "face value" of a "point" in the U.S.

9  Collection exchange pool is worth, and even if it were possible to make this determination, the

10  value of a "point" is diluted any time additional points are sold – a common occurrence, because

11  virtually every investor-member is purchasing "new" points.

12       58.    Further, there is no secondary market for the "points," and DRI's universal practice

13  is to refuse to buy back points (except by foreclosure), so it is impossible to determine a "market

14  value" of any investor's interest.

15  **IV.**    **THE ONEROUS, ONGOING COST OF DRI POINTS AND ITS RELATIONSHIP**

16         **TO DRI'S BUSINESS MODEL**

17       59.    While it is difficult, if not impossible, to ascertain the value of DRI points, it is

18  possible to calculate their cost. Investment in DRI "point" exchange pools comes at a high price

19  in the form of Club dues and fees, including (a) a yearly Club Fee, the amount of which is a

20  function of the Member's membership class (or a base fee), plus an amount based on the number

21  of points owned, to cover the costs of Club management; (b) a Property and Services Fee, in an

22  amount to be determined by the Club, to cover the costs relating to the represented services

23  provided by THE Club; (c) closing costs at the time of sale; and (d) "Other Charges," to cover

24  "any expenses associated with the operation of THE Club which are not covered" in the various

25  other fees.

26       60.    The Club Fee represents a significant source of income for DRI. DRI also collects

27  

28  a property "management fee" of 10-15% per year of the costs of operating any resort in a Diamond

-15-

Collection. DRI's revenue from property management contracts increases to the extent that (a) operation costs at managed resorts rise, and consequently, management fees increase proportionately under the cost-plus fee arrangements; (b) DRI adds services under their management contracts; or (c) DRI acquires or enters into contracts to manage additional resorts. In other words, the more investor-members are charged fees for the cost of operating an Association, the more revenue DRI generates. Moreover, the DRI property management contracts renew automatically each year.

61.     In addition to the income generated from fees, DRI generates significant revenue from financing the sale of its points. Many of DRI's investors are unable to purchase their points – which can range from costing a few thousand dollars to tens, or even hundreds, of thousands of dollars – in cash up front. Thus, DRI offers financing, from DRI's financing affiliate, to the investors by loaning them money to purchase the points. Those loans are secured by the points themselves as provided under article 9 of the Uniform Commercial Code.

62.     DRI's financing is a substantial source of DRI's business. Between January 1, 2011 and December 31, 2015, DRI financed 74.5% of all its Membership sales (i.e., sales of points).[3] According to the restated financial statements contained in the DRI 10-k, DRI sold $624,283,000 of vacation interests (including all financed sales) in 2015.

63.     DRI's loans to investor-members are a crucial component of its business model. In order to maintain the liquidity to support its lending to purchasers, DRI relies upon a $100 million loan sale facility with Quorum Federal Credit Union. As DRI stated in its final 10-k filing, "[o]ur ability to borrow against or sell our consumer loans has been an important element of our continued liquidity... In the past, we have sold or securitized a substantial portion of the consumer loans we originated from our consumers."[4]

_____

[3] *See* DRII 10-k, Dec. 31, 2015, at 32.

[4] DRI 10-k, Dec. 31, 2015, at 32.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

64.     Thus, DRI relies on its ability to use its outstanding loans to member-investors as collateral in order to borrow enough money to facilitate selling more points – and therefore issuing more loans – to new member-investors.   As described by Southern Investigative Reporting Foundation in an investigative analysis of DRI's business model:

> [DRI] cannot survive on the amount of cash sales it makes, so it needs to finance sales.  [DRI] has to securitize those loans to bring cash in the door or run the risk of losing money on every sale.  To retain favorable terms for monetizing its debt, the company has to use its own cash to make up shortfalls in the securitization pools.  Since the realized value on customers' loans is less than the amount [DRI] has borrowed against them, it needs to monetize new loans faster and faster.[5]

65.     Like most other components of the DRI investment scheme, what is presented as a wise investment is actually a tremendous expense.  Unlike an interest rate for a home mortgage, for example, DRI financing is set at credit card interest rates, which can be as high as 22% per annum.  Various other protections which exist as part of the underwriting process for homebuyers likewise do not apply to sales of ephemeral "points," such as affordability measures like debt to income ratios.

66.     While mortgage interest payments are often tax deductible, interest payments on "points" are not.  Despite this, and despite the fact that DRI investors do not actually hold any fee simple ownership interest in any real property, DRI sent IRS Form 1098 to investors for all calendar years through 2015.  Form 1098 is the IRS form provided by a lender to a mortgagor setting forth the amount of mortgage interest (which is generally deductible) paid in a particular year.

IV.     **THE HIGH-PRESSURE SALES PROCESS**

67.     The one-on-one, high pressure sales experience is a cornerstone of DRI's business model.  DRI has 61 sales centers around the world, with a full in-house sales and marketing team at 49 of these locations, including their Polo Towers hotel property in Las Vegas, Nevada.   A

---

[5] Roddy Boyd, *Diamond Resorts and Its Perpetual Mortgage Machine*, Southern Investigative Reporting Foundation, March 7, 2016 (available at http://sirf-online.org/2016/03/07/27464/).

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 132

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

substantial portion of DRI's sale of exchange pool "points" in the U.S. Collection take place at the sales office in Las Vegas, though these "points" are sold at various locations throughout the United States.

68.     The DRI sales technique, however, is not unique to any particular office.  The same high pressure sales pitch is utilized by virtually all DRI salespeople at offices throughout the country.  Indeed, DRI touted the uniformity of its sales practice in its most recent (and last) 10-k filing with the SEC, stating:

> Our sales force is highly trained in a consultative sales approach designed to ensure that we meet customers' needs on an individual basis.  We manage our sales representatives' consistency of presentation and professionalism using a variety of sales tools and technology.  The sales representatives are principally compensated on a variable basis determined by performance, subject to a base compensation amount.[6]

69.     In order to generate sales, DRI relies on high-pressure, in-person sale pitches, which take place following presentations at resorts targeted to prospective investors as well as current investors and their guests, and through "mini-vacation" packages.  In these packages, a sales target is offered a free "experience" – for example, a dinner at a high-end restaurant, tickets to a Cirque de Soliel performance in Las Vegas, tickets to a popular sporting event, or even an entire trip to Las Vegas for a period of several days – for "free," *if* they attend and sit through the entirety of a sales presentation that is said to last 90 minutes but often lasts as long as five or six hours or more.  If the target fails to attend the sales presentation, or leaves before the presentation has completed, the individual is told that he or she is responsible for paying the cost of the entire "free" experience.

A.     **DRI Salespeople State the Points Will Increase in Value**

70.     First, the DRI salesperson reiterates that points in THE Club/the Association exchange pool will increase in value, because the value of the underlying real estate properties increases, due largely to DRI's efforts to maintain, upkeep and improve the properties, as well as

---

[6] *See* DRI 10-k at 14.

-18-

1   the general appreciation of real estate.  In effect, the DRI salesperson represents that because DRI

2   is always working to improve the quality of the resorts, and because real property values in general

3   are increasing, the value of the target's investment in THE Club/the Association will increase as

4   well.

5       71.    Further, the prospective investors are routinely told that the points they are

6   purchasing are being sold to them at a discount from their regular price, so that they will

7   immediately have "equity" because they own interests that are worth more than the purchase price.

8       72.    Indeed, during sales presentations, DRI salespersons routinely provide potential

9   investor-members with a one-page document titled "Pricing History and Location Growth for

10  Diamond Resorts International," or similar document (which is sometimes shown on a computer

11  or described orally), which purports to set forth how the DRI points have increased and will

12  increase in value over time.  A recent version of this document states that between January 26,

13  2013 and January 1, 2017 DRI points in the U.S. Collection had a "15 price per point increase in

14  less than three years" with an "average" increase of 25%.  The document notes that a DRI has add

15  several locations between 2007 and 2016.  Finally, the document states that points purchased

16  "today" at a price of $8.61 per point will be "worth" $10.76 per point in one year, and $13.45 in

17  two years.

18      73.    However, as set forth above, the points have no intrinsic value.  They are not tied

19  to any ownership interest in any piece of real estate, because the real estate interest is held in trust

20  for the Association.  Moreover, the offer to sell points at a discount as being time sensitive is false.

21  Prospective purchasers are not receiving any preferential treatment or receiving any special,

22  discounted price on the day of the sales presentation. The price point offer will be available to the

23  purchaser on the following day and the following week.

24      74.    Because THE Club can increase the number of points in the pool as much as it

25  would like, and because THE Club can arbitrarily change the "value" of a point at any time, it is

26  virtually impossible to determine what the value of any member's points is, and thus impossible

27  to determine whether the points' value has increased over time.  Moreover, the points have no

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  market value because they generally cannot be sold due to the restrictions that DRI has placed on

2  them. In effect, DRI points are illiquid and worthless to the purchaser because DRI effectively has

3  a monopoly on the sale of points.

4       75.     DRI salespeople also tell existing investor-members that they will "save money" on

5  maintenance fees for their existing points by purchasing more points. Sales people represent that,

6  by purchasing additional points, an investor will enter a different "tier" of membership and will

7  thereby be able to apply points as payment of paying maintenance fees (or pay fewer maintenance

8  fees). Such representations are false, because the fees are calculated based on how many points a

9  member owns – the more points, the more fees.

10     **B.**    **DRI Salespeople State that there is a Market for Points, and DRI will Help**

11            **Investor-Members Find Buyers for Their Points**

12      76.     Of course, an investment's appreciation in value requires the existence of a market

13 for the investment. DRI salespeople mislead potential investor-members into believing that there

14 is a robust market for the sale of points in THE Club/Association exchange pool, and they will be

15 able to easily sell their points after they have increased in value (which they purportedly already

16 have because they were purchased at a "discount"), thereby capturing a significant return on their

17 investment. DRI salespeople further represent that they, and/or DRI, will assist the investor-buyer

18 in locating a buyer to purchase the DRI member's points.

19      77.     In reality, however, this statement is belied by THE Club's Legal Documents

20 (which potential investor-members are not provided any meaningful opportunity to study and

21 review before agreeing to purchase their points). Points in THE Club are non-transferrable; indeed

22 "membership in THE Club shall be personal to the Member and may not be voluntarily or

23 involuntarily assigned or conveyed regardless of whether the purported assignment or conveyance

24 is to the successor in interest to such Member's Qualifying Interest."[7]

25

26

27 _____

28 [7] *See* THE Club Legal Documents, 2015-2016, Art. 3.5.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106
Law Offices

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 135

78.     While an investor-member's membership in the Association could, theoretically, be sold – conditioned on DRI's consent, which it is entitled to withhold in its discretion and which it virtually never grants – there is no viable market for these membership interests.  First, no fully-informed rational buyer would purchase points on the resale market, if a viable market even existed.  The buyer must be willing to assume the onerous fees described herein.  A reasonable, fully-informed potential buyer would prefer to simply reserve rooms at the resort in question without purchasing any points or interest in the Association.  By way of example, DRI directly markets and rents rooms to the general public at its various resorts. Non-DRI members may book rooms by the night without having to expend enormous upfront sums on points or being charged maintenance fees. Second, DRI restricts the prospective resale of points that are not purchased directly from DRI.     Further, the DRI salesperson's representation that they will help an investor/member sell their points directly contradicts THE Club "Legal Documents," which state that "THE Club Operating Company has no obligation to assist a Member with the resale, lease or rental of his or her Qualifying Interest."

79.     Indeed, so many DRI investor-members (as well as purchasers of interests of various timeshare companies) are desperate to release themselves from their continuing obligation to make high-interest financing payments and exorbitant maintenance fees that an entire industry has arisen to help them do so.  Called "timeshare exit companies", these organizations will – for a fee that typically ranges in the many thousands of dollars to the tens of thousands of dollars – attempt to find a buyer for points or time share interests (or otherwise help the purchaser try to get out of his or her contract).  People generally utilize these timeshare exit companies services only as a last resort, after all prior efforts to rid themselves of their investment have failed. Simply put, once the brief period to rescind the membership has expired, there is no way for an investor-member to get out of his or her contract. Investor-members are trapped in perpetuity because there is no viable secondary market for the resale of points and memberships. Moreover, DRI even prohibits the use of points to rent rooms except to friends and relatives. Accordingly, the timeshare exit companies typically try to negotiate a release from the timeshare membership. Success rates

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 136

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

are extremely low because DRI has no interest in letting investor members out of their contracts. In the overwhelming majority of cases,  the timeshare exit companies advise investor-members to simply stop making payments on their maintenance fees and/or loan. When that happens, DRI terminates the membership, recaptures the points and then resells them to new purchasers. The net result is that the purchasers lose their entire investments. Furthermore, DRI reports the purchasers to the credit agencies thereby damaging the purchasers' credit scores.

80.     Although DRI salespeople regularly represent to member investors that there exists a viable secondary market for points, DRI not only refuses to help its member-investors sell their points, it targets and attacks timeshare exit companies and law firms who attempt to help investor-members (sometimes by suing them) in an attempt to effectively destroy any possible secondary market. DRI has experienced a substantial increase in the number of purchasers who are defaulting on their loans and maintenance fees.

81.     DRI has a significant interest in ensuring that no viable secondary market exists for its points (despite its representations to the contrary during its sale pitches). Pursuant to the Purchase and Security Agreement, DRI can, and does,  "recover" (*i.e.*, repossess) member-investors' points if the member-investor defaults on any payment due to DRI, including any payments due under a loan financed by DRI, maintenance fees, or any other obligation that the member-investor owes to DRI. Thus, if a member-investor is unable to continue making payments to DRI and defaults under the terms of the Purchase and Security Agreement or credit sales contract, DRI can repossess their points and resell them to another  member-investor or new purchaser, meaning that DRI has little to lose – and much to gain – if a member-investor defaults. In fact, the DRI 10-k states that when DRI member-investors default of their payments, those interests "are added to [DRI's] existing inventory and resold at full retail value" and such "recovered" points "may be sold by [DRI] in the form of points to new customers or existing members."[8] If, however, that same member-investor could utilize a secondary market to sell their

_____

[8] DRI 10-k at 21.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

points, they would, presumably, do so – thereby costing DRI the opportunity to profit off of the resale. Thus, DRI has a significant pecuniary interest in ensuring that no viable secondary market for its points is ever established.

**C.    DRI Salespeople Represent That Investor-Members Can Bequeath Their Points to Heirs to Convince Their Potential Sales Targets That the Points are a Sound Investment**

82.    In the course of their sales pitch to potential investor-members, DRI salespeople emphasize the fact that they can leave the points to their children, grandchildren, or other heirs in a will. This tactic is designed to encourage the potential investor-member to view the points as a long-term investment; something they can enjoy and then pass down to their children; and something that will increase in value, act as a hedge against inflation and can one day be sold for a significant profit.

83.    Unfortunately, while THE Club does provide that it will "ordinarily" and at its discretion approve the transfer of points to an immediate family member following an investor-member's death, points in THE Club are not an inheritance any rational person would want. As set forth above, the points are not tied to an interest in real property, they have no intrinsic value, and, indeed, they largely serve to saddle their owner with massive annual fees and loan payments. In leaving their points to their heirs, investor-members are not providing for their future, but rather, they are burdening them with debt.

**D.    The DRI Sales Motto – "No Heat, No Eat"**

84.    The DRI sales pitch itself is designed to exhaust and bewilder a potential investor-member until they "give in" and purchase points. The DRI sales person takes the individual (or couple) to a small office or other area. They are not permitted to leave the room or area to review any written material they are provided – they must first agree to purchase their points on the spot. They cannot consult with an attorney, a financial advisor, one of their adult children, or any other person not in the sales pitch location.

85.    Many of DRI's targets are senior citizens, many of whom are living on a fixed

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1  income. It makes no fiscal sense for these targets (or anyone who succumbs to the sales pitch) to

2  purchase – often via financing at credit card interest rates – hundreds of thousands of dollars of

3  "points" just to go on vacations a few times per year.  Instead, Plaintiffs and the Class purchased

4  points because DRI sold them as an investment.

5      86.    DRI salespeople are highly incentivized to sell points to investors by any means

6  necessary.  DRI salespeople are principally compensated based on a "performance basis," meaning

7  that their income is directly correlated to how many points they sell.

8      87.    Upon information and belief, a motto within the DRI sales department is "no heat,

9  no eat."  "Heat" refers to the high-pressure sales tactics utilized by DRI sales people to induce

10  targets to purchase points; "eat" refers to the salesperson's ability to earn money to buy food and

11  other things.

12  **V.    THE TERMS OF THE DRI PURCHASE AND SECURITY AGREEMENTS**

13      **A.    <u>The Member-Investor's Right to Rescind the Agreements is Illusory</u>**

14      88.    At least some of the DRI Purchase and Security Agreements and credit sales

15  contracts by which DRI sells points in the U.S. Collection and Hawaii Collection contain a

16  rescission provision which provides that the purchaser has 5 to10 days after signing the contract

17  to rescind its terms.

18

19      89.    This right to rescind is illusory, however.  First, as set forth above, investor-

20  members sign DRI contracts following multi-hour long, high pressure sales presentations during

21  which they are given no meaningful opportunity to review the terms of the Purchase Agreement

22  prior to signing.  Moreover, the vast majority of DRI's investor-members are on vacation when

23  they attend a sales presentation and then sign the Agreement, meaning that they generally do not

24  review the terms of the contract until they have returned home – which, in many cases, means they

25  are not even aware of their right to rescind until the deadline by which to do so has already passed.

26      90.    Additionally, the Agreement is constructed with densely-worded, highly technical

27  language in small print with scant headings and little organization.  It is virtually impossible for a

28  layperson to fully comprehend its provisions.  Finally, the purchaser is required to review, sign

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   and initial numerous other documents that would take many hours to read and understand. Simply

2   put, the closing is designed to rush the purchasers through the process so that they are not afforded

3   a fair opportunity to understand what they are buying or what obligations they are undertaking.

4        91.    Further, because the Purchase and Security Agreements and other documents

5   provided to investor-members after they sign the Agreements do not clearly describe the points as

6   a security, nor do the contracts adequately provide accurate and complete information regarding

7   the investor-member's rights under the law nor any of the information required to be set forth in a

8   prospectus for the offering of a security (which in and of itself renders the Agreement void and

9   unenforceable),[9] it is impossible for an investor-member to understand what, precisely, he or she

10  has purchased without the assistance of an attorney and/or financial advisor.  Because investor-

11  members are prohibited from having an attorney, financial advisor, or anyone else review the sales

12  materials including the PSA or the Credit Sales Contract before they sign it, and because most

13  investor-members sign their Agreements while on vacation and thus would not be able to provide

14  the document to their attorney or financial advisor for several days, any right to rescind in 5 to 10

15  days is purely illusory.

16      **B.**    **The Arbitration Clause Does Not Apply**

17       92.    The DRI PSAs and Credit Sales Contracts that the purchasers sign contain a clause

18  mandating that any dispute arising under the terms of the Agreement must be arbitrated. These

19  arbitration clauses are inapplicable and unenforceable because the Agreement represents an

20  attempt to sell an unregistered security.  As such, the entire Agreement – including the arbitration

21  clause – is void and unenforceable under federal securities law.[10]

22       93.    Moreover, the SEC policy and practice is that an issuer of securities may not include

23  a mandatory arbitration provision in its bylaws or attempt to preclude class action (or other)

24  

25  _____

26  [9] *See* 17 C.F.R. 229.500 *et seq.*; 17 C.F.R. 239.11; S.E.C. Form S-1.

27  [10] *See* 15 U.S.C. § 77n; *see also* 15 U.S.C. § 78cc.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 140

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    lawsuits by shareholders.[11].

2    **V.    The Plaintiffs Are Induced to Invest in the Association/THE Club to Their Great**
3    **Detriment**

4        **A.    <u>The Dropp Plaintiffs</u>**

5        94.    The Dropp Plaintiffs, like many other members of the Class, were initially owners

6    of an unrelated timeshare company that was purchased by DRI.  Over the course of approximately

7    15 years, the Dropp Plaintiffs acquired a timeshare interest in four properties located in Virginia

8    Beach, Virginia and Kill Devil, North Carolina, through the Gold Key Resorts ("Gold Key").

9    Under the terms of this timeshare agreement, the Dropp Plaintiffs owned the right to use these

10   properties for certain weeks each year.

11       95.    On or about August 18, 2015, DRI announced that it had purchased Gold Key's

12   timeshare business.

13       96.    The following year, on August 4, 2016, the Dropp Plaintiffs attended an annual

14   sales presentation (described by DRI as an "update meeting") that DRI indicated was mandatory

15   for all Gold Key timeshare owners. At that meeting, DRI told the Dropp Plaintiffs that failure to

16   purchase DRI points would render the Dropp Plaintiffs' existing timeshare membership useless or

17   worthless.

18       97.    Following the sales presentation, the Dropp Plaintiffs purchased a membership in a

19   U.S. Collection Association "worth" 8,500 points for a total cost of $25,000.  In order to pay this

20   amount, the Dropp Plaintiffs were induced to apply for, and received, a Barclaycard Diamond

21   Resort credit card, and placed half of the cost of the points on the Diamond Resort card in order to

22   finance their purchase.

23       98.    Only a few hours after the Dropp Plaintiffs purchased their 8,500 points, they

24   received a phone call from a DRI representative insisting that they were required to schedule an

25   

26   _____

27   [11] *See,* Karan Singh Tyag, *Carlyle Leaves Out Mandatory Arbitration Clause in IPO,* Kluwer Arbitration
     Blog (Feb. 7, 2012), *available at* http://arbitrationblog.kluwerarbitration.com/2012/02/07/carlyle-leaves-

28   out-mandatory-arbitration-clause-in-ipo/.

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 141

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

"orientation meeting" with DRI that would take place in Las Vegas. Plaintiffs were required to pay for airfare and put down a $300 deposit, and the rest of the three-day trip to Las Vegas would be "free." However, if Plaintiffs failed to attend the sales meeting in Las Vegas on the third day of the trip, they would be charged for the entire cost of the trip. Plaintiffs arranged to take the trip and attend the "orientation meeting."

99.     Plaintiffs attended the sales presentation in Las Vegas on November 9, 2016. Plaintiffs were approached by a DRI salesperson. The salesperson took Plaintiffs to a private office and made, *inter alia*, the following representations to them:

- He described DRI points as an "investment."

- He stated that the Dropp Plaintiffs would own an interest in real property by purchasing DRI points.

- He said that these additional points in DRI, plus the 8,500 points already owned by the Dropp Plaintiffs, would be worth approximately $700,000. He indicated that they would have $700,000 of "equity."

- He stated that the value of the points would increase over time due to the improvements and updates that DRI continuously made to their properties.

- He indicated that the points (and the "properties") should be added to the Dropp Plaintiffs' wills and could be bequeathed to their children and grandchildren.

- He stated that the points could be sold for a profit in the future.

- He informed the Dropp Plaintiffs that they could use their Diamond credit card for purchases and earn (wholly separate) points, which could be applied to their maintenance fees.

100.    Relying on these representations that the points were a sound investment, the Dropp Plaintiffs then purchased a membership in a U.S. Collection Association "worth" 50,000 points for a total price of $140,000.

101.    Of the $140,000 sale price for the points, the Dropp Plaintiffs made a down payment of $15,000 and financed the rest through DRI.

102.    In addition to making payments every month towards the cost of the points, the

-27-

1    Dropp Plaintiffs are responsible for annual maintenance fees of approximately $15,000 per year

2    as of January 2018.   Contrary to the DRI salesperson's representations, in no way do purchases

3    made on the Diamond credit card offset or absolve the Dropp Plaintiffs of their obligation to pay

4    their annual maintenance fees.

5       **B.      The Levine Plaintiffs**

6       103.   Plaintiff Susan Levine first purchased DRI points in the U.S. Collection in or around

7    2007.  By 2016, she had acquired approximately 35,000 DRI points in the U.S. Collection.

8       104.   In October 2016, the Levine Plaintiffs travelled to Hawaii on vacation.  While there,

9    they attended a DRI sales presentation on October 25, 2016 at the DRI sales office at the Royal

10   Kona Resort in Kona, Hawaii.  During the course of this sales presentation, a DRI sales person

11   represented to the Levine Plaintiffs that:

12
13       • They should convert all of Susan Levine's points in the U.S. Collection to points in
           the Hawaii Collection, because points in the Hawaii Collection would appreciate
14         faster than points in the U.S. collection due to the fact that there is limited real estate
           in Hawaii, causing real estate values to continue to rise.
15
16       • Their points could be passed down to their heirs and could be sold by their heirs at
           a profit.
17
18       • However, in order to convert Susan's points in the U.S. Collection to points in the
           Hawaii Collection, they would have to purchase additional points in the Hawaii
19         Collection.
20
         • If they purchased points in the Hawaii Collection immediately, they would
21         purchase at a "low price" because the prices per point were steadily increasing.

22      105.   Relying on the DRI salesperson's representations that the points in the Hawaii

23   Collection were a sound investment, on October 25, 2016 the Levine Plaintiffs converted Susan

24   Levine's 35,000 points in the U.S. Collection to points in the Hawaii Collection.  They also

25   purchased a membership in the Hawaii Collection "worth" 30,000 points for a price of $84,650.

26      106.   In May 2017, the Levine Plaintiffs traveled to Miami on vacation.  While there, on

27   May 11, 2017, they attended another DRI sales presentation at the Diamond Crescent Resort in

28   Miami, Florida.  During the course of that sales presentation, a DRI salesperson represented to

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

-28-

them that:

- Points in the U.S. Collection are actually more valuable than points in the Hawaii Collection because the U.S. Collection requires the payment of lower maintenance fees than the Hawaii Collection.

- Points purchased in the U.S. Collection are steadily increasing in value and could be sold at a profit in the future.

- However, in order to convert their points in the Hawaii Collection to points in the U.S. Collection, they would need to purchase additional points in the U.S. Collection.

107.    In reliance on the DRI salesperson's representations that the points in the U.S. Collection were a sound investment, on May 11, 2017 the Levine Plaintiffs converted their points in the Hawaii Collection to points in the U.S. Collection, and purchased a membership in the U.S. Collection "worth" 25,000 points for a price of $71,250.

108.    In July 2017, the Levine Plaintiffs traveled to Las Vegas, Nevada. While there, on July 11, 2017, they attended another DRI sales presentation at the DRI sales office in the Polo Towers in Las Vegas. During the course of the sales presentation, a DRI salesperson represented to them that:

- DRI was implementing a new "Legacy Program" designed to operate as an estate planning device beginning in January 2018. Through the Legacy Program, DRI itself would sell up to 20,000 of the Levine Plaintiffs' points at a price of $8.79 per point, generating a total sale price of $176,000, minus an estimated escrow fee. The profit would be passed along to the Levine Plaintiffs, and they would not have to do anything other than to contact DRI to commence the selling of the points. However, in order to participate in the Legacy Program, the Levine Plaintiffs would have to purchase 50,000 additional points in the U.S. Collection.

- Further, if the Levine Plaintiffs or their heirs wished to sell all of their points in the future, Diamond would "handle" the sale and sell the points at a price of $8.79 per points for a total amount of $1,230,000 minus closing costs. This was presented as an estate planning device.

- Additionally, if the Levine Plaintiffs purchased 50,000 additional points in the U.S. Collection that day, they could convert up to 80,000 of the DRI points to a credit on their Diamond International credit card and could use that credit to pay their annual maintenance fees.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

-29-

- Again, the Levine Plaintiffs were told that prices per point in the U.S. Collection were constantly increasing and they had to purchase points that day in order to reap the benefits of this investment.

109.   In reliance upon the representations of the DRI salesperson, on July 11, 2017, the Levine Plaintiffs purchased an additional membership in the U.S. Collection "worth" 50,000 points for a total cost of $144,000.

110.   In January 2018, the Levine Plaintiffs contacted DRI to request that DRI begin selling some of their points pursuant to the Legacy Program.   To their shock, the DRI representative informed the Levine Plaintiffs that no such program existed, and that DRI would not make any attempts to sell their points.

111.   In addition to making payments every month towards the cost of the points, the Levine Plaintiffs are responsible for annual maintenance fees of approximately $24,000 per year as of January 2018. Contrary to the DRI salesperson's representations, no program exists by which the Levine Plaintiffs can convert some of their points to a credit card credit and use that credit to pay their onerous maintenance fees.

**C.   Plaintiff Pakka**

112.   Like many other class members, Plaintiff Pakka's first interaction with DRI occurred when DRI acquired a traditional timeshare company from which she had purchased timeshare interests, in her case, Sunterra Corporation, in March 2007.   Plaintiff Pakka had purchased a timeshare interest with Sunterra in February 2007.

113.   After DRI acquired Sunterra Corporation in March 2007, Plaintiff Pakka's timeshare interest in Sunterra was "converted" to 30,000 points in the DRI U.S. Collection.

114.   In November 2016, Plaintiff Pakka travelled to Hawaii on vacation.   While there, she attended a DRI sales presentation on November 16, 2016 at the DRI sales office in Maui, Hawaii. During the sales pitch, a DRI salesperson represented to Plaintiff Pakka that:

- The DRI points were an "investment" that would increase in value over time. Indeed, the salesperson provided Plaintiff Pakka with the "Pricing History and Location Growth for Diamond Resorts International" document which, as described above, projects how much value the

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

points will gain over time.

- The value of her points "can only go up."

- She would have "no problem" selling her points.

- In addition to making payments every month towards the cost of the point, she will be responsible for annual maintenance fees of approximately $15,000 per year as of January 2018.

115.    Relying on the representations of the DRI salesperson and the documents the salesperson provided to her during the pitch, on November 16, 2016 Plaintiff Pakka purchased a membership in the U.S. Collection Association "worth" 50,000 points for a total price of $175,356, plus $825 in closing costs.

## STATUTE OF REPOSE ALLEGATIONS

116.    Section 13 of the Securities Act of 1933 provides that all claims under the Securities Act must be brought within one year of the discovery of the violation and within three years after the security was offered to the public.[12]

117.    As described herein, the typical investor would not be able to discover facts sufficient to form the basis for an investigation into the question of whether that the sale of "points" was actually the sale of an unregistered security. Moreover, investors in such points are not put on inquiry notice of the fact that the purchase of such points constitutes the purchase of securities under applicable law. For the reasons alleged herein, Diamond's sales practices and ongoing business practices are designed to prevent such inquiry notice. Reasonable inquiry into this matter is possible only after a thorough investigation and analysis by attorneys or financial professionals with highly specialized knowledge of the provisions of the Securities Act who make sustained efforts to obtain access to a substantial body of information concerning Diamond's sales practices involving numerous investors and salespersons over a period of time in several Diamond sales center locations. Upon information and belief, almost none of the Class members are aware that they have purchased an unregistered security under the Act.

---

[12] *See* 15 U.S.C. § 77m.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

118.   Thus, the full three-year statute of repose, and not the one-year-from-discovery statute of limitations, should apply to the claims set forth herein.

## CLASS ACTION ALLEGATIONS

119.   Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action individually and on behalf of the following class of similarly situated persons:

> All persons who purchased "points" in THE Club and membership in a Diamond Resorts U.S. Collection Members Association or in the Diamond Resorts Hawaii Collection Members Association on or after three years prior to date of filing of this complaint. Excluded from the Class are Defendants and any of their affiliates, current and former employees, officers, and directors.

**A.   Numerosity – Fed. R. Civ. P. 23(a)(1)**

120.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).   Thousands of individuals have collectively purchased hundreds of millions of points in the U.S. Collection. Indeed, according to DRI's last and most recent 10-k filing with the S.E.C., as of December 31, 2015, the DRI loan portfolio (representing loans taken out by investor-members in order to finance their purchase of membership/points) totaled approximately 64,000 loans with an outstanding aggregate loan balance of $916.1 million.[13] Additionally, DRI reported that it earned $765 million in revenue from its "vacation interest sales and financing" segment in 2015.[14]

**B.   Commonality and Predominance – Fed. R. Civ. P. 23(a)(2) and 23(b)(3)**

121.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because it involves common questions of law and fact, and because these common questions predominate over any questions affecting only individual Class members.   These common questions of law and fact include, without limitation, the following:

    a.   Whether the points in a U.S. Collection Members Association, the
        Hawaii Collection and/or THE Club constitute securities under the

---

[13] *See* DRI 10-k, Dec. 31, 2015, at 15.

[14] *See id.* at 6.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 147

Securities Act;

b. Whether DRI violated the registration provisions of the Securities Act;

c. Whether a common practice of DRI employees and/or agents to potential investors was to make representations that "points" are investments that will appreciate in value due to the efforts of DRI as set forth herein; and

d. The nature of relief that may be granted to Plaintiffs and the Class under the Securities Act.

C.    **Typicality – Fed. R. Civ. P. 23(a)(3)**

122.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants.  The relief Plaintiffs seek is typical of the relief sought for the absent Class members and does not conflict with the interests of any other members of the Classes.

D.    **Adequate Representation – Fed. R. Civ. P. 23(a)(4)**

123.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting securities class action litigation to represents themselves and the Class.

124.    Plaintiffs and their counsel are committed to vigorously prosecuting this action and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

E.    **Superiority – Fed. R. Civ. P. 23(b)(2) and 23(b)(3)**

125.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the Class as a whole.

126.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 148

1   controversy.

2       127.  Because the damages suffered by and/or the relief that may be afforded to each

3   individual Class member are relatively small in comparison to the expense of litigation, the

4   expense and burden of individual litigation would make it very difficult or impossible for

5   individual Class members to redress the wrongs done to each of them individually, such that most

6   or all Class members would have no rational economic interest in individually controlling the

7   prosecution of specific actions, and the burden imposed on the judicial system by individual

8   litigation by even a small fraction of the Classes would be enormous, making class adjudication

9   the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

10       128.  The conduct of this action as a class action presents far fewer management

11   difficulties, far better conserves judicial resources and the parties' resources, and far more

12   effectively protects the rights of each Class member than would piecemeal litigation.  Compared

13   to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of

14   individualized litigation, the challenges of managing this action as a class action are substantially

15   outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of

16   class treatment in this Court, making class adjudication superior to other alternatives, under Fed.

17   R. Civ. P. 23(b)(3)(D).

18

19       129.  Plaintiffs are not aware of any obstacles likely to be encountered in the management

20   of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court

21   with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and

22   reduce management challenges.

23                     **CLAIMS FOR RELIEF**

24                        **COUNT I**

25   **(Unregistered Offer and Sale of Securities in Violation of Section 5(a), 5(c),**

26          **and 12(a)(1) of the Securities Act – Against All Defendants)**

27       130.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

28       131.  Section 5(a) of the Securities Act of 1933 prohibits the use of "any means or

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   instruments of interstate commerce or of the mails" in the sale of a security "unless a registration

2   is in effect" as to that security. *See* 15 U.S.C. § 77e(a).

3       132.   Section 5(c) of the Securities Act of 1933 provides that "[i]t shall be unlawful for

4   any person, directly or indirectly, to make use of any means or instruments of transportation or

5   communication in interstate commerce or of the mails to offer to sell or offer to buy through the

6   use or medium of any prospectus or otherwise any security, unless a registration statement has

7   been filed as to such security." *See* 15 U.S.C. § 77e(c).

8       133.   Section 12(a)(1) of the Securities Act of 1933 provides that "Any person who offers

9   or sells a security in violation of section 5...shall be liable...to the person purchasing such security

10   from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover

11   the consideration paid for such security with interest thereon, or for damages if he no longer owns

12   the security." *See* 15 U.S.C. § 77*l*(a)(1).

13       134.   Registration of a security with the SEC is not a perfunctory or rote process.  To the

14   contrary, SEC. regulations mandate that any issuer of a security file a prospectus which in turn

15   must provide extensive, detailed information regarding, *inter alia*, risk factors, ration of earnings

16   to fixed charges, use of proceeds, determination of offering price, plan of distribution, and any

17   potential conflicts of interest of the named experts and counsel. *See, e.g.*, 17 C.F.R. 229.500 *et seq.*

18   17 C.F.R. 239.11, S.E.C. Form S-1.  This prospectus must be reviewed by the SEC to determine

19   full compliance with all applicable regulations.  Any comments to the preliminary prospectus must

20   be addressed to the SEC's satisfaction before the issuer may offer the applicable security for sale.

22       135.   Defendants made use of means or instruments of transportation or communication

23   in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such

24   securities to be carried through the mails or in interstate commerce for the purpose of sale or for

25   delivery after sale.

26       136.   Defendants sold "points" in various "membership associations" exchange pools

27   including the Diamond Resorts U.S. Collection Associations and the Hawaii Collection

28   Association, which are in turn affiliated with points in THE Club.  These points are affiliated with

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   the ability to reserve rooms at various hotels and resorts for various lengths of time. The "points"

2   system is modelled after a traditional timeshare system, but is different in several key respects.

3       137.   Defendants, through their sales people, represented to Class members, including

4   Plaintiffs, that these "points" reflected an ownership interest in real property and were an

5   investment. Defendants further represented that the value of the points would increase over time

6   and Plaintiffs and other Class members would be able to sell their points at a profit. Defendants

7   represented that the value increase would be due, at least in part, to the efforts of Defendants

8   insofar as they manage and market the various hotels, resorts, and other properties.

9       138.   The "points" were marketed as securities.

10       139.   Defendants utilized the mails, and interstate commerce and communication,

11   including interstate telephone calls and internet communication, to market and sell these securities.

12       140.   No registration statements have been filed with the SEC or have been in effect with

13   respect to the offering of the "points."

14       141.   By reason of the foregoing, the Defendants have violated Sections 5(a), 5(c) and

15   12(a)(1) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), & 77l(a)(1).

16       142.   As a direct and proximate result of the Defendant's sale of unregistered securities,

17   Plaintiffs and members of the class have suffered damages in connection with the respective

18   purchases of "points" in the U.S. Collection and the Hawaii Collection.

19

20                              **COUNT II**

21   **(Control Person Liability Pursuant to Section 15(a) of the Securities Act – Against the**
                              **Individual Defendants and Apollo)**

22

23       143.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

24       144.   Section 15(a) of the Securities Act provides that "[e]very person who, by or through

25   stock ownership, agency, or otherwise...controls any person liable under section 11 or 12 [of the

26   Securities Act], shall also be liable jointly and severally with and to the same extent as such

27   controlled person to any person to whom such controlled person is liable..." *See* 15 U.S.C.

28   § 77o(a).

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 151

145.   As the Chief Executive Officer, Defendant Flaskey is the head of DRI, and thus considered a "control person" of DRI.

146.   As the President and Chief Administrative Officer of DRI, Defendant Siegel is a "control person" of DRI.

147.   The Individual Defendants were both officers and controlling persons of Defendants charged with the legal responsibility of overseeing its operations.  Both controlling persons had the power to influence and exercised the same to cause Defendants to engage in the unlawful acts and conduct complained of herein.

148.   As the owner of DRI, Apollo was a control person of Defendants charged with the legal responsibility of overseeing its operations.   Both controlling persons had the power to influence and exercised the same to cause Defendants to engage in the unlawful acts and conduct complained of herein.

149.   By reason of such conduct, the Individual Defendants and Apollo are liable pursuant to Section 15(a) of the Securities Act.  As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of DRI "points."

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Fed. R. Civ. P. 23;

B.   Determining that the unlawful conduct alleged above is in violation of Sections 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act;

C.   Injunctive relief prohibiting Defendants from continuing to market and sell unregistered securities in violation of Sections 5(a), 5(c), 12(a)(1), and 15(a) of the Securities Act;

D.   Granting Plaintiffs and other Class members to right to rescind their purchases of points/memberships as set forth herein.

Law Offices
ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

-37-

E.      Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

F.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

G.      Such other relief as deemed appropriate by the Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff and the class hereby demand a trial by jury of all issues so triable.

DATED this _9th_ day of February, 2018.

ALBRIGHT, STODDARD, WARNICK
& ALBRIGHT

G. MARK ALBRIGHT (Nv #001394)
D. CHRIS ALBRIGHT, ESQ. (Nv #004904)
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada 89106
Tel:  (702) 384-7111
Fax: (702) 384-0605
gma@albrightstoddard.com
dca@albrightstoddard.com

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
LAWRENCE P. KOLKER
LYDIA KEANEY REYNOLDS
270 Madison Avenue
New York, NY 10016
Tel:  (212) 545-4600 / Fax: (212) 545-4653
Kolker@whafh.com
Reynolds@whafh.com
*Attorneys for Plaintiffs*

*Law Offices*
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

-38-

JAN. 25. 2018  1:39PM      SYR. FED. CREDIT UNION                          NO. 508    P.  2

## PLAINTIFFS' CERTIFICATION

Joseph Dropp and Mary Dropp ("Plaintiffs") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiffs have reviewed the accompanying Complaint and authorized the filing of the Complaint on Plaintiffs' behalf.

2.      Plaintiffs did not purchase the securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3.      Plaintiffs are willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiffs' transaction in **Diamond Resorts International, Inc.** securities during the Class Period specified in the Complaint are as follows:

| Date | Number of Points Purchased | Amount Paid for Points |
|---|---|---|
| August 4, 2016 | 8,500 | $25,000 |
| November 9, 2016 | 50,000 | $140,000 |

5.      During the three years prior to the date of this Certificate, Plaintiffs have not sought to serve or served as representative parties for a class in action filed under the federal securities law.

6.      Plaintiffs will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25

day of January, 2018.

_____
Joseph Dropp

_____
Mary Dropp

2

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 155

## PLAINTIFFS' CERTIFICATION

Susan Levine and Robert Levine ("Plaintiffs") declare under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiffs have reviewed the accompanying Complaint and authorized the filing of the Complaint on Plaintiffs' behalf.

2.     Plaintiffs did not purchase the securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in this private action.

3.     Plaintiffs are willing to serve as representative parties on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiffs' transaction in **Diamond Resorts International, Inc.** securities during the Class Period specified in the Complaint are as follows:

| Date | Number of Points Purchased | Amount Paid for Points |
|---|---|---|
| October 25, 2016 | 30,000 | $84,650 |
| May 11, 2017 | 25,000 | $71,250 |
| July 11, 2017 | 50,000 | $144,000 |

5.     During the three years prior to the date of this Certificate, Plaintiffs have not sought to serve or served as representative parties for a class action filed under the federal securities law.

6.     Plaintiffs will not accept any payment for serving as representative parties on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9 day of February, 2018.

_____
Susan Levine

_____
Robert Levine

## CERTIFICATION OF PLAINTIFF

KAARINA PAAKA ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the accompanying Complaint and authorized the filing of the Complaint on Plaintiff's behalf.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction in **Diamond Resorts International, Inc.** securities during the Class Period specified in the Complaint are as follows:

| Date | Number of Points Purchased | Amount Paid for Points |
|---|---|---|
| November 16, 2016 | 50,000 | $175,356 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in action filed under the federal securities law.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of February, 2018.

                                        /s/ Kaarina Pakka
                                        KAARINA PAKKA

Case 2:18-cv-00247-APG-GWF   Document 1-1   Filed 02/09/18   Page 1 of 1

JS 44 (Rev. 11/15)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
JOSEPH M. DROPP, MARY E. DROPP, ROBERT LEVIN, SUSAN LEVINE, and KAARINA PAKKA, Individually and on Behalf of All Others Similarly Situated,

**(b)** County of Residence of First Listed Plaintiff    Arizona
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
G. Mark Albright, Esq., NBN 1394; D. Chris Albright, Esq. NBN #4904
Albright Stoddard Warnick & Albright, 801 S. Rancho Drive, Suite D-4,
Las Vegas, Nevada  89106; Tel: (702) 384-7111

**DEFENDANTS**
Diamond Resorts International, Inc.; Diamond Resorts Holdings, LLC; Diamond Resorts Corporation; Diamond Resorts International Club, Inc., a/k/a The Club Operation Company; et al

County of Residence of First Listed Defendant    Nevada
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC §§ 77e(a), 77e(c), 77l(a)(1) & 77 o(a)
Brief description of cause:
Sale of unregistered securities

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions)*
JUDGE                                    DOCKET NUMBER

DATE   Feb 9, 2018                SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

EXHIBIT G TO NOTICE OF REMOVAL
PAGE 159

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 301 North Lake Avenue, Suite 1100, Pasadena, California 91101-4158.

On the date below, I served a copy of the foregoing document entitled:

**NOTICE OF REMOVAL BY DEFENDANTS PURSUANT TO**
**28 U.S.C. §§ 1441(b) & 1331 [FEDERAL QUESTION] AND, ALTERNATIVELY, § 1332**
**[DIVERSITY JURISDICTION]**

on the interested parties in said case as follows:

**Served By Means Other than Electronically**
**Via the Court's CM/ECF System**

*Attorneys for Plaintiffs:*

Stephen M. Dake, Esq.
DAKE, BRAUN, & MONJE, LLP
1626 19th Street, Suite 23
Bakersfield, CA 93301

Tel: (661) 322-0991
Fax: (661) 322-0650
Email: sdake@dbmllp.com

☒   **BY MAIL:** I am readily familiar with the firm's practice of collection and processing correspondence by mailing. Under that same practice it would be deposited with U.S. Postal Service on that same day with postage fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. This declaration is executed in Pasadena, California on December 27, 2019.

| Laurie Hlista | /s/ Laurie Hlista |
|---|---|
| (Type or Print Name) | (Signature of Declarant) |

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP